UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTHER BROWNLEE, JACKIE TATE, AND JOANIE FLEMING,<br><br>Plaintiffs,<br><br>v.<br><br>CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO,<br><br>Defendant. | Case No. 16-CV-00665<br><br>Judge Joan B. Gottschall |

## MEMORANDUM AND ORDER

The three plaintiffs, Esther Brownlee ("Brownlee"), Jackie Tate ("Tate"), and Joanie Fleming ("Fleming"), worked[1] as mobile outreach workers for the defendant, Catholic Charities of the Archdiocese of Chicago ("Catholic Charities"). (*See* Ans. & Aff. Defenses ¶¶ 20–22 [hereinafter "Ans."], ECF No. 16.) All three plaintiffs are female. (Ans. ¶¶ 17–19.) The first nine counts of the plaintiffs' first amended complaint[2] (ECF No. 8) (referred to for simplicity's sake as "the complaint") arise under Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e *et seq*. Each count concerns only one of the plaintiffs and a single Title VII theory: "sexual harassment" as to each plaintiff (Counts One, Two, and Three); "sex discrimination" as to each plaintiff (Counts Four, Five, and Six); retaliation as to Brownlee and Fleming (Counts Seven and Eight), and a "constructive discharge" count brought by Tate in Count Nine. In the complaint's final two counts (Ten and Eleven), Brownlee brings claims under Illinois law respectively for battery and intentional infliction of emotional distress

---

[1] The complaint does not make clear whether Fleming still works for Catholic Charities. (*See* 1st Am. Compl. ¶¶ 13–15 (alleging only that Catholic Charities employed each plaintiff "at all times pertinent herein").) Tate resigned on October 31, 2014, (Compl. ¶ 269), and Catholic Charities fired Brownlee on June 25, 2015 (Compl. ¶ 139).
[2] The plaintiffs amended their complaint as a matter of course before Catholic Charities answered it. *See* Fed. R. Civ. P. 15(a)(1).

1

("IIED"). Before the court is Catholic Charities' motion to dismiss six counts of the complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). For the following reasons, the court grants the motion in part and denies it in part.

## I. BACKGROUND

For purposes of deciding a Rule 12(b)(6) motion, the court assumes that all of the well-pleaded allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Manistee Apts., LLC v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016). In addition, the court notes the allegations Catholic Charities has admitted in its answer (ECF No. 16).

The plaintiffs' duties as mobile outreach workers included driving with a partner to deliver meals and services to people in the community. (Ans. ¶¶ 26, 28, 30.) Duane Washington "Washington"), a male mobile outreach worker during the relevant time periods, figures prominently in all three plaintiffs' claims.

### A. Brownlee

Brownlee and Washington drove as partners from approximately May 18–June 16, 2015. During that time, Washington sexually harassed her verbally and physically. (*See* Compl. ¶ 33–34.) For example, Washington told Brownlee more than once that she looked good (¶ 35), "I know Ray would like to fuck you" (¶ 38), and "[i]f I was your man, you wouldn't talk unless I told you to" (¶ 42). Washington also "rubbed Brownlee's shoulders and thighs on at least five occasions." (Compl. ¶ 44.) Brownlee pushed Washington's hand away each time and told him to stop. (Compl. ¶ 45.) She complained to her supervisor, Ray Lee ("Lee"), and said that she did not want to work with Washington anymore. (Compl. ¶¶ 46–47.) Lee responded "[W]e put you with him because you can handle him." (Compl. ¶ 48.) Catholic Charities did not investigate Washington's conduct or adequately discipline him. (Compl. ¶¶ 50–51.)

On June 16, 2015, Washington yelled and cursed at Brownlee while the two were delivering a meal. The client to whom they were delivering the meal refused to open the door for them as a result, and Lee ordered the pair to return to the office to discuss what happened. (*See* Compl. ¶¶ 123–25.) During the drive back to the office, Washington struck Brownlee on her arm with the back of his hand. (Compl. ¶¶ 126, 274.) He also threatened Brownlee, saying "I'll have someone meet you at 10 S. Kedzie and hurt you." (Compl. ¶ 127.)

The pair met with management when they arrived at the office. Washington admitted to striking Brownlee, and though Lee said at one point that he could not "have [the] two working together anymore," (Compl. ¶ 214) Renee Rouse ("Rouse"), another supervisor, later told Brownlee that she could not be reassigned despite Washington's conduct (Compl. ¶ 215). Brownlee was told to leave a meeting so that Lee and a third supervisor could speak with Washington alone. (*See* Compl. ¶¶ 216–17.) After the three met in private, Lee warned Brownlee that she would be written up if she missed four more days of work. (Compl. ¶ 217.)

Rouse assigned Brownlee and Washington to again work together on June 18, 2015. (Compl. ¶ 220.) That same day, Brownlee called Cynthia Guerrero to report that she was subjected to a hostile work environment. (Compl. ¶ 219.) Brownlee also told Lee that she was afraid to work with Washington after he struck her, and Lee assigned her to work with another employee. (Compl. ¶ 221.)

On June 23, 2015, Brownlee filed a police report regarding Washington's conduct and attempted to obtain a restraining order. (Compl. ¶ 223.) Two days later, Catholic Charities' Executive Director terminated Brownlee's employment "due to unprofessional behavior related to the June 16, 2015 incident." (Compl. ¶ 225.)

**B. Tate**

Washington made harassing comments similar to those he made to Brownlee to Tate on a daily basis between October 2012 and October 2014. (*See* Compl. ¶¶ 60–64.) He also made homophobic comments Tate overheard. (Compl. ¶ 65.) Tate reported Washington's conduct to three supervisors, including Lee, but Washington was not adequately disciplined. (Compl. ¶¶ 66–68.) Sometime in the fall or winter of 2013, Washington showed Tate a pornographic video, which she found offensive. (Compl. ¶¶ 69–70.) She immediately reported the incident to Lee, who responded "[Y]ou know how he is." (Compl. ¶ 72.)

Tate resigned on October 31, 2014. (Compl. ¶ 269.) She pleads that the ongoing harassment and discrimination caused her to resign. (*See* Compl. ¶¶ 268–69.)

**C. Fleming**

Washington began making harassing comments to Fleming and homophobic comments in her presence in September 2012 and continued until Fleming left Catholic Charities. (*See* Compl. ¶¶ 82–83, 88.) Fleming advised Washington of Catholic Charities' policy forbidding sexual harassment when his behavior persisted (Compl. ¶ 85), and she filed a grievance with Lee in November 2012 in which she stated that she was uncomfortable being alone with Washington (Compl. ¶ 86). "Lee did not conduct any meaningful investigation after receiving Fleming's complaint." (Compl. ¶ 87.)

Fleming also describes an incident in which a vendor commented "You must have a happy husband." (Compl. ¶ 89.) When Fleming told the vendor that she was a married lesbian, the vendor responded, "I wonder how she fucks you." (Compl. ¶ 90.) Fleming complained to Lee and another supervisor about this incident in November 2012, but she had to continue working with the vendor until May 2014. (Compl. ¶¶ 91–92.)

4

In May 2015, Fleming began working as an administrative assistant. (Compl. ¶ 239.) Fleming was relocated in September 2015 to "a desk located in an open area of the office space." (Compl. ¶ 241.) From her new location, Fleming could see Washington come and go from the office every day. (*Id.*) Because of the relocation Fleming "was placed in close proximity to Washington on a regular basis causing her to experience stress and anxiety at work." (Compl. ¶ 242.) Fleming also alleges that she "was intentionally excluded from attending a supervisor meeting where she planned on providing important information." (Compl. ¶ 243.) The program director admonished Fleming after the meeting, telling her that she "needed to be present during the meeting in order to effectively contribute her findings regarding a report she compiled." (Compl. ¶ 244.)

## II. RULE 12(b)(6) STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)); *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Twombly, supra*). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations

that merely recite the elements of a claim are not entitled to this presumption of truth. *Katz-Crank*, 843 F.3d at 646 (citing *Iqbal*, 556 U.S. at 662, 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

### III. TITLE VII SEX-DISCRIMINATION CLAIMS

"A complaint alleging sex discrimination under Title VII need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Cox v. Calumet Pub. Sch. Dist.*, 180 F. Supp. 3d 556, 561 (N.D. Ill. 2016) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)). Catholic Charities focuses its motion to dismiss several of the claims pleaded in the complaint on the adverse-employment-action element. It first argues that Tate and Fleming's claims of "sex discrimination" pleaded in Counts Five and Six should be dismissed because they allege no adverse employment action separate from the "sexual harassment" allegations of Counts Two and Three. Also, maintains Catholic Charities, Tate's constructive discharge claim fails because she does not allege working conditions so intolerable that a reasonable person would feel compelled to resign. Finally, Catholic Charities attacks Fleming's retaliation count.

**A. Tate and Fleming's "Sex Discrimination" Counts Are Redundant of Their Harassment and Constructive Discharge Counts**

Tate and Fleming's "sexual harassment" and "constructive discharge" Counts are ways to prove prohibited sex discrimination in violation of a single statutory provision, 42 U.S.C. 2000e-2(a); they are not distinct statutory claims. In 42 U.S.C. § 2000e-2(a)(1), Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a) (West

2017). The Supreme Court has construed § 2000e-2(a)(1) as allowing "a plaintiff [to] establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *see also id.* at 64–67 (quoting § 2000e-2(a)(1) and tying this holding to its language); *E.E.O.C. v. Mitsubishi Motor Mfg. of America, Inc.*, 990 F. Supp. 1059, 1071 (citing *Meritor* for the proposition that "[i]t is now well-established that 'sex discrimination' includes claims for sexual harassment, both for quid pro quo harassment and for hostile environment harassment."). As for constructive discharge, the Supreme Court has held that "a hostile work-environment-claim is a 'lesser included component' of the '*graver* claim of hostile-environment constructive discharge.'" *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004)). As this suggests, Title VII's constructive discharge doctrine also finds its textual footing in § 2000e-2(a)'s prohibition of "discrimination based on . . . sex." *See Suders*, 549 U.S. at 143 (quoting *Meritor's* construction of "[t]he phrase 'terms, conditions, or privileges of employment' [in § 2000e-2(a)(1)]" when holding that the constructive discharge theory is available in Title VII actions); *Chapin v. Fort–Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Suders* for the proposition that "[a] constructive discharge constitutes an adverse employment action").

Accordingly, Counts Five and Six wholly duplicate facts and legal theories pleaded in other counts of the complaint; they add nothing new. *See Sassaman v. Heart City Toyota*, 879 F. Supp. 901, 916 (N.D. Ind. 1994) ("the legal theories in [the plaintiff]'s claims for sexual harassment and sexual discrimination were the same"). In the complaint itself, Tate and Fleming rely on the same legal theories and facts for Counts Five and Six as their sexual harassment and constructive discharge counts, substituting "sex discrimination" for the more specific legal

7

theories of harassment and constructive discharge. Indeed, their response to Catholic Charities' motion to dismiss cites the factual and legal allegations in the complaint they argue show they experienced "sexual harassment" and arguing that the complaint, taken as a whole, gives Catholic Charities fair notice of their claims. (Pls' Resp. to Mot. to Dismiss 4–5, ECF No. 18.) Tate also points to her constructive discharge claim as an additional reason why her "sex discrimination claim" should not be dismissed. (*Id.* at 4–5.)

That Counts Five and Six are redundant does not mean that they should be dismissed under Rule 12(b)(6), however. If Tate and Fleming's harassment claims are properly pleaded (and Catholic Charities does not challenge those counts), Counts Five and Six are as well, for the Rule 12(b)(6) analysis requires the complaint to be "taken as a whole" when evaluating the probability that relief can be granted on each claim. *Atkins*, 631 F.3d at 832. Instead, truly redundant counts—those that duplicate a legal theory and add no new facts underpinning it—should be stricken rather than dismissed. *See* Fed. R. Civ. P. 12(f)(1) (allowing the court to "strike from a pleading . . . any redundant . . . matter . . . on its own" motion).

**B. The Complaint Gives Fair Notice of Tate's Constructive Discharge Claim**

Catholic Charities also contends that Tate has failed to state a discrimination claim based on constructive discharge in Count Nine. Constructive discharge "occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin*, 621 F.3d at 679 (citing *Suders*, 542 U.S. at 147) (other citations omitted). Catholic Charities maintains that Tate's allegations of Washington's harassing comments "sometime between 2012 and 2014" and the fact that he showed her a pornographic video in 2013 do not plausibly allege sufficiently unbearable

conditions. (Mem. Supp. Mot. to Dismiss 9, ECF No. 14.) Tate has to plead "clear factual allegations in the year before [her] resignation," according to Catholic Charities. (*Id.*)

No party cites the Seventh Circuit's opinion in *Carlson* holding that the plaintiff's complaint stated a constructive discharge claim. The complaint in *Carlson* included allegations that the plaintiff entered a manager training program, but "her superiors . . . made the training program intolerable by belittling her, assigning her extra work, and giving her unjustifiably poor evaluations, leaving her no viable choice but to drop out." *Carlson*, 758 F.3d at 822. The Carlson court concluded that the district court "applied the wrong standard" at the pleading stage by "repeatedly fault[ing] her for not providing 'evidence' in support of her claims . . . [and] rel[ying] on summary judgment decisions that addressed not the content of complaints but the evidence needed to take a claim to a jury." *Id.* at 827 (citations omitted). The *Carlson* court reasoned:

> Even if a claim might theoretically be too "conclusory"—a theory hard to square with *Swierkiewicz* and *Swanson*, at least where the situation is identified and unlawful motivation alleged—Carlson included specific examples of poor treatment. A work environment, it is true, must be "intolerable" to support a constructive discharge claim. *See Chapin v. Fort–Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The conditions Carlson described in her complaint may not ultimately qualify as intolerable, but we cannot say so definitively at the pleading stage, which (we stress again) is before any evidence is required.

*Id.* at 830.

Tate's constructive discharge allegations pass muster under this standard. Tate provides several "specific examples of poor treatment" based on her sex, *Carlson*, 758 F.3d at 830, including specific incidents of Washington's verbal harassment and the 2013 incident in which Washington showed her a pornographic movie. Thus, Tate alleges considerably more than a bare conclusion that Washington's conduct and management's responses to her complaints about

9

it made conditions so intolerable that she had no choice but to resign. *See id.*; *Tamayo v. Blagojevich*, 526 F.3d at 1079, 1085 (holding allegations that plaintiff "was given routine work assignments, banned from important . . . meetings, prohibited from working on any licensing matters and prohibited from attending staff meetings" stated Title VII discrimination claim); *Contrast Gilhooly v. UBS Securities, LLC*, 772 F. Supp. 2d 914, 917–18 (holding that threadbare allegation that employer's "constant criticism and harassment about her work left her with little choice but to resign" did not state a claim for constructive discharge).

Tate also alleges that the harassment she experienced occurred on a daily basis and persisted until the day she quit. Catholic Charities would have the court infer that the harassment stopped after the last incident associated with a date in Tate's complaint: Washington showing her a pornographic movie in 2013. Tate specifically alleges that "beginning in October 2012 and continuing through October 2014, Washington made sexual and homophobic comments to and around Tate." (Compl. ¶ 254.) Tate consistently characterizes Washington's harassment as "severe," "persistent," "ongoing," and "continuous." (*See* Compl. ¶¶ 264–68.) Because Tate describes specific incidents of Washington's harassment, these allegations are not too conclusory, and they must be accepted as true at the Rule 12(b)(6) stage. *See Carlson*, 758 F.3d at 827. Thus, as pleaded in the complaint, this is not a case of a single incident that would not rise to the level of a hostile work environment. *See Anzaldua v. Chi. Transit Auth.*, No. 02 C 2902, 2002 WL 31557622, at *3 (N.D. Ill. Nov. 15, 2002) (holding decision to transfer employee did not support constructive discharge claim where it did not support a hostile work environment harassment claim). Notably, Catholic Charities does not move to dismiss Tate's harassment count, which is based on the same factual allegations about Washington. In effect, Catholic Charities wants Tate to plead additional evidence supporting her constructive discharge claim

between 2013 and 2014, but Tate does not have to do that at the pleading stage. Catholic Charities' focus on what it deems potential evidentiary deficiencies in Tate's case shows that the complaint "provide[s] the defendant[ ] with sufficient notice to begin to investigate and defend against her claim," which is all that it is required to do. *Tamayo*, 526 F.3d at 1085; *see Carlson*, 758 F.3d at 830 ("The conditions Carlson described in her complaint may not ultimately qualify as intolerable, but we cannot say so definitively at the pleading stage, which (we stress again) is before any evidence is required.").

The cases on which Catholic Charities relies do not compel a different conclusion. In *Barnard v. City of Chicago Heights*, No. 91 C 3626, 1992 WL 309567, at *6–7 (N.D. Ill. Oct. 22, 1992), a Title VII constructive discharge claim was dismissed where the complaint did not describe any incidents of harassment in the five months before the plaintiff resigned. As just explained, Tate's complaint includes allegations of persistent and continuous harassment. Further, *Barnard* predates *Carlson*, *Taymayo*, and the Supreme Court's decision rejecting heightened pleading standards in Title VII cases in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002). *See Carlson*, 828 F.3d at 827 (collecting cases holding that *Swierkiewicz* survived *Twombly* and *Iqbal*). The balance of Catholic Charities' cases concern what evidence must be produced at summary judgment or trial on a constructive discharge claim. *See Chapin*, 621 F.3d at 674, 679 (holding district court should have entered judgment as a matter of law for defendant at trial); *E.E.O.C. v. Univ. of Chi. Hosp.*, 276 F.3d 326, 328, 332 (7th Cir. 2002) (reversing summary-judgment decision); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886–87 (7th Cir. 1998) (same). The question here is not whether Tate's constructive discharge claim should go to a jury; it is whether her complaint states a claim upon which relief can be granted. *See Carlson*, 758 F.3d at 828 (castigating district court because it "relied on summary judgment

11

decisions that addressed not the content of complaints but the evidence needed to take a claim to a jury").

**C. The Complaint Leaves the Thirty-Month Delay Between Fleming's Grievance and the Alleged Retaliatory Conduct Unexplained**

"Title VII also prohibits discriminating against an employee 'because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Volling v. Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 382 (quoting 42 U.S.C. § 2000e–3(a)) (alteration in original). "To state a claim for retaliation under Title VII, a plaintiff must allege that he engaged in protected activity, and, as a result, was subjected to an adverse employment action." *Lugo v. IBEW Local #134*, 175 F. Supp. 3d 1026, 1037 (citing *Carlson*, 758 F.3d at 828); *see also, e.g.*, *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied*, 2017 WL 77803 (Feb. 21, 2017) (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)) (holding employee must establish that "he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two" at summary judgment). Catholic Charities argues both that Fleming fails to allege a plausible causal link given the amount of time between her complaint and the retaliatory conduct and that the retaliatory acts Fleming pleads—moving her desk to an open area where she saw Washington daily and denying her access to a meeting and then reprimanding her for not being present at it—"are too trivial" to be retaliatory adverse employment actions. (Mem. Supp. Mot. to Dismiss 6.) Because the court agrees that no causal link has been alleged, it need not reach the question of whether Fleming adequately alleges an adverse employment action.

According to the complaint, Fleming filed a grievance with Lee about Washington's harassment "in approximately November 2012." (Compl. ¶ 237.) Lee did not investigate. (Compl. ¶ 238.) The complaint then jumps ahead approximately thirty months to May 2015 when Fleming started to work as an administrative assistant and got her own office. (*See* Compl. ¶¶ 239-40.) The first allegedly retaliatory act occurred four months (now thirty-four months after the complaint) later when Fleming was relocated to a desk in an open area of the office near Washington's office. (*See* Compl. ¶¶ 241–42.) The complaint does not specify when the second act–excluding Fleming from a meeting—occurred, but due to the nature of the contribution Fleming alleges she would have made, she must have worked as an administrative assistant at the time. (*See* Compl. ¶ 243 (alleging that Fleming intended to present "important information concerning a shelter bed report to representatives from the City of Chicago").) Additionally, Rouse, not Lee, supervised Fleming when the retaliation occurred. (*See* Compl. ¶ 243.)

Because the complaint does not explain the delay of at least thirty months between Fleming's grievance to Lee and the allegedly retaliatory conduct, it does not state a plausible claim of a causal connection based on temporal proximity. Even at the pleading stage, "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible." *Carlson*, 758 F.3d at 828 (citing *Carmody v. Bd. of Trs. of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014)). In her response to Catholic Charities' motion to dismiss, Fleming points to paragraph 247 of the complaint (and nothing else) to show that she has adequately alleged a causal connection. (ECF No. 18 at 7.) But that paragraph pleads the legal element in wholly conclusory fashion–"the proximity in time between my protected activity and the adverse employment actions . . . experienced through Defendant's conduct raises an inference of

13

retaliatory intent." (Compl. ¶ 247.) The complaint gives no indication that ongoing retaliation was occurring. *See Carlson*, 758 F.3d at 829 (holding plaintiff adequately alleged causal connection where the complaint "described an ongoing campaign of retaliation, and her claims must be viewed through that lens"); *see also Lugo*, 175 F. Supp. 3d at 1037 (analyzing retaliation claim "based on a single incident"). Instead, the complaint, even viewed in the light most favorable to Fleming, includes no facts explaining the delay of at least thirty months between Fleming's grievance and the allegedly retaliatory conduct. Consequently, the complaint's well-pleaded facts do not plausibly give rise to the inference of a causal connection between the grievance and the allegedly retaliatory conduct. *See Carmody*, 747 F.3d at 480 (affirming dismissal under Rule 12(b)(6) of retaliation claim based on unexplained three-year delay between protected activity and allegedly retaliatory termination because the plaintiff provided "no potential explanation for the long delay"); *see also O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (stating, on review of summary judgment ruling, that two-month delay between protected activity and adverse action was "not strongly suggestive of retaliation"); *Martinez v. Nw. Univ.*, 173 F. Supp. 3d 777, 788 (N.D. Ill. 2016) (holding at summary judgment that unexplained two-year delay between protected activity and retaliation did not create genuine fact issue for trial).

**IV. Brownlee's Battery And IIED Claims**

Catholic Charities offers a host of reasons why it believes that Brownlee's battery and IIED claims should be dismissed. Two suffice.

First, as to Brownlee's battery claim, Catholic Charities asserts that it cannot be held responsible for Washington slapping her on the arm under the respondeat superior doctrine. For Catholic Charities to be held vicariously liable for Washington's battery, which is an intentional

tort, he must have been acting in the course and scope of his employment. *See, e.g., Doe v. Sperlik*, No. 05 C 1277, 2005 WL 3299818, at *3 (N.D. Ill. Nov. 30, 2005) (citing *Bates v. Doria*, 502 N.E.2d 454, 457 (Ill. App. Ct. 1986)) ("*Respondeat superior* liability hinges upon a finding that the employee acted in furtherance of his employer's interest when committing the acts complained of."). Catholic Charities correctly observes that the complaint's respondeat superior claim on this score recites the legal doctrine in threadbare fashion. (*See* Compl. ¶ 271 ("while acting within the scope of his employment with Defendant, Dwayne Washington ("Washington"), Mobile Outreach Worker, subjected Brownlee to a battery").) In her response to the instant motion, Brownlee does not address Catholic Charities' respondeat superior argument. (*See* ECF No. 18 at 8–13.) As Washington's motives for slapping Brownlee were apparently personal, the court dismisses Brownlee's battery claim. *See Doe*, 2005 WL 3299818, at *3 ("When the motive for an employee's intentional tort is personal . . . it is necessarily unrelated to his employer's objectives." (citing *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 635 (7th Cir. 2005))).

Catholic Charities also argues that the Illinois Human Rights Act ("IHRA") preempts Brownlee's battery and IIED claims. As presently pleaded and described in her response, she seeks to impose liability upon Catholic Charities for its supervision and continued retention of Washington in her IIED claim. The IHRA therefore preempts Brownlee's IIED claim as presently pleaded.

The IHRA provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS § 5/8–111(D). Whether the IHRA preempts a claim depends on the source of the duty allegedly breached: "if the conduct would be actionable even aside from its

15

character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (quoting *Krocka v. City of Chi.,* 203 F.3d 507, 516-17 (7th Cir. 2000) (alteration omitted); *accord. Blount v. Stroud*, 904 N.E.2d 1, 8 (Ill. 2009) (quoting *Geise v. Phoenix Co. of Chi.*, 639 N.E.2d 1273, 1276 (Ill. 1994)). To determine whether the IHRA preempts a tort claim, the court asks "whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). The common law independently creates the duty to refrain from intentionally engaging in the extreme and outrageous behavior that constitutes the IIED tort regardless of whether the conduct also happens to constitute sexual harassment under the IHRA. *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 940 (holding sexual harassment claim of IIED not preempted, collecting authority, and stating that "the duty not to commit the intentional tort of intentional infliction of emotional distress exists on its own."); *see Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) (recognizing possibility that IIED claim could be premised on harm caused by coworker's racial slurs "regardless of his [discriminatory] motivation"). Likewise, the common law of battery independently imposes a duty to refrain from intentional, offensive touching. *See Zuidema*, 866 F. Supp. 2d at 940 (citing *Maksimovic*, 687 N.E.2d at 23) (other citations omitted) (holding IHRA did not preempt battery claim that coworker engaged in unwanted sexual touching of the plaintiff).

Here, however, Brownlee alleges that: (1) Washington committed IIED and battery by harassing Brownlee; and (2) Catholic Charities is liable for failing to supervise Washington or for retaining him. Brownlee predicates her IIED count on Washington's "subject[ing] [her] to

16

sexual harassment and battery during her employment." (Compl. ¶ 278.) She attributes her damages, such as fright, emotional distress, and physical illness, to "Washington's conduct." (Compl. ¶ 282 (alleging damaged experience "[a]s a result of Washington's conduct").) Washington is not named as a defendant, however, as in the principal case on which Brownlee relies; the analysis would be different if he were. *See Benitez v. Am. Standard Circuits, Inc.*, 678 F. Supp. 2d 745, 768 (N.D. Ill. 2010) (holding IIED and battery claims against employee who harassed plaintiff were not preempted). Brownlee pleads that Catholic Charities "could have prevented the aforementioned extreme and outrageous conduct Washington imposed upon Brownlee by taking reasonable care in supervising or disciplining Washington." (Compl. ¶ 283.) In her response to the instant motion, Brownlee essentially frames her theory of Catholic Charities' liability in terms of negligent supervision and retention. (*See* ECF No. 18 at 11 (describing Washington's conduct and stating that Brownlee "further alleged that the Defendant failed to provide reasonable care in the retention or supervision of its employee, Washington, that resulted in Plaintiff being subjected to . . . battery" and IIED).) Catholic Charities' duty to supervise Washington so as to prevent sexual harassment exists, from an Illinois law perspective, because the IHRA prohibits sexual harassment, so Brownlee's IIED claim is inextricably intertwined with that prohibition because the IHRA, unlike Title VII, imposes strict liability on employers for workplace harassment, making claims based solely on the employer's retention and supervision of a harasser based on the same conduct redundant of the IHRA remedy. *See Geise*, 639 N.E.2d at 1277–78 (holding IHRA preempted negligent hiring and negligent supervision claims against employer and explaining that unlike Title VII liability for sexually harassment, the IHRA "imposes strict liability on the employer, regardless of whether the employer knew of the offending conduct" (citation omitted)); *Carwyle v. Anna Hosp. Corp.*, 102

F. Supp. 3d 1024, 1027 (S.D. Ill. 2015) (holding IHRA harassment and retaliation claims preempted IIED claims based on same alleged conduct by coworker); *Hernandez v. Partners Warehouse Supplier Servs., LLC*, 890 F. Supp. 2d 951, 963 (N.D. Ill. 2012) (holding IHRA preempted IIED claim against employer for "fail[ing] to take appropriate measures to rectify [a coworker]'s . . . sexual harassment, sexual assault and battery").

**V. CONCLUSION**

Based on the foregoing analysis, Catholic Charities' motion to dismiss (ECF No. 13) is granted in part and denied in part. Pursuant to Rule 12(f), Counts Six and Seven of the plaintiffs' amended complaint (ECF No. 8) are stricken as redundant. Counts Nine, Ten, and Eleven are also dismissed. The court grants the plaintiffs leave to amend their complaint to replead those counts, if they wish, by 03/21/17. *See* Fed. R. Civ. P. 15(a)(2). As discovery remains ongoing, the parties should advise if they believe a status conference before the current setting of 6/2/17 is needed.

The stricken counts are not the only redundancies in the complaint. Any amended complaint should strive to eliminate repetition of factual allegations. *See* Fed. R. Civ. p. 8(a)(2).


Date:   February 28, 2017                                      /s/
                                                      Joan B. Gottschall
                                                      United States District Judge

18