# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ESTHER BROWNLEE, JACKIE TATE, | ) | |
| AND JOANIE FLEMING, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 16-CV-00665 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CATHOLIC CHARITIES OF THE | ) | |
| ARCHDIOCESE OF CHICAGO and | ) | |
| DUANE WASHINGTON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Catholic Charities of the City of Chicago ("Catholic Charities") and Duane

Washington ("Washington") separately move to dismiss certain counts of the Second Amended

Complaint ("SAC"), ECF No. 37, filed by three former Catholic Charities mobile outreach

workers—Esther Brownlee ("Brownlee"), Jackie Tate ("Tate"), and Joanie Fleming

("Fleming")—for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).  In their First Amended

Complaint ("FAC"), Brownlee brought claims under Illinois law for battery and intentional

infliction of emotional distress ("IIED").  All three plaintiffs pleaded claims under Title VII of

the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e *et seq*.  The Title VII

counts separately alleged each plaintiff's claims of "sexual harassment," "sex discrimination,"

retaliation (Brownlee and Fleming only), and a "constructive discharge" theory advanced by

Tate.  Catholic Charities moved to dismiss the FAC for failure to state a claim.  On February 28,

2017, the court granted that motion in part and granted plaintiffs leave amend their complaint.

*Brownlee v. Catholic Charities of the City of Chi.* ["*Brownlee I*"], No. 16-CV-00665, 2017 WL

770997, Slip Op. at 18, ECF No. 33 (N.D. Ill. Feb. 28, 2017) (also striking two counts as

redundant). Plaintiffs timely filed their SAC, adding Washington, another former Catholic Charities employee who figured prominently in the FAC's allegations, as a defendant. In Count Ten, Brownlee pleaded for the first time a claim against Washington and Catholic Charities under the Illinois Gender Violence Act (sometimes "IGVA"), 740 Ill. Comp. Stat. 82/1 *et seq.* (West 2018).

In its pending motion, Catholic Charities contends that the IGVA does not apply to corporations and that the SAC fails to cure the defects identified by the court when it partially dismissed the FAC. Adopting Catholic Charities' arguments and adding a couple of his own, Washington maintains that his conduct, as alleged in the SAC, is not extreme and outrageous enough to state a claim for IIED under Illinois law. *See, e.g.*, *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (listing elements of IIED claim under Illinois law, including that "the defendant's conduct was truly extreme and outrageous" (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003))).

## I. RULE 12(b)(6) STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Twombly*, *supra*). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-

matter of the case to present a story that holds together."). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Katz-Crank*, 843 F.3d at 646 (citing *Iqbal*, 556 U.S. at 662, 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## II. FACTS

As just explained, the court assumes that the well-pleaded allegations in the SAC are true and views them in the light most favorable to plaintiffs. *See Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016); *Katz-Crank*, 843 F.3d at 646 (citation omitted). For the most part, plaintiffs' allegations have not changed. The court therefore assumes familiarity with the discussion of the alleged facts in *Brownlee I*. *See Brownlee I*, Slip Op. at 2–5.

In brief, the plaintiffs, all of whom are women, worked as mobile outreach workers for most of the period described in the SAC. SAC ¶¶ 9–11, 18–20, 108 (noting that Fleming worked as an administrative assistant beginning in May 2015). Mobile outreach workers deliver meals and services to people in the community. *E.g.*, SAC ¶ 24. Catholic Charities required the plaintiffs to drive with a partner when delivering food; Brownlee and Tate were partnered with Washington at various times between 2012 and 2015. *See* SAC ¶¶ 25, 27.

Like the FAC, the SAC details a number of offensive and sexually explicit comments Washington made and actions he took. Tate was Washington's partner from around October 2012 through October 2014. During their partnership, Washington showed Tate a pornographic

video she found offensive, referred to Tate as a prostitute and himself as a pimp, and told Tate, "I like the way your ass is shaped." SAC ¶¶ 73, 74, 80–81.

Washington made similar comments to Fleming. He remarked in explicit terms on how her jeans fit, touched her arm and leg in one incident, and made homophobic statements she found offensive on a daily basis beginning in October 2012. SAC ¶¶ 86, 93–94, 100. Fleming filed a grievance with her supervisor, Ray Lee ("Lee"), in November 2012, but other than an apology from Washington, Lee did not conduct a meaningful investigation. *See* SAC ¶¶ 89–92. Washington's behavior did not stop. SAC ¶ 93. Rather, Washington, believing that Fleming was a lesbian, began regularly calling her "little gay girl" in conversations with coworkers. SAC ¶¶ 103–04. In allegations not present in the FAC, Fleming pleads that Washington retaliated against her by escalating his harassment and offensive comments beginning within days after she filed a grievance against him in November 2012. *See* SAC ¶¶ 201–03.

Catholic Charities assigned Brownlee to be partners with Washington from May 18–June 16, 2015. SAC ¶ 29. Washington made sexually offensive and aggressive comments to Brownlee during this period, e.g., "You know Ray want to fuck you." *See* SAC ¶¶ 29–38. Washington also rubbed Brownlee's shoulders and thighs on at least five occasions; she always pushed his hand away and told him to stop. SAC ¶¶ 39–40. Brownlee complained about Washington's behavior and comments "sometime between May 18, 2015, and June 16, 2015," but she was not reassigned. SAC ¶¶ 43–47. Things came to a head on or about June 16, 2015, when a client refused to open the door for Brownlee and Washington because Washington was yelling and cursing at Brownlee. SAC ¶ 48. Brownlee called Lee who ordered the pair to return to the office. SAC ¶¶ 49–50. Washington hit Brownlee on the arm with the back of his hand

while the two were driving to the office.  SAC ¶ 51; *see also id.* ¶ 55 (alleging Washington threatened to have someone meet Brownlee at 10 S. Kedzie and hurt her).

### III. FLEMING'S TITLE VII RETALIATION CLAIM

Among other things, "Title VII . . . prohibits discriminating against an employee 'because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"  *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382 (quoting 42 U.S.C. § 2000e–3(a)) (alteration in original).  "To state a claim for retaliation under Title VII, a plaintiff must allege that he engaged in protected activity, and, as a result, was subjected to an adverse employment action." *Lugo v. IBEW Local #134*, 175 F. Supp. 3d 1026, 1037 (N.D. Ill. 2016) (citing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014)); *see also, e.g.*, *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1115 (2017) (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)) (discussing standard at summary judgment).  On a Title VII retaliation claim, a materially adverse employment action means one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

The court dismissed Fleming's retaliation claim pleaded in the FAC on causation grounds.  *See Brownlee I*, Slip Op. at 12–14.  Fleming complained about Washington in November 2012, according to the FAC, and the first adverse employment action she pleaded occurred about thirty months later in May 2015.  *Id.* at 13.  The court ruled that "[b]ecause the [FAC did] not explain the delay of at least thirty months between Fleming's grievance to Lee and the allegedly retaliatory conduct, it [did] not state a plausible claim of a causal connection based

on temporal proximity." *Id.* The FAC, observed the court, gave no indication "that ongoing retaliation was occurring." *Id.* at 14 (citing *Carlson*, 758 F.3d at 829) (other citation omitted).

The same cannot be said of the SAC. Fleming alleges that Washington's harassing words and actions escalated beginning "within days" after she went to management with a grievance against him in November 2012 and that his escalated and continuing harassment and continuing conduct interfered with her ability to do her job. *See* SAC ¶¶ 201–04. Catholic Charities raises no causation challenge to those allegations. Rather, it says that Fleming's retaliation claim now fails for a different reason: she did not administratively exhaust her claim by filing a timely charge with the Equal Employment Opportunity Commission ("EEOC").

In Illinois, a charge must be filed with the EEOC within "three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e) (West 2018). "If a plaintiff fails to file a timely charge concerning a discrete act of discriminatory conduct, his claim is time-barred." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (citing *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007)) (affirming dismissal of time-barred claim on Rule 12(b)(6) motion). The EEOC charge requirement serves two main purposes: it "gives the EEOC and the employer a chance to settle the dispute, and it gives the employer notice of the employee's grievances." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). If, Catholic Charities reasons, Washington's retaliatory harassment escalated to the level of an adverse employment action days after Fleming's November 2012 grievance, *see* SAC ¶¶ 201–02, then she had 300 days from November 2012 to complaint to the EEOC, and because she did not, her retaliation claim is untimely.

Fleming responds that she has alleged a continuing violation. Resp. to Mot. to Dismiss 3, ECF No. 50. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992); *see also Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (discussing doctrine when applied to claims under another statute). The misnamed doctrine turns on the distinction between discrete, separately actionable employment practices on the one hand and a situation in which "the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment" on the other. *Selan*, 969 F.2d at 566 (quotation omitted); *see also Limestone Dev. Corp.*, 520 F.3d at 801 (explaining that "[t]he office of the misnamed [continuing violation] doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought. It is thus a doctrine not about a continuing, but about a cumulative, violation" (internal citations omitted)).

The Supreme Court ruled on the extent to which the continuing violation doctrine applies to Title VII claims in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *Morgan*, the Court distinguished discrimination claims based on discrete, adverse actions from claims that the plaintiff was subjected to a discriminatorily hostile work environment. *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (discussing *Morgan* and subsequent Supreme Court and statutory authority). The first category of discrete acts—things like firing someone, refusing to hire her, not promoting her, or denying her a transfer, *Morgan*, 536 U.S. at 114,—"are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Adams*, 742 F.3d at 730 (quoting *Morgan*, 536 U.S. at 113). But as explained in *Morgan*, hostile environment claims by "[t]heir very nature involve[ ] repeated conduct," so, the

Court held, "a hostile-work-environment charge is timely as long as 'any act falls within the statutory time period,' even if the charge encompasses events occurring prior to the statutory time." *Adams*, 742 F.3d at 730 (quoting *Morgan*, 536 U.S. at 115, 120) (emphasis omitted). In Count Three of the SAC, Fleming separately pleads a hostile work environment claim based on statements and actions from September 2012 through the end of her tenure. *See* SAC ¶¶ 161–77. Catholic Charities does not argue that Count Three fails to state a claim or is time barred, and Fleming premises her retaliation claim on largely the same conduct, adding the detail that Washington's harassment escalated within days after he learned of Fleming's grievance, *see* SAC ¶¶ 197–204.

As this similarity suggests, Fleming has pleaded a retaliatory hostile work environment claim in the SAC rather than the retaliation claim based on discrete acts she alleged in the FAC. The Seventh Circuit confirmed last year that, although less common than other Title VII theories, it recognizes a Title VII retaliation claim based on a hostile work environment theory. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Knox v. Indiana*, 93 F.3d 1327, 1334–35 (7th Cir. 1996)) (other citations omitted); *see also Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001); *contra Threatt v. Jackson*, No. 06 C 3944, 2008 WL 1774986, at *10 (N.D. Ill. Apr. 16, 2008) (citing *Hobbs v. City of Chicago*, No. 06 C 3795, 2007 WL 1810511, at *9–10 (N.D. Ill. June 21, 2007)) (holding "that harassment allegation based on prior EEOC activity was not a separate cause of action"). On a first reading, Fleming's response seems to frame her retaliation claim in terms of a series of discrete acts. *See* ECF No. 50 at 4–5. Her citation to *Knox*, *id.* at 5, reveals that she is pursuing a theory of retaliatory hostile work environment. *See Boss*, 816 F.3d 910, 920 (tracing theory to *Knox*).

The SAC adequately pleads a retaliatory hostile work environment claim. Fleming's retaliation and hostile environment claims overlap factually, but the overlapping facts can support both claims. *Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir. 2012); *see also Cooper v. Lew*, No. 13 C 2643, 2015 WL 7568382, at *6 (N.D. Ill. Nov. 24, 2015) (holding retaliatory hostile work environment claim failed at summary judgment because factually overlapping hostile work environment claim failed). Fleming alleges at least one act of harassment that occurred within the 300-day window, escalation of the harassing behavior soon enough after her grievance to permit an inference that the grievance caused the escalation, and, when the SAC is viewed favorably to Fleming, a persistently escalated level of harassment going forward. *See* SAC ¶¶ 197–204; *cf. Sinkhorn v. LaHood*, No. 08 C 1431, 2010 WL 1031970, at *8 (N.D. Ill. Mar. 17, 2010) (granting defendant summary judgment because plaintiff produced no evidence that his coworkers' behaviors, many of which began before he filed a discrimination complaint, were causally connected to his complaint).

Catholic Charities says that Fleming did not plead that she complained to it of the escalated harassment. Reply 3–4, ECF No. 51. In addition to the November 2012 complaint to Lee, the SAC describes a complaint to another Catholic Charities supervisor named Samira Robinson ("Robinson") about Washington's comments. SAC ¶ 148 (also stating that Robinson overheard comments). The SAC does not say when that incident occurred, and although that allegation comes before the paragraphs of the SAC describing the November 2012 incident, Fleming gets the benefit of the favorable inference that the complaint to Robinson came after the November 2012 incident. *See id.* Title VII's anti-retaliation provision sweeps broadly enough to prevent an employer from "retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII." *Knox*, 93 F.3d at 1334. With favorable

inferences, that is what Fleming alleges, so her allegations state a retaliatory hostile work environment claim encompassing the time-barred conduct dating to the escalated harassment beginning in or around November 2012. *See id.* at 1334–35 (upholding jury verdict on retaliation claim based on evidence that management sat on its hands after learning of a campaign of retaliatory coworker harassment); *Whittaker v. N. Ill. Univ.*, No. 02 C 50503, 2003 WL 21403520, at *1 (N.D. Ill. June 16, 2003) (holding complaint stated retaliatory hostile work environment claim and rejecting claim that certain acts were time-barred because "court may consider all of the events and incidents contributing to the hostile work environment, both before and after the 300th day, so long as one of the events took place within the statutory filing period" (citing *Morgan*, 536 U.S. at 117–18)); *Kruger v. Principi*, 420 F. Supp. 2d 896, 907, 908 (N.D. Ill. 2006) (holding plaintiff exhausted her retaliatory hostile work environment claim by making a timely administrative complaint "of any incident that she alleges helped create a hostile working environment").

## IV. BROWNLEE'S BATTERY, IIED, AND GENDER VIOLENCE ACT CLAIMS

The remainder of the pending motions to dismiss concern Brownlee's claims for battery, for IIED, and under Illinois' Gender Violence Act, 740 Ill. Comp. Stat. 82/1 *et seq.* (West 2018). In *Brownlee I*, this court dismissed Brownlee's battery and IIED claims, which were then pleaded against Catholic Charities alone, for two reasons. First, the FAC did not adequately plead the predicates for holding Catholic Charities vicariously liable for Washington's alleged battery under the doctrine of respondeat superior. *Brownlee I*, Slip Op. at 14–15. Second, the Illinois Human Rights Act ("IHRA") preempted Brownlee's battery and IIED claims as they were pleaded in the FAC. *Id.* at 16–18; *see also* 775 Ill. Comp. Stat. 5/8–111(D) (West 2018).

Catholic Charities argues that the SAC cures neither defect. Catholic Charities also argues, as it did the last time around, that the Illinois Workers' Compensation Act ("IWCA") is Brownlee's exclusive remedy for her battery claim. *See* 820 Ill. Comp. Stat. 305/5(a) (West 2018). As for Brownlee's claim under the Illinois Gender Violence Act, Catholic Charities contends that it is not a "person" under that statute. Finally, Washington joins Catholic Charities in arguing that the SAC fails to state an IIED claim against him because it alleges no conduct Illinois law recognizes as extreme and outrageous. The court examines the issues in turn.

## A. Brownlee States a Claim that Catholic Charities Ratified Washington's Intentional Torts

As the court explained in *Brownlee I*, if Catholic Charities is to be held liable for Washington's conduct under the doctrine of respondeat superior, he must have been acting in the course and scope of his employment. *See, e.g.*, *Doe v. Sperlik*, No. 05 C 1277, 2005 WL 3299818, at *3 (N.D. Ill. Nov. 30, 2005) (citing *Bates v. Doria*, 502 N.E.2d 454, 457 (Ill. App. Ct. 1986)) ("*Respondeat superior* liability hinges upon a finding that the employee acted in furtherance of his employer's interest when committing the acts complained of."). The court dismissed the FAC's respondeat superior allegations because they were threadbare and because Brownlee did not address Catholic Charities' respondeat superior arguments in her response to the motion to dismiss the FAC. *Brownlee I*, Slip Op. at 15.

In her response to the instant motion, Brownlee first posits, without citing authority, that Catholic Charities can be held liable for Washington's acts because he would not have had the opportunity to do them but for Catholic Charities continuing to employ him after receiving complaints about his conduct. ECF No. 50 at 6. Accepting this position would effectively eliminate the rule that an employer is not liable for employee's acts exceeding the scope of employment because the continuing employment relationship can often, if not always, be said to

be the but-for cause of an employee who starts the workday doing the employer's business and later goes on what the law calls a frolic, i.e., pursuit of personal objectives so far removed from the job that they land outside the scope of employment. *See generally Pyne v. Witmer*, 543 N.E.2d 1304, 1309 (Ill. 1989) (discussing the rules governing when an employee's actions fall outside the scope of employment and stating that "when a deviation is exceedingly marked and unusual, as a matter of law the employee may be found to be outside the scope of employment" (citations omitted)). Brownlee does not elaborate further on the branch of her respondeat superior theory, *see* Resp. to Mot. to Dismiss 6, and the court cannot develop the theory for her. The court therefore expresses no ultimate opinion on whether Washington's battery, as alleged, falls within the scope of his employment. *Compare Stern v. Ritz Carlton Chi.*, 702 N.E.2d 194, 197–98 (Ill. App. Ct. 1998) (holding that an intentional sexual assault was not within the scope of hotel's employment of massage therapists), *with Pyne*, 543 N.E.2d at 1310–11 (discussing evidence sufficient to send question of whether employee intended was returning from a possible frolic or otherwise in the scope of employment).

Brownlee has, however, developed and adequately pleaded her theory that Catholic Charities ratified Washington's intentional torts. The Illinois Supreme Court has said that "[i]t is well-established that an informed ratification is equivalent to an original authorization." *Knuepfer v. Fawell*, 449 N.E.2d 1312, 1314 (Ill. 1983) (collecting cases, the oldest of which is *Bragg v. Fessenden*, 11 Ill. 544 (1850)). Because authorization can be inferred from conduct, a specific application of the general rule in employment cases has been formulated: "[M]anagement's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct." *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 938 (N.D. Ill. 2011) (quoting *Thomas v. Habitat Co.*, 213 F. Supp. 2d 887, 892–93 (N.D. Ill.

2002)) (other citations omitted); *but see Neville v. Chi. & Alton R.R. Co.*, 210 Ill. App. 168

(1918) (holding that retaining night watchman after he attacked someone, without evidence of

knowledge or acquiescence by employer, did not prove ratification).  With favorable inferences,

Brownlee pleads management's knowledge; after she complained to multiple management

personnel about Washington's verbal and physical harassment, Catholic Charities' management

did nothing meaningful to address the problem.  *See* SAC ¶¶ 43–47, 58–65.  Defendants read the

SAC narrowly as alleging that Brownlee first complained of Washington's behavior on the last

day she worked with him, June 16, 2015.  *See* Reply 6–7, ECF No. 51.  The SAC describes a

complaint to Lee "sometime between May 18, 2015 and June 16, 2015" which Lee rebuffed.

SAC ¶¶ 41–44.  Read only modestly favorably to Brownlee, the SAC describes a separate call to

Lee on June 16, 2015, one to which Lee responded differently by saying that he couldn't have

Brownlee and Washington working together anymore (though he was overridden).  *See* SAC ¶¶

49, 60, 61.  That is more than enough to state a claim of ratification; Catholic Charities' disputes

about the timeline and knowledge can be sorted out at the summary judgment and, if necessary,

trial stage.  *See Zuidema*, 866 F. Supp. 2d at 938 (holding that allegations that employee

complained of unwanted sexual touching by another employee yet management did nothing

stated claim because arguments about whether management had enough time to react and exactly

when management knew of allegations were appropriate issues for trial or summary judgment).

**B. The IHRA Does Not Preempt Brownlee's Battery and IIED Claims**

The IHRA provides that "[e]xcept as otherwise provided by law, no court of this state

shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth

in this Act."  775 Ill. Comp. Stat. 5/8–111(D) (West 2018).  Whether the IHRA preempts a claim

depends on the source of the duty allegedly breached: "if the conduct would be actionable even

aside from its character as a civil rights violation because the IHRA did not 'furnish the legal duty that the defendant was alleged to have breached,' the IHRA does not preempt a state law claim seeking recovery for it." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (quoting *Krocka v. City of Chicago*, 203 F.3d 507, 516–17 (7th Cir. 2000)) (alteration omitted); *accord Blount v. Stroud*, 904 N.E.2d 1, 8 (Ill. 2009) (quoting *Geise v. Phoenix Co. of Chi., Inc.*, 639 N.E.2d 1273, 1276 (Ill. 1994)). To determine whether the IHRA preempts a tort claim, the court asks "whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997).

When the court ruled that Brownlee's battery and IIED claims in the FAC were preempted, it emphasized that Washington was not named as a defendant and that "the analysis would be different if he were." *Brownlee I*, Slip Op. at 17 (citing *Benitez v. Am. Standard Circuits, Inc.*, 678 F. Supp. 2d 745, 768 (N.D. Ill. 2010)). Because the claims against Catholic Charities in the FAC were effectively claims for negligent and supervision of Washington, they were "inextricably intertwined" with the IHRA "because the IHRA, unlike Title VII, imposes strict liability on employers for workplace harassment." *Id.* (citations omitted).

The analysis changes now that Washington has been brought in as a defendant and the SAC comes equipped with a ratification theory for imputing his intentional torts to Catholic Charities.[1] As explained in *Brownlee I*, the common law independently creates the duty to

---

[1] The presence of a properly pleaded ratification theory here distinguishes *Richards v. U.S. Steel*, 869 F.3d 557 (7th Cir. 2017), which was decided while the parties were briefing the instant motions. *Richards* held that the IHRA precluded IIED liability for two incidents because the coworker's conduct in those incidents went so far afield from the scope of employment that it could not be attributed to the employer under Illinois respondeat superior doctrine. *Id.* at 566. Because the IHRA arguably made the employer strictly liable for this conduct anyway, the Seventh Circuit held that the IIED claim based on those incidents was inextricably intertwined with the IHRA claim. *Id.* at 565–66. *Richards'* dicta implies that were it not for ratification, Brownlee's claims based on Washington's sexual assaults would be preempted. *See id.* (quoting *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 966 N.E.2d 52, 61

refrain from intentionally engaging in the extreme and outrageous behavior that constitutes the IIED tort, and Brownlee has now pleaded a claim that Catholic Charities ratified Washington's conduct. *See Zuidema*, 866 F. Supp. 2d at 940 (holding sexual harassment claim of IIED not preempted, collecting authority, and stating that "the duty not to commit the intentional tort of intentional infliction of emotional distress exists on its own"); *see also Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) (recognizing possibility that IIED claim could be premised on harm caused by coworker's racial slurs "regardless of his [discriminatory] motivation"). Likewise, the common law of battery independently imposes a duty to refrain from intentional, offensive touching. *See Zuidema*, 866 F. Supp. 2d at 940 (citing *Maksimovic*, 687 N.E.2d at 23) (other citations omitted) (holding IHRA did not preempt battery claim that coworker engaged in unwanted sexual touching of the plaintiff).

As the cases just cited make clear, the battery and IIED claims ratified by Catholic Charities (as alleged in the SAC) exist regardless of the IHRA's strict-liability regime. Because Catholic Charities would be liable for ratifying battery or IIED regardless of whether that conduct violated the IHRA, the IHRA preempts neither claim. *See Zuidema*, 866 F. Supp. 2d at 940 (citing *Maksimovic*, 687 N.E.2d at 23); *see also Benitez*, 678 F. Supp. 2d at 768 (holding IIED and battery claims against employee who harassed plaintiff were not preempted).

## C. No IWCA Preemption

Catholic Charities next argues that a claim under the Illinois Workers Compensation Act is Brownlee's exclusive remedy for her battery claims against it (not Washington). The IWCA preempts common law claims and supplies an employee's exclusive remedy "for injury or death sustained by any employee while engaged in the line of his duty as such employee." 820 Ill.

---

(Ill. App. Ct. 2012), as "holding that "sexual assault by its very nature precludes a conclusion that it occurred within the employee's scope of employment under the doctrine of *respondeat superior*" (emphasis omitted)).

Comp. Stat. 305/5(a) (West 2018).  The IWCA reaches "'accidental' injuries."  *McPherson v.*

*City of Waukegan*, 379 F.3d 430, 442 (7th Cir. 2004).  As the term is used in the IWCA, an

accidental injury means one "which is traceable to a definite time, place and cause, and occurs in

the course of employment unexpectedly and without affirmative act or design of the employee."

*Id.* (quoting *Hales & Hunter Co. v. Industrial Comm'n*, 198 N.E.2d 846, 847 (Ill.1964)).  The

question of accident must be viewed from the employer's perspective, so intentional torts of

coworkers qualify as "accidental," and are preempted, "[u]nless the employer has commanded or

expressly authorized the assault . . . ."  *Id.* (quoting *Meerbrey v. Marshall Field & Co.*, 564

N.E.2d 1222, 1227 (Ill. 1990)).

In *McPherson*, the Seventh Circuit held at summary judgment that the plaintiff had not

come forward with sufficient evidence to permit a jury to conclude that her employer knew of

harassing comments made by the plaintiff's coworker and that when it learned of the coworker's

misconduct, it "acted promptly and effectively to rectify the situation," responding "immediately

and effectively."  *Id.* at 442–43.  It nevertheless cited *Thomas v. Habitat Co.*, 213 F. Supp. 2d

887, 892 (N.D. Ill. 2002) for the proposition that "management's knowledge coupled with lack of

follow-up action is equivalent to express authorization of injurious conduct" [is] sufficient to

avoid the IWCA's exclusivity provision.  *McPherson*, 379 F.3d at 443 (quoting *Thomas*, 213 F.

Supp. 2d at 892).  Nothing in the summary judgment record in *McPherson* rose to the level of

express authorization, however.  *Id.*

*Thomas* illustrates the difference between summary judgment and what must be pleaded

in a complaint.  There, the plaintiff alleged that she interviewed for a job as a property manager.

213 F. Supp. 2d at 890.  She also lived on the premises, and one of the interviewers told her that

he watched her all the time and was in love with her.  *Id.*  Months later, the harassing interviewer

called the plaintiff into his office, again professed his love, and wrapped his legs around her. *See id.* at 890–91. Those allegations, the *Thomas* court held, stated a claim that the employer expressly authorized the employee's conduct through ratification. *Id.* at 892–93 (citing *Quela v. Payco–General Am. Credits, Inc.*, 84 F. Supp. 2d 956, 960 (N.D. Ill. 2000)) (other citations omitted).

Catholic Charities maintains that Washington's conduct was "accidental" from its point of view. Its argument depends on its reading of the SAC as insufficient to allege that Catholic Charities ratified Washington's conduct. *See* Reply 9, ECF No. 51. The court rejected this argument under the Rule 12(b)(6) standard in Part III.A., *supra*.

The cases cited by Catholic Charities are therefore distinguishable. In *Fortenberry v. United Air Lines*, the complaint included no more than the conclusory assertion that the employer "knew or should have known" of the coworker's harassment leading up to the altercation. No. 96 C 3198, 1997 WL 457499, at *5, 1997 U.S. Dist. LEXIS 11751, at *14 (N.D. Ill. Aug. 7, 1997) (quoting two paragraphs of complaint and citing *Griffith v. Keystone Steel & Wire*, 887 F. Supp. 1133, 1141 (C.D. Ill. 1995)). The plaintiff in the second did not point at summary judgment to enough evidence of express authorization to create a fact issue for trial. *See Sacramento v. City of Chicago*, No. 07 C 4267, 2010 WL 2740305, at *12 (N.D. Ill. July 12, 2010) (citations omitted). Again, the SAC here includes enough well-pleaded facts to make the inference of express authorization, not just knowledge of Washington's behavior, through ratification plausible. *See* SAC ¶¶ 41–62.

The court's ruling of course does not say anything about whether Brownlee will be able to produce enough evidence of express authorization at summary judgment; that question is not before the court. *Compare Benitez*, 678 F. Supp. 2d at 765–66 (denying summary judgment

because fact disputes over express authorization existed), *with McPherson*, 379 F.3d at 442–43

(affirming denial of summary judgment on express authorization); *Sacramento*, 2010 WL

2740305, at *12–13 (granting summary judgment to employer). The court determines only that

Brownlee states a plausible claim that her injuries were not "accidental" for IWCA purposes

because Catholic Charities expressly authorized them through ratification. *See Zuidema*, 866 F.

Supp. 2d at 938 (finding complaint sufficient to state ratification claim sufficiency under IHRA

analysis); *Thomas*, 213 F. Supp. 2d at 992–93 (same conclusion under IWCA); *Cuela*, 84 F.

Supp. 2d at 960 (same).

**D. No Claim That Catholic Charities "Personally Encouraged or Assisted" Washington**

Brownlee brings a claim under the Illinois Gender Violence Act against Washington and

Catholic Charities in Count X of the SAC. Catholic Charities argues that corporations cannot be

held liable under the IGVA and that the SAC fails to state a claim that it personally encouraged

or assisted Washington's gender-related violence. It focuses on the use of the words "person"

and "personally" in the following IGVA provision:

> Any person who has been subjected to gender-related violence as
> defined in Section 5 may bring a civil action for damages,
> injunctive relief, or other appropriate relief against a person or
> persons perpetrating that gender-related violence. For purposes of
> this section, "perpetrating" means either personally committing the
> gender-related violence or personally encouraging or assisting the
> act or acts of gender-related violence.

740 Ill. Comp. Stat. 82/10 (West 2018).[2]

Catholic Charities cites several nonbinding decisions of federal district courts concluding

that the IGVA's language precludes corporate liability. *Fuesting v. Uline, Inc.*, 30 F. Supp. 3d

---

[2] *See also* 740 Ill. Comp. Stat. 82/5 (defining "gender-related violence" to include "[o]ne or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction").

739 (N.D. Ill. 2014); *Zamudio v. Nick & Howard LLC*, No. 15 C 3917, 2015 WL 6736679 (N.D. Ill. Nov. 4, 2015); *Doe v. Lee*, 943 F. Supp. 2d 870 (N.D. Ill. 2013); *Fayfar v. CF Mgmt.-IL, LLC*, No. 12 C 3013, 2012 WL 6062663, at *1–3 (N.D. Ill. Nov. 4, 2012). These cases generally reason that because corporations act exclusively their agents while human beings act personally, corporations can neither "personally commit" nor "personally encourage" gender-related violence, so they're off the hook. *See, e.g.*, *Fuesting*, 30 F. Supp. 3d at 742–33; *Fayfar*, 2012 WL 6062663, at *1–2. Other federal district courts have reached a contrary conclusion or imposed liability under the IGVA on a corporation. *See Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001 (N.D. Ill. 2012), *motion for summary judgment denied* No. 11-cv-9417, 2014 WL 6886869, at *13 (N.D. Ill. Dec. 8, 2014) (holding corporation can be liable under the IGVA on motion to dismiss complaint and at summary judgment); *Cruz v. Primary Staffing, Inc.*, No. 10 C 5653, 2011 WL 1042629 (N.D. Ill. Mar. 22, 2011) (holding complaints stated claim against employer under the IGVA for failing to address complaints of harassment).

Brownlee argues first that *Doe v. Sanchez*, 52 N.E.3d 618 (Ill. App. Ct. 2016), a case decided after the district court decisions just cited, resolves the IGVA question. It does not. The plaintiff in *Sanchez* brought an IGVA claim among others, *id.* at 620, but, although the case discusses imputed and vicarious liability principles in detail, it turns on tort law governing the nondelegable duty owed by a common carrier. *See id.* 623–31. The case neither considers nor analyzes the IGVA, which is mentioned only once in background. *Id.* at 620. *Sanchez*, a case about a company operating school buses, does not settle the IGVA question.

The Illinois Supreme Court has not spoken on this issue. Federal district courts have found "scant guidance" in the Illinois cases applying the IGVA. *Doe ex rel. Smith v. Sobeck*, 941

F. Supp. 2d 1018, 1026 (S.D. Ill. 2013); *accord Fuesting*, 30 F. Supp. 3d at 742 (citation omitted).

Besides *Sanchez*, this court has located three other IGVA cases in Illinois. *Watkins v. Steiner* held that the plaintiffs' allegations that township employees "knew about" another employee's sexually assaulting members of the public did not state a claim that the township "personally encouraged" or assisted gender-related violence. Nos. 5–11–0421, 5–11–0422, 5–11–0423, 5–11–0424, 5–11–0442, 5–11–0443, 2013 WL 166737, at *1, 4 (Ill. App. Ct. Jan. 14, 2013). *Doe v. Psi Upsilon Int'l*, 963 N.E.2d 327 (Ill. App. Ct. 2011), declined to reach the question of whether a national fraternity was a "person" under the IGVA for the same reason. The plaintiff did not allege enough factual material to show the national organization, as contrasted with its local chapter (not named as a defendant), "personally encouraged" excessive drinking and other conduct the plaintiff alleged led to a student sexually assaulting her in an off-campus apartment. *See id.* at 329, 331. And in *Doe v. University of Chicago*, the court decided that the plaintiff's claims accrued before the IGVA took effect, and the opinion does not mention the question of corporate liability *vel non*. *See* 939 N.E. 2d 76, 77, 79, 81 (Ill. App. Ct. 2010).

While none of these cases bear directly on the broad question of corporate responsibility under the IGVA, they betray a marked preference for deciding the case on a narrower ground when possible. *Psi Upsilon* in particular acknowledges the broad question and decides the case on the narrower ground that the plaintiff failed to state a claim that the corporate defendant "personally encouraged" gender-related violence. 963 N.E.2d at 331.

Heeding the guidance of Illinois courts, this court takes the narrower path here because Catholic Charities specifically raises the argument. Brownlee relies on already discussed arguments to support her IGVA claim against Catholic Charities. She pleads that she complained

to Lee about Washington's behavior at least once between May 18 and June 16, 2015, and Lee effectively told her to deal with it because she could "handle" Washington. SAC ¶¶ 273–75. In Count X, Brownlee claims that Catholic Charities "ratified Washington's conduct when it continued to assign Brownlee to work with Washington despite its knowledge of Brownlee's complaints," SAC ¶ 287, and "[t]hat Catholic Charities failed to exercise reasonable care in the retention and supervision of its employee, Washington, that resulted in Brownlee being subjected to another act of violence or physical aggression," SAC ¶ 288. Though these threadbare conclusions must be disregarded, they articulate an IGVA claim *Watkins* rejects: even seen favorably to Brownlee, she alleges no more than Lee's knowledge of Washington's assaults and his refusal to do anything. *See Watkins*, 2013 WL 166737, at *4; *see also Psi Upsilon*, 963 N.E.2d at 331.

Brownlee contends in response that the IGVA contemplates vicarious liability under a respondeat superior theory. ECF No. 50 at 14–15. Her argument is difficult to make out. Its heading reads "Defendant Encouraged and/or Assisted Washington's Gender-Related Violence," *id.* at 14, and her argument concludes by asserting that Catholic Charities can be held liable for Washington's conduct rather than Lee's, *id.* at 15. As nearly as the court can tell, Brownlee points to respondeat superior doctrine to show that employing Washington after hearing complaints of his behavior amounts to "assisting" or "encouraging" him in assaulting Brownlee. *See id.* at 14–15 (citing *Bryant v. Livigni*, 619 N.E.2d 550, 559 (Ill. App. Ct. 1993)). As already explained, Brownlee fails to develop the respondeat superior branch of her argument for imputing liability for battery to Catholic Charities. *See id.* at 5. Moreover, saying that Washington acted in the course and scope of his employment after Brownlee complained to a manager about his conduct just restates the idea that Lee knew about the assaults and did

nothing.  Again, *Watkins* holds, and *Psi Upsilon* implies, that a corporation's knowledge plus inaction doesn't state a claim for personally encouraging or assisting under the IGVA.  *See Psi Upsilon*, 963 N.E.2d at 331 (requiring a "connection" between assaultive conduct and corporate defendant to prove it assisted in assault); *Watkins*, 2013 WL 166737, at *4; *cf. Smith*, 941 F. Supp. 2d at 1027 (holding that complaint failed to state an IGVA claim against employer because it failed to state claim against employees for personally encouraging or assisting gender-related violence).

Taking the narrower path, the court finds that the SAC fails to state a claim that Catholic Charities personally encouraged or assisted Washington's gender-related violence.  The court expresses no view on whether the IGVA applies only to human beings.

## E. Brownlee States a Claim of Extreme and Outrageous Behavior

Both defendants move to dismiss the intentional infliction of emotional distress claim pleaded in Count IX of the SAC.[3]  To state an IIED claim, Brownlee must establish: "(1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress."  *Richards*, 869 F.3d at 566 (citing *Feltmeier*, 798 N.E.2d at 80).  Defendants argue that the SAC fails to allege any sufficiently extreme and outrageous conduct to state a claim under the first element.  Catholic Charities Mem.' Supp. Mot. to Dismiss 10–11, ECF No. 42.

"Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case."  *Richards*, 869 F.3d at 566 (quoting

---

[3] Count IX is the sole subject of Washington's pending motion to dismiss, and he adopts Catholic Charities' arguments as his own.  ECF No. 54 ¶ 5.

*Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003)) (alteration omitted). To be objectively extreme and outrageous, the conduct must go beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" or even anything that would entitle the plaintiff to punitive damages for another tort. *Id.* at 566–67 (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997)). Furthermore, the scope of conduct the IIED tort reaches "is even more constrained in the employment context . . . because 'personality conflicts and questioning of job performance are unavoidable aspects of employment and ... frequently, they produce concern and distress.'" *Id.* at 567 (quoting *Van Stan*, 125 F.3d at 567–68).

Defendants cite a few cases of IIED claims they say involve far more extreme conduct than that alleged in the SAC. Examples include drugging and raping an employee resulting in a suicide attempt, *Gilardi v. Schroeder*, 833 F.2d 1226, 1228–29 (7th Cir. 1987), and vulgar, rude, sexually hostile talk (e.g., the size of a man's penis, detailed descriptions of having sex with two women at once, asking about how a woman performs oral sex, etc.) continuously over an eight-week period followed by a threat to "get even," (which was made good), *Class v. N.J. Life Ins. Co.*, 746 F. Supp. 776, 778–79 (N.D. Ill. 1990). These cases prove somewhat unhelpful, however, because they do not reject an IIED claim. *Class* distinguishes *Miller v. Equitable Life Insurance Society*, 537 N.E.2d 887, 889 (Ill. App. Ct. 1989), on the ground that the harassing supervisor in *Class* did more than engage in disgusting (harassment seems too benign a term) behavior—he threatened her and got her fired. *Class*, 746 F. Supp. at 778–79. Even taking *Class* on its own terms, Brownlee alleges that Washington threatened to have someone meet her at the Catholic Charities office and "hurt you." SAC ¶ 55. And nothing in *Class* suggests that

the plaintiff alleged that her supervisor ever touched her, much less rubbed her shoulders and thighs repeatedly.

The IHRA preemption analysis in *Corcoran v. City of Chicago*, No. 10 C 6825, 2011 WL 2110264, at *5 (N.D. Ill. May 25, 2011), bears more directly on the issues. There a Chicago police officer alleged a pattern of retaliation ranging from reassignment to a "punishment" beat, being prohibited from getting his car washed, and various, sometimes false, disciplinary write-ups, some of which were resolved through his employer's dispute resolution process. *See id.* at *1–3. The court explained that without the IHRA's strict-liability rule against retaliation, this conduct would not state a claim of extreme and outrageous conduct. *Id.* at *5. Again, though, the plaintiff alleged no physical contact, no sexually aggressive and revolting talk, no slapping anyone, and no threats to have someone hurt the plaintiff. *See id.* at *1–3.

Brownlee relies on one case to support her IIED claim. Resp. to Catholic Charities' Mot. to Dismiss 12, ECF No. 50. In *Bustamante v. Tin, Inc.*, No. 07 CV 970, 2008 WL 360786 (N.D. Ill. Feb. 11, 2008), the plaintiff, a Hispanic male, brought employment-discrimination and other claims against his former employer. *Id.* at *1. Conducting an IHRA analysis, the court identified the following allegations in the complaint as sufficient to state an IIED claim: "requiring Plaintiff and other Hispanics to work in unsafe work environments while not requiring members of other races to do the same, insults, racial comments and degradations, age-based comments and degradations, disciplining [Plaintiff] in a loud, humiliating and embarrassing manner due to his age, hostile environment, and retaliatory environment." *Id.* at *2–3.

Taken collectively and in the light most favorable to Brownlee, these allegations plausibly rise to the level of conditions so intolerable that an individual would be compelled to involuntarily resign. *Schumacher v. J.P. Morgan & Co. Inc.*, No. 98 C 108, 1999 WL 58554, at

*5 (N.D. Ill. Feb. 3, 1999) (quoting *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (holding that allegations of office reprimands, unfair work assignments, and the like did not state an IIED claim)).  While the conduct alleged in the SAC, even viewed in the light most favorable to Brownlee, might not ultimately amount to extreme and outrageous conduct at a later stage of litigation, the rule that the facts in their totality matter to that inquiry counsels against dismissal at the pleading stage.  *See Richards*, 869 F.3d at 566.  Brownlee pleads specifically that she felt "physically threatened" when Washington pulled off the expressway on Congress Parkway in Chicago and refused to drive until Brownlee talked to him, and Brownlee had to threaten to get out and walk to a police station to get Washington to drive her to the office.  SAC ¶¶ 52–54.  Then, Washington threatened to have someone "hurt" her.  SAC ¶ 55.  Even if that is not enough on its own, *see Bustamante*, 2008 WL 360786, at *2 (allegations include unsafe work assignments), it capped a month-long campaign of physical and verbal sexual harassment.  *See* SAC ¶¶ 30–45.  More than once Washington said Brownlee's supervisor would like to "fuck" her, SAC ¶ 32, and "kn[e]w what a man would do to a woman like you," SAC ¶ 34, and said that she "wouldn't talk the way [she] talk[ed]," "wouldn't talk unless [Washington] told [her] to," and "wouldn't speak, unless [she was] spoken to" "if [Washington] was [her] man," SAC ¶¶ 36, 37, 38.  Viewed in a light favorably to Brownlee, Washington's statements, especially those about talking, blend sexual objectification and physical aggression laced with implications of domestic abuse.  Together they dehumanize.  With that verbal harassment as context, Washington's repeated (at least five times) rubbing of Brownlee's thighs and shoulders can be seen as a display of physical power designed to reinforce the message that Washington could and would transgress Brownlee's boundaries so as to keep ever in the forefront of Brownlee's mind the point at which sex and violence can collide–rape.  *See* SAC ¶¶ 39–42.  This is by no means the only way to

view what happened, but at the pleading stage, these allegations state a claim of more than "personality conflicts" and ordinary, but distasteful, workplace disputes. *Richards*, 869 F.3d at 567; *Bustamante*, 2008 WL 360786, at *2–3.

Summary judgment may tell a different story, or it may not. *See Richards*, 869 F.3d at 567–68. The court's task is to determine whether the SAC gives fair notice of a plausible claim. *See Iqbal*, supra, 556 U.S. at 678–79. It does. The motions to dismiss Count IX are denied.

## V. CONCLUSION

For the reasons stated, Catholic Charities' partial motion to dismiss the Second Amended Complaint, ECF No. 41, is granted in part and denied in part, and Washington's motion to dismiss Count IX of the Second Amended complaint, ECF No. 54, is denied. Count X of the Second Amendment Complaint, ECF No. 37, is dismissed against Catholic Charities. A status hearing is set for April 18, 2018 at 9:30 a.m.


Date: March 28, 2018                                    _____/s/_____
                                                       Joan B. Gottschall
                                                       United States District Judge