**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ESTHER BROWNLEE and JOANIE FLEMING,

      Plaintiffs,

      v.

CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO and DWAYNE WASHINGTON,

      Defendants.

No. 16-cv-00665

Honorable Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Esther Brownlee (Brownlee) and Joanie Fleming (Fleming) (collectively, Plaintiffs) worked for the Catholic Charities of the Archdiocese of Chicago (Catholic Charities) as mobile outreach workers providing emergency services to homeless and at-risk people in Chicago. Plaintiffs allege that they worked in a discriminatory, sexually charged, and hostile work environment. They brought suit against Catholic Charities and one of their male co-workers, Duane Washington (Washington) (collectively, Defendants), asserting several counts arising under Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000(e), *et seq.* (each count concerns a distinct Title VII theory, including sexual harassment, sex discrimination, and retaliation). R. 37, SAC.[1] Brownlee also brought state claims for battery, intentional infliction of emotional distress (IIED), and violations of the

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

Illinois Gender Violence Act (IGVA), 740 Ill. Comp. Stat. 82/1 *et seq. Id.* On January 27, 2021, the Court entered an order granting in part and denying in part Defendants' motions for summary judgment (the Order). R. 145, Order Summ. J.

Catholic Charities and Fleming now bring separate motions for reconsideration of the Court's Order. R. 146, Def.'s Mot. Reconsider; R. 150, Pl.'s Mot. Reconsider. For the reasons stated below, Catholic Charities' motion for reconsideration (R. 146) is granted in part and denied in part. Fleming's motion for reconsideration (R. 150) is denied.

## Background

The Court assumes familiarity with the facts of this case detailed in the Order and thus does not fully recount them herein. The Court's Order, in pertinent part:

- denied Defendants' motions for summary judgment with respect to Count I (sexual harassment – Brownlee), Order Summ. J. at 29–33, Count III (sexual harassment – Fleming) with respect to Washington's conduct, *id.* at 48, 51–55, and Count V (retaliation – Brownlee), *id.* at 37–40 ; and

- granted Defendants' motion for summary judgment on Count III (sexual harassment – Fleming) with respect to the Vaia owner's conduct. *Id.* at 48–51.

Catholic Charities moves the Court to reconsider the denial of summary judgment for Count I (sexual harassment – Brownlee) and Count V (retaliation – Brownlee), as well as the Court's partial denial of summary judgment on Count III (sexual

harassment – Fleming), with respect to Washington's conduct. Def.'s Mot. Reconsider. Fleming moves the Court to reconsider its partial grant of summary judgment on Count III (sexual harassment – Fleming), with respect to the Vaia owner's conduct, as well as the Court's finding that Fleming's allegations with respect to Washington's conduct before 2015 are time-barred. Pl.'s Mot. Reconsider.

## Standard of Review

Motions to reconsider are interlocutory orders governed by Federal Rule of Civil Procedure 54(b). *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 911 (N.D. Ill. 2015). Under Rule 54 of the Rules of Federal Civil Procedure, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).[2] *See also Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012). The Court therefore has discretion to reconsider its ruling on Defendants' motions for summary judgment. *Patrick*, 103 F. Supp. 3d at 911 (N.D. Ill. 2015).

Motions for reconsideration under Rule 54(b) generally "serve the limited function of correcting manifest errors of law or fact." *Slick v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 900, 902 (N.D. Ill. 2015) (internal quotation marks and citation omitted). Manifest error occurs where the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court

---

[2]Fleming cites caselaw interpreting Fed. R. Civ. P. 59(e), Pl.'s Mot. Reconsider at 2–3, but Rule 59(e) applies only to final judgments. *Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*, 816 F. Supp. 1286, 1287 (N.D. Ill. 1993) (citation omitted).

by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotation marks and citation omitted). A party may also use a motion for reconsideration to alert the court to "a significant change in the law or facts." *Janusz v. City of Chicago*, 78 F. Supp. 3d 782, 787 (N.D. Ill. 2015), *aff'd*, 832 F.3d 770 (7th Cir. 2016) (citing *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008)).

That said, a motion to reconsider is not an appropriate vehicle to "advance arguments already rejected by the Court or new legal theories not argued before the ruling[.]" *Schilke v. Wachovia Mortg., FSB*, 758 F. Supp. 2d 549, 554 (N.D. Ill. 2010), *aff'd on other grounds sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) (internal quotation marks and citation omitted). Ultimately, motions for reconsideration are disfavored, and a party asserting that the court committed a manifest error of fact or law "bears a heavy burden . . . . " *Patrick*, 103 F. Supp. 3d at 911–12 (citations omitted).

## Analysis

The Court addresses Catholic Charities' motion for reconsideration first, followed by Fleming's motion for reconsideration.

### I. Catholic Charities' Motion for Reconsideration

Catholic Charities moves the Court to reconsider four aspects of the Order granting in part and denying in part summary judgment. Def.'s Mot. Reconsider at 1–2. With respect to the Court's denial of summary judgment on Count I (Sexual Harassment – Brownlee), Count V (Retaliation – Brownlee), and Count III (Sexual

4

Harassment – Fleming), Catholic Charities asks the Court to conduct analysis on various issues the Court did not reach in its Order. *Id.* Alternatively, Catholic Charities requests reconsideration of the Court's denial of summary judgment on Count III (Sexual Harassment – Fleming) based on Fleming's purported failure to present facts to establish severe or pervasive sexual harassment. *Id.* at 2. Catholic Charities finally requests that the Court reopen discovery to allow Catholic Charities to re-depose Fleming. *Id.* The Court assesses each request in turn.

### A. Count I (Sexual Harassment – Brownlee)

The Court denied summary judgment on Count I (Sexual Harassment – Brownlee), because the Court found that Brownlee had adduced evidence sufficient for a reasonable jury to find that the third element of a sexual harassment claim— severe or pervasive conduct—had been satisfied. Order Summ. J. at 29–33. Having rejected Defendants' argument with respect to the severe or pervasive conduct element, the Court declined to address Defendants' argument regarding the fourth element of a sexual harassment claim—employer liability. *Id.* at 33 ("Reaching these determinations precludes summary judgment, and the Court need not address Catholic Charities' second argument regarding employer liability.").

### 1. Reconsideration is Proper for Count I (Sexual Harassment – Brownlee)

Catholic Charities argues that reconsideration is proper on the Court's denial of summary judgment on Count I (Sexual Harassment – Brownlee), as the Court declined to address Defendants' argument regarding employer liability. R. 147, Def.'s Memo. Reconsider at 8. Catholic Charities maintains that the Court could not resolve

its summary judgment motion on Brownlee's sexual harassment claim without determining whether there is a basis for employer liability. *Id.* at 5, 8 (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). Plaintiffs respond that the Court's Memorandum Opinion and Order reflects that it did consider the basis for employee liability, despite the Court's language to the contrary. R. 153, Pls.' Resp. Reconsider at 8–9.

To dodge summary judgment, the non-moving party must present sufficient evidence to support each element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Whereas the moving party on summary judgment only bears the burden of either: "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted).

A plaintiff alleging sexual harassment has to adduce evidence sufficient for a reasonable jury to find for the plaintiff on four elements: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [sex]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs*, 587 F.3d at 840. Thus, to survive summary judgment on her sexual harassment claim, Brownlee had to put forward sufficient evidence on each of the aforementioned four elements, whereas Defendants only had to knock out or negate one of those elements. It follows then that Defendants could

have prevailed on their motion for summary judgment for Count I (Sexual Harassment – Brownlee), independent of the Court's finding on the severe or pervasive element, if Defendants had shown either an absence of evidence on the employer liability element or affirmative evidence negating the employer liability element. *Hummel*, 817 F.3d at 1016.

Although the Court agrees with Plaintiffs that the Court considered facts relevant to an employer liability analysis, *see* Pls.' Resp. Reconsider at 8–9, the Court ultimately did not discuss the law surrounding the employer liability element. Nor did the Court evaluate the pertinent facts under that specific law. As a result, the Court finds that it erred by not reaching Defendants' argument regarding employer liability in the Order. *See Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162, 1167 (N.D. Ill. 2018) (citing *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012)) (Rule 54(b) "allows the court to correct its own errors and avoid unnecessary appellate procedures"). The Court turns to that analysis now.[3]

---

[3]Both Catholic Charities and Brownlee offer substantive arguments on the employer liability element in their briefing on Catholic Charities' motion for reconsideration. *See* Def.'s Memo. Reconsider at 8–9; Pl.'s Resp. Reconsider at 6–9. However, the Court focuses its analysis on the arguments made at the summary judgment stage, for a motion for reconsideration is not appropriate "to advance arguments or theories that could and should have been made before the district court rendered a judgment." *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 459 F. Supp. 3d 1058, 1111 (N.D. Ill. 2020) (internal quotation marks and citations omitted).

### 2. Reconsideration of Catholic Charities' Employer Liability Arguments on Count I (Sexual Harassment – Brownlee)[4]

An employer may be liable for sexual harassment "if the harassment is done by a co-worker and the employer is shown to have been negligent in failing to prevent the harassment." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995)). An employer is deemed negligent if it fails to take reasonable steps to discover and remedy the harassment. *Id.* According to the Seventh Circuit, the first step in evaluating an employer's potential negligence is to assess "whether the employer was on notice of the harassment." *Id.* And "[n]otice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863, 866 (7th Cir. 2013) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1037 (7th Cir.1998)).

Catholic Charities asserts that it was not on notice of any sexual harassment of Brownlee. R. 123, Defs.' Memo. Brownlee Mot. Summ. J. at 7. Specifically, Catholic Charities insists that, despite knowing the process for reporting sexual harassment at Catholic Charities, Brownlee only made vague and non-specific complaints to her supervisor, Ray Lee (Lee). *Id.* at 7–8. Brownlee responds that Catholic Charities ignored Brownlee's complaints about sexual harassment, and that Catholic Charities

---

[4]Consistent with this reconsideration, and any other reconsideration granted throughout this Order, the Court concurrently issues an Amended Memorandum Opinion and Order, which reflects the analysis and holdings contained herein.

was also put on notice of Washington's conduct by the sexual harassment complaints of Fleming and Karla Davis. R. 128, Brownlee Resp. Summ. J. at 13–14.

The Court finds that Brownlee has adduced sufficient evidence on the employer liability element, such that a reasonable jury could find in her favor. As an initial matter, Brownlee has presented adequate evidence indicating that Catholic Charities was "on notice of the harassment." *Cooper-Schut*, 361 F.3d at 426 (citation omitted). For example, Brownlee testified that she "told [Lee] on several occasions that [Washington] would touch me and things like that, and I was like why do you guys have me working with him. He's very unprofessional. He talks on my phone, and [Lee] was like, well, that's why we put you with him because we know you can handle him […]." R. 121-1, Brownlee Dep. at 163:17–19. Additionally, in her affidavit, Brownlee states that "Ray Lee and Jason Marsh had knowledge that Washington harassed me in the van because I complained to both on several occasions about the harassing things Washington said to me and how erratic and unsafe his driving was." R. 131-4, Brownlee Aff. ¶ 12. In terms of the frequency of her complaints, Brownlee stated that she "complained to Lee about Washington's sexual harassment nearly every other day for the month period [she] was his partner." *Id.* ¶ 16. Thus, the Court finds that Brownlee marshaled enough evidence to show that Catholic Charities was on notice of the sexual harassment.

Catholic Charities advances two primary arguments in opposition, neither of which persuades the Court.

### a. Vague and Non-Specific Complaints

First, Catholic Charities argues that it was not on notice because "Brownlee's complaints to Lee were vague and non-specific . . ." Defs.' Memo. Brownlee Mot. Summ. J. at 7. Catholic Charities maintains that Brownlee only informed Lee that Washington was "a freak," and that she may have told Lee that Washington "talks too much, plays too much and is too touchy feely." *Id.* (internal quotation marks and citation omitted). Accordingly, Catholic Charities reasons that it could not have been put on notice of Washington's sexual harassment of Brownlee. *Id.* However, because the Court denied Defendants' motion to strike with respect to the pertinent paragraphs of Brownlee's affidavit, *see* Order Summ. J. at 24–25, the record contains evidence indicating that Brownlee not only informed Lee of Washington's generally bad behavior, but also that she specifically "complained to Lee about Washington's sexual harassment nearly every other day for the month period [she] was his partner," that "Ray Lee and Jason Marsh had knowledge that Washington harassed [Brownlee] in the van because [she] complained to both on several occasions about the harassing things Washington said to [her]," and that upon hearing Brownlee's concerns, Lee "would acknowledge [her] concerns, downplay them and often state, 'You can handle him Esther, that's why we made you two partners.'" Brownlee Aff. ¶¶ 12, 16, 17.[5] Catholic Charities' argument that it was not on notice of sexual harassment of Brownlee due to the vague nature of her complaints therefore falls flat.

---

[5]The believability of Brownlee's affidavit statements, of course, is not an issue to be resolved at summary judgement. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

### b. Failure to Escalate Complaint to Human Resources

Second, Catholic Charities contends that it was not on notice because Brownlee failed to properly "escalate" her report of Washington's sexual harassment to human resources: "If she thought Lee had failed to respond adequately to her vague complaints, Catholic Charities' policy instructed her to then escalate the issue to HR, but she did not." Defs.' Memo. Brownlee Mot. Summ. J. at 8. Catholic Charities directs the Court to three cases in support of this argument: *Westbrook v. Illinois Dep't of Hum. Servs.*, 2018 WL 1469035, at *9 (N.D. Ill. Mar. 26, 2018); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011); and *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019). The Court addresses each below, beginning with *Yancick*.

In *Yancick*, the Seventh Circuit affirmed the district court's grant of summary judgment against a plaintiff employee alleging a racially hostile work environment under 42 U.S.C. § 1981. 653 F.3d at 534–35. The Seventh Circuit found that, "taken as a whole, the facts do not lead to a reasonable inference that the harassment was pervasive or severe or motivated by race." *Id.* at 544. Accordingly, the Seventh Circuit stated that it could end its discussion there without addressing the defendant's employer liability arguments. *Id.* at 549. Yet, "for completeness," the court "note[d]" that the plaintiff's claim would fail on the employer liability element as well. *Id.* In assessing the employer liability element, the Seventh Circuit stated that the plaintiff could have either "followed the harassment policy reporting requirements or reported 'the alleged harassment to anyone who had the authority to deal with the harassment

or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Id.* at 549 (quoting *Parkins*, 163 F.3d at 1037). The court in *Yancick* found that the plaintiff "did neither," because he reported to a "low-level supervisor who had no authority to hire, fire, transfer, or discipline any Hanna Steel employees," and because the supervisor's "unwillingness and refusal to address the situation" made it "unreasonable for [the plaintiff] to believe that [the supervisor] would convey his complaints up the ladder." *Id.* (citation omitted).

Similarly in *Westbrook*, the court granted summary judgment in favor of the defendant on the plaintiff's hostile work environment claim, noting that the plaintiff only reported the alleged harassment to a "low-level supervisor with no authority to deal with the harassment." 2018 WL 1469035, at *9. Just as in *Yancick*, the court in *Westbrook* framed the issue with language from *Parkins*, 163 F.3d at 1037: "the plaintiff can either follow[] the harassment policy reporting requirements or report[] the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Id.* (internal quotation marks and citations omitted). Significantly, the court explained that the plaintiff "knew that the correct person to go to [was] . . . the Assistant Director of Nursing," and that "[s]urely after the first few months of Jacobson's demonstrated indifference, [the plaintiff] could not reasonably expect that [the supervisor] would report the racially offensive conduct to her supervisors." *Id.* at *9.

The facts in this case are distinct from those in *Yancick* and *Westbrook*. In both cases, the plaintiffs failed to follow the employers' harassment reporting policies. *Yancick*, 653 F.3d at 549; *Westbrook*, 2018 WL 1469035, at \*9. In addition, the plaintiffs in *Yancick* and *Westbrook* reported the purported harassments only to low-level supervisors who did not have the authority to deal with the harassment. *Yancick*, 653 F.3d at 549; *Westbrook*, 2018 WL 1469035, at \*9.

Here, the facts, construed in favor of Brownlee, show that she complied with Catholic Charities' sexual harassment policy. Catholic Charities' Employee Handbook provides: "Any employee who feels that he or she has been subjected to or witnessed an incident of unlawful discrimination or harassment should report the matter to his or her immediate supervisor or another supervisor within the chain of command." R. 131-13, Employee Handbook at 31. The record shows that Brownlee followed that policy by reporting Washington's sexual harassment to her immediate supervisors, Lee and Marsh. Brownlee Aff. ¶ 12. The policy in turn required supervisors who are either informed of harassment or who reasonably suspect harassment to report such incidents to the Service Area Vice President, who was then required to contact HR, and if necessary, the legal department. Employee Handbook at 31. Catholic Charities ignores these portions of the policy and insists that if Brownlee "thought Lee had failed to respond adequately to her vague complaints, Catholic Charities' policy instructed her to then escalate the issue to HR . . . ." Defs.' Memo. Brownlee Mot. Summ. J. at 8 (citation omitted). Catholic Charities further

argues that Brownlee knew the proper way to escalate a harassment claim based on an email she had sent to a vice president at Catholic Charities in May 2013. *Id.*

However, each of these arguments misses the mark. True, the reporting policy provides that "if previous conversations have been ineffective, the employee should report the concern to the Employee Relations Manager in the Human Resources Department." Employee Handbook at 31. Yet, the record is equivocal as to the effectiveness of Brownlee's reports to Lee. Although Brownlee and Washington continued to be paired, Brownlee stated that Lee, at the very least, "would acknowledge [her] concerns" about Washington's behavior. Brownlee Aff. ¶ 17. Moreover, while Brownlee stated that she talked to Lee and Marsh frequently about Washington's conduct, she was only paired with him for a month, so unlike the plaintiff in *Westbrook*, Brownlee's complaints did not sit idle for months. *Westbrook*, 2018 WL 1469035, at *9. As a result, Brownlee may not have considered her reporting attempts to be ineffective, which means she did not violate the reporting policy by failing to escalate her complaint to human resources.

With respect to Brownlee's prior sexual harassment complaint, the record illustrates that Brownlee made her previous harassment complaint via email to a vice president at Catholic Charities on May 14, 2013. R. 121, DSOF ¶ 87. However, Brownlee did not sign an acknowledgment form stating she received the Employee Handbook until October 22, 2013. R. 121-1, Exh. A-27, Employee Handbook Acknowledgment. So, the Court does not find Brownlee's previous harassment complaint (made before the record shows she had received the Employee Handbook)

probative to the question of whether she complied with the harassment reporting policy with respect to Washington's conduct (taking place after she had received the Employee Handbook). All of this is to say, Catholic Charities' arguments do not convince the Court that the evidence, evaluated in the light most favorable to Brownlee, shows that Brownlee failed to follow Catholic Charities' sexual harassment reporting policy.

In any event, there is evidence in the record that Lee and Marsh had the authority to deal with the harassment, so even if Brownlee had failed to follow the policy, Brownlee's notice still would pass muster under the *Parkins* framework. *See Yancick*, 653 F.3d at 549. The Employee Handbook provided that supervisors informed of harassment needed to report to the Service Area Vice President, who was then required to contact HR, and if necessary, the legal department. Employee Handbook at 31. This reveals that Lee and Marsh had the authority to deal with Brownlee's complaints of sexual harassment.

However, even if Lee and Marsh did not actually have the authority to deal with the harassment, Brownlee can satisfy the *Parkins* framework if she establishes that it was reasonable for her to expect Lee to elevate her complaint up the ladder. *See Yancick*, 653 F.3d at 549. Here, the Court finds that it was reasonable for Brownlee to expect Lee to report the harassment, when the Employee Handbook required him to do so.

Hence, this case unlike *Yancick* or *Westbrook*. The facts, construed in Brownlee's favor, show that she followed Catholic Charities' reporting policy, and that

15

the supervisors she reported to had the authority to deal with the purported harassment. Thus, Brownlee satisfies the *Parkins* framework, unlike the plaintiffs in *Yancick* and *Westbrook*. *See Yancick*, 653 F.3d at 549 (quoting *Parkins*, 163 F.3d at 1037) (emphasis added) (plaintiff could have either "followed the harassment policy reporting requirements *or* reported 'the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'").

Catholic Charities' third case in support of its argument that it was not on notice of the sexual harassment of Brownlee, *Hunt v. Wal-Mart Stores*, 931 F.3d 624, likewise fails to convince the Court that Brownlee has failed to satisfy this element at the summary judgment stage. The *Hunt* decision's analysis revolved around the application of the *Faragher-Ellerth* defense. The *Faragher-Ellerth* defense is an affirmative defense that an employer may raise to escape liability for a hostile work environment and requires the employer "prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Hunt*, 931 F.3d at 628 (citation omitted). As far as the Court can discern, Catholic Charities' briefs are silent as to the *Faragher-Ellerth* defense, so the usefulness of *Hunt* in resolving the issues of this case is unclear.

No matter, even if Catholic Charities were invoking the *Faragher-Ellerth* defense here, *Hunt* is distinguishable. The Seventh Circuit found the employer in *Hunt* took sufficient steps to prevent the harassment, in large part, due to the employer's prompt and thorough investigation into the purported harassment once the employee had complained to the store manager, who had reported the complaint to human resources. 931 F.3d at 630–31. By contrast here, Catholic Charities has not directed the Court to any evidence that Brownlee's supervisor escalated the complaint to human resources, nor has Catholic Charities shown that it investigated Brownlee's complaints of sexual harassment by Washington. *Hunt* thus does not fit the facts of this case.

In sum, the Court agrees with Catholic Charities that it erred by not initially considering Defendants' arguments regarding the employer liability element of Brownlee's sexual harassment claim. However, having considered Defendants' arguments, the Court finds that the result is the same. Defendants have not shown the absence of genuine dispute of material fact with respect to Brownlee's sexual harassment claim. Summary judgment on Count I (Sexual Harassment – Brownlee) is denied.

### B. Count V (Retaliation – Brownlee)

After rejecting Defendants' arguments on whether Brownlee had engaged in a statutorily protected activity—the first element of a retaliation claim under Title VII—the Court denied summary judgment on Count V (Retaliation – Brownlee). Order Summ. J. at 39–40 ("[T]he Court finds that there is a genuine issue of material

fact as to whether Brownlee engaged in a protected activity here . . . Reaching this determination precludes summary judgment, and the Court need not address Catholic Charities' second argument regarding causation. The Court denies Catholic Charities' motion for summary judgment with respect to Count V.").

### 1. Reconsideration is Proper for Count V (Retaliation – Brownlee)

Catholic Charities asserts that the Court should reconsider its denial of summary judgment on Count V (Retaliation – Brownlee) because even if Brownlee satisfied the protected activity element of her retaliation claim, "her retaliation claim cannot withstand summary judgment without evidence of causation." Def.'s Memo. Reconsider at 10 (citing *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019)). Plaintiffs respond that the "Court's opinion demonstrates that the Court did consider Brownlee's evidence of a causal connection." Pls.' Resp. Reconsider at 11. As an example, Plaintiffs point out that the Court discussed Brownlee's challenge of Catholic Charities' pretextual explanation for her termination. *Id.* (citing Order Summ. J. at 11).

Title VII's anti-retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). To survive summary judgment on her retaliation claim, Brownlee had to put forward sufficient evidence for a reasonable jury to find she satisfied three elements: (1) that she engaged in a statutorily protected activity; (2) that her employer took materially

adverse action against her; and (3) that there is a causal link between the protected activity and the adverse action. *See Mollet*, 926 F.3d at 896 (citation omitted). For Defendants to defeat Brownlee's retaliation claim at summary judgment, on the other hand, Defendants need only show that there was an absence of evidence supporting one element of her retaliation claim, or present affirmative evidence negating one element of Brownlee's retaliation claim. *Hummel*, 817 F.3d at 1016.

Accordingly, Catholic Charities is correct that even if Brownlee presented enough evidence to survive summary judgment on the protected activity element, her retaliation claim still should have failed if the record does not sufficiently support the causal connection element. Def.'s Memo. Reconsider at 10. And because Defendants' arguments regarding the causal link of Brownlee's retaliation claim created an independent basis for granting summary judgment, the Court erred by not considering those arguments, regardless of whether the Court happened to discuss evidence relevant to the causal link element. The Court therefore considers Catholic Charities' arguments regarding the causal link of Brownlee's retaliation claim.[6]

### 2. Reconsideration of Catholic Charities' Causal Link Arguments on Count V (Retaliation – Brownlee)

Catholic Charities contends that Brownlee cannot establish that her termination was retaliatory because the sole reason for her belief that she was fired due to her complaints of sexual harassment is the "short timing between her June 22,

---

[6]Again, in reconsidering Defendants' motion for summary judgment on this count, the Court limits its discussion to arguments the parties made at summary judgment, not the arguments made in the reconsideration briefs which could and should have been made at summary judgment. *Maui Jim*, 459 F. Supp. 3d at 1111 (internal quotation marks and citations omitted).

2015 e-mail and her June 25, 2015 termination." Defs.' Memo. Brownlee Mot. Summ.

J. at 10. According to Catholic Charities, suspicious timing, alone, is insufficient to

establish a causal link, and the timing here does not suggest a causal link because

Catholic Charities asked for the summary email that Brownlee claims led to her

termination. *Id.* at 11. Overall, Catholic Charities maintains that Brownlee lacks

evidence that she was terminated for any reason other than her behavior on June 16,

2015, in addition to her prior disciplinary history. *Id.* Brownlee responds that "[i]n

addition to suspicious timing, Brownlee can show that she was retaliated against

based on pretext." Brownlee Resp. Summ. J. at 9.

To establish a causal link in a Title VII retaliation claim, the plaintiff must

show "but-for" causation. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738,

748–49 (7th Cir. 2021) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360

(2013)). That is, Brownlee "must show that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

(internal quotation marks and citations omitted). To do so, Brownlee can offer

circumstantial evidence, such as suspicious timing, ambiguous statements, "and

other bits and pieces from which an inference of [retaliatory] intent might be drawn."

*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Brownlee may

further offer "evidence that the employer offered a pretextual reason for an adverse

employment action." *Dickerson v. Board of Trustees of Community College Dist. No.

522*, 657 F.3d 595, 601 (7th Cir. 2011). "Each type of evidence is sufficient by itself

(depending of course on its strength in relation to whatever other evidence is in the

case) to support a judgment for the plaintiff; or they can be used together." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal quotation marks and citations omitted).

Brownlee proffers two types of evidence to satisfy the causal link of her retaliation claim: (1) suspicious timing; and (2) pretext. Yet, as discussed below, Brownlee fails to "present circumstantial evidence that, when considered together, would permit a jury to believe that the defendants retaliated against her for exercising her [] rights." *Cole v. Illinois*, 562 F.3d 812, 815 n.2 (7th Cir. 2009).

### a. Suspicious Timing

As part of Human Resource's investigation into the June 16, 2015 incident between Brownlee and Washington, Brownlee sent a written statement to Human Resources via email on June 22, 2015. R. 121-1, Exh. A-20, Brownlee Written Statement. Brownlee explained the incident in detail and generally noted that "[t]his guy has been a constant problem with anyone he has worked with and nobody wants to work with him, he does the job partially and only wants to drive he does not put work into the computer at all and talks about everyone at the job constantly." *Id*. at 2. On June 25, 2015, Catholic Charities terminated Brownlee. DSOF ¶ 132. Brownlee testified that she believed her termination was retaliatory because of the short time between her June 22, 2015 email and her June 25, 2015 termination. DSOF ¶ 133. Defendants counter that the timing between Brownlee's email and termination is not suspicious, as Catholic Charities requested that Brownlee compose and send the June 22, 2015 statement. Defs.' Memo. Brownlee Mot. Summ. J. at 10–11.

"Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (citations omitted). *See Coleman*, 667 F.3d at 861 (interval of few weeks or months "may provide probative evidence of the required causal nexus" when "there is corroborating evidence of retaliatory motive").

At first blush, the timing of Brownlee's termination appears suspicious. Brownlee's termination came only three days after her email complaining about Washington, and such a short time frame could be indicative of a causal link. *See, e.g.*, *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). However, Catholic Charities ordered Brownlee to compose and send the email as part of the company's investigation of the June 16, 2015 altercation, so it seems improbable that Catholic Charities would terminate Brownlee for doing exactly what she was told to do. DSOF ¶ 125. In addition, Catholic Charities' investigation involved not only Washington's bad conduct on June 16, 2015, but also Brownlee's bad conduct. Defs.' Memo. Brownlee Mot. Summ. J. at 11; DSOF ¶¶ 112–25. As such, Brownlee's termination "on the heels of the key parties submitting statements about the incident," Defs.' Memo. Brownlee Mot. Summ. J. at 11, is not necessarily suspicious. Even assuming suspicious timing here, that timing alone does not establish causation in this case because Brownlee has not offered "corroborating evidence that supports an inference of causation." *Sklyarsky*, 777 F.3d 892, 898 (citations omitted). Thus, the Court finds

that Brownlee's suspicious timing evidence falls short of supporting the necessary causal link for her retaliation claim.

### b. Pretext

Brownlee avers that she can show that she was retaliated against based on pretext, under the cat's paw theory.[7] Brownlee Resp. Summ. J. at 9–11. Defendants retort that Brownlee "lacks evidence to suggest that her termination was influenced by anything but her swearing and threatening behavior toward Washington [on June 16, 2015], combined with her prior disciplinary history." R. 133, Defs.' Brownlee Reply at 12.

Once an employer in a Title VII retaliation case produces evidence "which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action . . . the plaintiff, to avoid summary judgment, then must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). When assessing pretext evidence, a court does not evaluate whether the employer's stated reason for the adverse action "was inaccurate or unfair, but whether the employer

---

[7]"[T]he 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22 (2011)).

honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). "A pretextual decision then, 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Scruggs*, 587 F.3d at 838–39 (quoting *Argyropoulos*, 539 F.3d at 736).

Applying these concepts here, Catholic Charities has produced evidence sufficient to show that it had a "legitimate non-discriminatory reason" for terminating Brownlee, namely her swearing and threatening behavior toward Washington on June 16, 2015, combined with her prior disciplinary history, which included warnings about unexcused absences, excessive "dock" time, and ongoing attendance problems. DSOF ¶¶ 89–93; *see also* Order Summ. J. at 35. Thus, to avoid summary judgment on her retaliation claim on the basis of pretext, Brownlee "must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Robertson*, 949 F.3d at 378 (citation omitted). Brownlee has failed to meet that burden because she has not adduced enough evidence demonstrating that Catholic Charities did not "honestly believe[] the reason it has offered to explain the discharge." *Harper*, 687 F.3d at 311.

While Brownlee asserts that "[e]mployer honesty is exactly what is at issue in the present case," Brownlee Resp. Summ. J. at 9, she does not explain how, or direct the Court to evidence of Catholic Charities' dishonesty. Rather, she highlights the friendships between Lee and Washington and Lee and Rouse, as well as the fact that

24

Washington was not terminated despite his disciplinary history. *Id.* at 10. In other words, Brownlee maintains that "Washington and Lee's friendship, coupled with Washington's extensive disciplinary history, creates an issue of material fact where a jury could find a causal connection between Brownlee's complaints and Lee's discriminatory animus towards Brownlee." *Id.*

The Court disagrees for three reasons. First, Brownlee has produced no evidence supporting her claim that Lee has discriminatory animus towards Brownlee. The fact that Washington, who purportedly sexually harassed Brownlee, was friends with Lee is not evidence that Lee had discriminatory animus. *See Jordan v. Summers*, 205 F.3d 337, 343–44 (7th Cir. 2000) (employee's mere perception that white female employees were being groomed for promotions failed to establish pretext); *Jenkins v. Lifetime Hoan Corp.*, 259 Fed. App'x. 863, 866 (7th Cir. 2008) (allegations that female colleague was treated more leniently because of relationship with a vice president did not amount to sex discrimination).

Second, Washington and Lee's friendship does not indicate that the decisionmakers who terminated Brownlee—Luiz Barbosa, Cynthia Gutierrez, and Bob Hannicke—provided a "phony reason" for doing so. *Scruggs*, 587 F.3d at 838–39 (citation omitted). For that to be the case, Brownlee would have to show, at minimum, that the cat's paw theory connects some discriminatory animus of Lee to Barbosa and Gutierrez's decision to terminate Brownlee. Brownlee has not made that showing. Again, Brownlee has not established that Lee has discriminatory animus, and as will

be discussed further below, Brownlee has not shown that the cat's paw theory applies to this case.

Lastly, it is not the Court's place to second-guess the fairness of Catholic Charities' termination decision. While it indeed seems unfair that Washington, unlike Brownlee, was not fired following the June 16, 2015 altercation, despite his disciplinary history, the Court's "sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson*, 949 F.3d at 378 (citations omitted). Brownlee has not offered enough evidence for a reasonable jury to find, by a preponderance of the evidence, that Catholic Charities' stated reason for terminating her was a falsehood, so her pretext argument fails.

Brownlee cites an unpublished decision, *Stringer v. Cambria Fabshop--Indianapolis, LLC*, 2015 WL 1499085, at *12 (S.D. Ind. Mar. 31, 2015), in support of her pretext argument, but the case is inapposite. In *Stringer*, the employer's stated reason for terminating the plaintiff was the plaintiff's violation of the employer's offensive behavior/harassment policy. *Id.* at *16. The plaintiff argued that the employer's argument was pretextual, as a similarly situated employee engaged in comparably egregious conduct and yet was not terminated. *Id.* The court in *Stringer* stated that the Seventh Circuit "has recognized that 'a discrimination plaintiff may employ such comparator evidence to discharge [his] burden at the pretext stage . . .'[;] the inconsistency in [an employer's] application of its [harassment] policy [can] create[] a genuine issue of material fact as to whether its stated reason for terminating [the plaintiff] was a pretext for discrimination" *Id.* (quoting *Coleman v.*

*Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012)). While Brownlee similarly supports her pretext argument with Catholic Charities' distinct treatment of Washington, Brownlee—unlike the plaintiff in *Stringer*—has not offered evidence sufficient to support a claim that Washington is a comparator.

To establish Washington as a comparator, Brownlee must show that she and Washington "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 808 (7th Cir. 2014) (internal quotation marks and citation omitted). Here, the record unequivocally demonstrates that there were differentiating circumstances that distinguish Brownlee's conduct from Washington's. For one, Catholic Charities determined, after its investigation of the June 16, 2015 incident, that Brownlee's unprofessionalism on that date was worse than Washington's because she made credible threats to have her son injure Washington, and because the company determined Brownlee's allegation that Washington hit her to be incredible. R. 130, Pls.' Resp. DSOF ¶¶ 121–127, 130. Perhaps more importantly, Brownlee had recently received a final written warning before her termination, whereas Washington had not. *Id.* Thus, because the record directly contradicts Brownlee's claim that Washington is a comparator, her reliance on *Stringer* does not advance her pretext argument.

Brownlee's pretext argument also fails because she has misapplied the cat's paw theory of liability. Under a cat's paw theory of liability, an employer may be liable "when a biased supervisor 'who lacks decisionmaking power uses the formal decision

maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). However, "the mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Id.* at 462. Significantly, where the "investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Staub*, 562 U.S. at 421.

The cat's paw theory does not fit here because Brownlee has not pointed to any evidence revealing bias or discriminatory animus on behalf of her supervisors, Lee and Rouse. Additionally, there is no evidence in the record that Lee or Rouse improperly influenced Barbosa, Hannicke, or Gutierrez to terminate Brownlee. As Catholic Charities points out, its human resources department investigated with information from multiple sources, not just Lee and/or Rouse. Defs.' Brownlee Reply at 10; Pls.' Resp. DSOF ¶ 125 (Plaintiffs do not contest that "Human Resources collected written statements from Washington, Brownlee and Lee in addition to the incident report prepared by Rouse"); *id.* ¶ 130.[8] Brownlee's claim to the contrary—

---

[8]Although Brownlee contests the statement of fact in ¶ 130 of Defendants' Statement of Material Facts, in reviewing the underlying evidence in support of Defendants' statement and Plaintiffs' response, the Court finds that the uncontroverted evidence shows that, although Gutierrez was not present to witness the incident on June 16, 2015 firsthand and relied in part on information provided to her by Lee and Rouse, she also relied on the statement submitted by Brownlee and statements made by Brownlee after the incident in a meeting with Lee, Rouse, and Ian Stephens (another supervisor), that she threatened Washington. R. 121-5, Gutierrez Dep. at 78:14-22.

that because Barbosa and Gutierrez only made infrequent visits to the 10 South Kedzie office, they must have relied solely on information provided by Lee and Rouse—is belied by the evidence in the record. Pls.' Resp. DSOF ¶¶ 125, 130. As a result, the cat's paw theory does not apply because the decisionmakers were not wholly dependent on a single source of biased information. *Id. See Martino v. MCI Communs. Servs.*, 574 F.3d 447, 453 (7th Cir. 2009) (internal quotation marks and citations omitted) (to avoid cat's paw liability a decisionmaker "is not required to be a paragon of independence. It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision"). All in all, Brownlee has failed to marshal enough evidence to illuminate a factual dispute on the question of pretext, so she cannot avoid summary judgment on that basis. *See Argyropolous v. City of Alton*, 539 F.3d at 736 n.6.

The Court, having considered Catholic Charities' arguments regarding the causal link to Brownlee's retaliation claim and Brownlee's suspicious timing and pretext arguments in support of causation, finds that Brownlee has failed to present enough evidence for a reasonable jury to find, by a preponderance of the evidence, that Brownlee was terminated in retaliation for any complaint of sexual harassment. The Court therefore grants Catholic Charities' motion for summary judgment on Count V (Retaliation – Brownlee).

### C. Count III (Sexual Harassment – Fleming) with respect to Washington's Conduct

The Court denied summary judgment on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct, because the Court rejected Defendants' arguments that: (a) Fleming's claim was time-barred; and (b) Washington's conduct was not severe or pervasive. Order Summ. J. at 48, 51–55. Having rejected Defendants' arguments on those points, the Court declined to address Defendants' argument regarding employer liability. *Id.* at 48, 55.

### 1. Reconsideration is Proper for Count III (Sexual Harassment – Fleming) with respect to Washington's Conduct

Catholic Charities argues that the Court should reconsider its ruling on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct because summary judgment on a sexual harassment claim cannot be resolved without a determination as to whether a basis for employer liability exists. Def.'s Memo. Reconsider at 6. Plaintiffs respond, again, that the Court's Memorandum Opinion and Order reflects that it did consider the basis for employer liability. Pls.' Resp. Reconsider at 5–6.

Just like Brownlee, Fleming had to put forward enough evidence on each element of her sexual harassment claim to survive summary judgment. So, Defendants could have prevailed on their motion for summary judgment on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct if Defendants had shown either an absence of evidence on the employer liability element, or

affirmative evidence negating the employer liability element. *Hummel*, 817 F.3d at 1016.

As was the case with respect to Brownlee's sexual harassment claim, the Court agrees with Plaintiffs that it did consider facts relevant to an employer liability analysis, *see* Pls.' Resp. Reconsider at 5–6. Even so, the Court did not discuss the relevant authority on employer liability, nor did it apply the controlling authority to the facts of the case. The Court consequently grants Catholic Charities' motion for reconsideration on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct and considers Defendants' arguments about employer liability next.[9]

### 2. Reconsideration of Catholic Charities' Employer Liability Arguments on Count III (Sexual Harassment – Fleming) with Respect to Washington's Conduct

Catholic Charities contends that Fleming's sexual harassment claim with respect to Washington fails because Fleming cannot show that Catholic Charities "knew or should have known about the harassment and unreasonably failed to stop it." R. 125, Defs.' Memo. Fleming Mot. Summ. J. at 9 (citing *Yancick*, 653 F.3d at 550). Catholic Charities maintains that Fleming did not complain about Washington's conduct other than reporting a 2012 comment Washington made about Fleming's pants. *Id.* at 10. Catholic Charities further suggests that it reacted reasonably to Fleming's 2012 report, as her report led to an apology from Washington, a

---

[9]As with the Court's previous reconsiderations, the Court analyzes the arguments the parties made at summary judgment, not the arguments made in the reconsideration briefing that could and should have been made before the district court rendered a judgment. *Maui Jim*, 459 F. Supp. 3d at 1111 (internal quotation marks and citations omitted).

supervisor's verbal warning to Washington, and a Mobile Outreach training about sexual harassment. *Id.* Fleming disputes this, stating that she "complained to Ray Lee each time that Washington made a sexually harassing comment to her, which was approximately every other day up until Washington's termination in November of 2015." R. 129, Fleming Resp. Summ. J. at 10 (citing PSOF ¶ 29).

As was the case with Brownlee's harassment claim, Catholic Charities may be liable for Fleming's purported sexual harassment by Washington if "the employer is shown to have been negligent in failing to prevent the harassment." *Cooper-Schut*, 361 F.3d at 426 (citation omitted). The first step in assessing Catholic Charities' potential negligence is to determine "whether the employer was on notice of the harassment." *Id.* That determination is satisfied when notice is "given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert*, 723 F.3d at 866 (citation omitted).

Here, the record contains evidence that Fleming informed Lee about Washington's purported sexual harassment, including harassment taking place in 2015. R. 131-7, Fleming Aff. ¶ 6.[10] Due to Catholic Charities' own sexual harassment reporting policy, as discussed above, *supra* Section I.A.2, which mandates that supervisors informed of harassment escalate such reports to human resources,

---

[10]Catholic Charities attacks this evidence, arguing that Fleming's evidence that she complained to supervisors every other day for three years about Washington "rests solely on Fleming's inadmissible affidavit and contradicts her deposition testimony." R. 132, Defs.' Fleming Reply at 8. Yet, the Court already rejected this argument by Defendants in their motion to strike. *See* Order Summ. J. at 25–26. And Catholic Charities does not ask the Court to revisit that aspect of its Order.

Employee Handbook at 31, Lee was "someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Lambert*, 723 F.3d at 866 (internal quotation marks and citation omitted). The Court thus finds, for the same reasons it did for Brownlee above, that there is sufficient evidence in the record for a reasonable jury to find that the employer liability element of Fleming's sexual harassment claim with respect to Washington's conduct is met. *See supra* Section I.A.2. Whether Catholic Charities was actually on notice is an issue for another day. *See Anderson v. City of Rockford*, 932 F.3d 494, 509 (7th Cir. 2019) ("Of course, the ultimate facts may come out differently at trial and fully absolve Detective Stevens. Our conclusion is limited to observing that the record, as it now stands, allows the plaintiffs to survive summary judgment on this alleged Brady violation.").

Therefore, although the Court has granted Catholic Charities' motion for reconsideration on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct, the result is the same. Catholic Charities' motion for summary judgment on that count is denied.

### D. Alternative Request on Count III (Sexual Harassment – Fleming)

Catholic Charities also posits that, even if there is a basis for employer liability, the Court should "reconsider its conclusion that there is sufficient evidence of severe or pervasive conduct, as that conclusion is contrary to controlling authority." Def.'s Memo. Reconsider at 11. Plaintiffs counter that Fleming's affidavit stating that Washington made sexually inappropriate comments to her approximately every other

day "demonstrates that Washington's inappropriate conduct was severe or pervasive." Pls.' Resp. Reconsider at 11 (citations omitted).

The Court construes Catholic Charities' assertion that the Court's conclusion was "contrary to controlling authority" to mean that Catholic Charities believes the Court made a manifest error of law. *Slick*, 111 F. Supp. 3d at 902. "[M]anifest error is not demonstrated by the disappointment of the losing party." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation and citation omitted). "It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Id.*

Catholic Charities cannot overcome the "heavy burden" for asserting that the Court committed a manifest error of law. *Patrick*, 103 F. Supp. 3d at 911–12 (internal quotation marks and citations omitted). In its Order, the Court determined that when looking at the non-time-barred allegations, the evidence supporting Fleming's hostile work environment claim was "[t]hat from October 2012 to November of 2015, Dwayne Washington made sexual comments to [Fleming] that interfered with [her] ability to do [her] job." Order Summ. J. at 55. As discussed elsewhere in the Order, Fleming specified that Washington made sexually harassing comments to her "at least every other day" until his termination in November 2015. *Id.* at 15 (citing PSOF ¶ 29; *see also* Fleming Aff. at ¶¶ 5, 7). In denying summary judgment, the Court found that whether Fleming's non-time-barred allegations constituted severe and pervasive harassment was a question of fact, *i.e.*, meant for the jury to decide. Such a conclusion is not contrary to Seventh Circuit precedent. *See, e.g., Johnson v. Advoc. Health &*

*Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) (citations omitted) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."); *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (same); *Saxton v. Wolf*, 508 F. Supp. 3d 299, 310 (N.D. Ill. 2020) (same).

Catholic Charities maintains that Fleming's vague, conclusory testimony is insufficient to support the severe or pervasive element of her hostile work environment claim, but Catholic Charities did not advance those arguments before the Court rendered its judgment. *See Maui Jim*, 459 F. Supp. 3d at 1111 (internal quotation marks and citations omitted). While the Court therefore need not consider Catholic Charities' "new legal theories not argued before the ruling," *Schilke*, 758 F. Supp. 2d at 554, the Court does so for the sake of completeness.

Catholic Charities cites *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012), for the proposition that statements like "Washington made sexual comments to me that interfered with my ability to do my job," are too vague for a harassment claim to proceed. Def.'s Memo. Reconsider at 12. Yet, the Seventh Circuit did not draw a bright line rule in *Porter*. Rather, the Seventh Circuit found that the specific instances of harassment cited by the plaintiff in that case—including being called "church girl" once and her allegations that she was being "harassed" and "intimidated" by her supervisors—were vague and conclusory, and that "without more detail, a reasonable jury could not find that the conduct was objectively offensive, severe, or pervasive." 700 F.3d at 956 (citations omitted). Viewing the record in the light most favorable to the plaintiff, "the most" the Seventh Circuit could

35

say about the plaintiff was "that she was subject to sporadic inappropriate and rude comments by her supervisors . . . ." *Id*. In fact, the plaintiff's allegations were limited to only "a couple of isolated incidents over four months." *Porter v. City of Chicago*, 2011 WL 1261133, at *8 (N.D. Ill. Mar. 31, 2011), *aff'd*, 700 F.3d 944 (7th Cir. 2012).

By contrast here, Fleming stated in her affidavit that Washington made sexually harassing comments to her every other day, which prevented her from doing her job, a far cry from the mere sporadic and rude comments in *Porter*. PSOF ¶ 29; *see also* Fleming Aff. at ¶¶ 5, 7. Additionally, as Catholic Charities concedes, Def.'s Memo. Reconsider at 6, Fleming has specified at least one comment made by Washington during the permissible time period—"how did you get up in there," which Fleming believed referred to having sex with a female co-worker. Pls.' Resp. DSOF ¶ 54. This is consequently not a case where the plaintiff has failed to specify any allegedly harassing comments or conduct. Fleming, unlike the plaintiff in *Porter*, has provided enough evidence for the jury to decide if her allegations rise to the level of severe or pervasive conduct; certainly, her statement that the harassing comments took place every other day is specific enough to create a fact issue as to the pervasiveness of Washington's conduct. *See Robinson*, 894 F.3d at 828 (citations omitted) (severe or pervasive requirement is "disjunctive, not conjunctive; the standard may be met by a single extremely serious act of harassment or by a series of less severe acts").

Catholic Charities next argues that "allegations of comments 'of a sexual nature' are, standing alone, too vague to support a hostile work environment claim."

Def.'s Memo. Reconsider at 12–13 (citing *EEOC v. Int'l Profit Assocs.*, 647 F. Supp. 2d 951, 983 (N.D. Ill. 2009)). However, in *Int'l Profit Assocs.*, the claimant at issue could not "remember a single comment with enough specificity to determine whether any or all of the comments were more like 'occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers,' which is generally non-actionable, or more like 'uninvited sexual solicitations; intimidating words or acts; or obscene language or gestures,' which are generally actionable." 647 F. Supp. 2d at 983 (citation omitted). Here, Fleming remembers specific conduct by Washington falling into the latter category, and she stated in her affidavit that he made sexually harassing comments which prevented her from doing her work. Thus, *Int'l Profit Assocs.* fails to persuade the Court that it made a manifest error of law by letting the jury decide if Fleming's allegations constitute severe or pervasive conduct.

Finally, Catholic Charities insists that Fleming's harassment claim fails because she fails to identify the frequency of Washington's comments (citing *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005)). In *Ezell*, the Seventh Circuit affirmed summary judgment on the plaintiff's hostile work environment claim, which was supported by the plaintiff's claim that she was harassed on a "regular basis." 400 F.3d at 1048. The Seventh Circuit observed that "a regular basis could be daily, weekly, monthly or even yearly" so the court could not conclude that alleged harassment was pervasive. *Id.* Here, Fleming did not generally claim that the conduct took place on a regular basis. Rather, Fleming specified that Washington made sexually harassing comments to her approximately every other day. PSOF ¶ 29. *Ezell* is accordingly off

point, and Catholic Charities has not met its heavy burden of establishing that the Court misapplied or failed to recognize controlling precedent. *Oto*, 224 F.3d at 606. Catholic Charities' motion for reconsideration on this alternative basis is therefore denied; the Court's ruling denying summary judgment on Fleming's sexual harassment claim with respect to Washington's conduct stands.

### E. Alternative Request to Reopen Discovery

Catholic Charities' final request in its motion for reconsideration is that the Court reopen discovery, so that Catholic Charities can depose Fleming about her post-deposition statement that "from October 2012 to November of 2015, Dwayne Washington made sexual comments to me that interfered with my ability to do my job." Def.'s Memo. Reconsider at 13–14. Plaintiffs object to the request, arguing that it is unnecessary to reopen Fleming's deposition and that reopening discovery "years after it closed would contravene the court's interest in ensuring 'prompt and orderly litigation.'" Pls.' Resp. Reconsider at 12 (citing *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 851 (7th Cir. 2002)).

The decision to reopen discovery is within the discretion of the court. *Winters v. Fru–Con, Inc.*, 498 F.3d 734, 743 (7th Cir. 2007). That discretion is "considerable," as "case management depends on enforceable deadlines, and discovery must have an end point." *Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015) (internal quotation marks and citations omitted). At the same time, a purpose of discovery is to avoid surprises at trial. *See Hickman v. Taylor*, 329 U.S. 495, 500–01 (1947); *see also United States v. Brown*, 349 F. Supp. 420, 429 (N.D. Ill. 1972), *modified*, 478 F.2d

1038 (7th Cir. 1973) ("The underlying purpose of discovery is to escape from the sporting theory of litigation towards the principle of an open proceeding in which surprise is minimized and the opposing legal and factual positions are fully clarified for the enlightenment of the decision-maker."). To that end, a court can reopen discovery to cure the prejudice caused by a party's discovery failure. *See Medline Indus., Inc. v. C.R. Bard, Inc.*, 2021 WL 809734, at \*9 (N.D. Ill. Mar. 3, 2021); *Cummings v. Dart*, 2022 WL 461987, at \*3 (N.D. Ill. Feb. 15, 2022) (collecting cases).

The Court, in the exercise of its discretion, finds that reopening discovery on a limited basis is proper here, for two primary reasons. First, no trial has been set in this case, so reopening discovery will not unduly delay the case. Second, reopening discovery can help cure any prejudice caused by Fleming's summary judgment affidavit. In particular, allowing Catholic Charities to depose Fleming again about her summary judgment affidavit will lead to the full and open disclosure of the facts of the case, thereby eliminating surprise evidence at trial.

Fleming insists that reopening discovery for the purpose of deposing Fleming would not be productive, and that, reopening discovery two years after discovery closed would obstruct the prompt and orderly litigation of the case. Pls.' Resp. Reconsider at 12 (citing *Campania*, 290 F.3d at 851). The Court disagrees. Re-deposing Fleming on her summary judgment affidavit will enable Catholic Charities to discover the bases for her summary judgment affidavit. Specifically, Catholic Charities will be able to investigate Fleming's statement, made for the first time in her summary judgment affidavit, that "from October 2012 to November of 2015,

Dwayne Washington made sexual comments to me that interfered with my ability to do my job." Fleming Aff. ¶ 6. Such investigation is productive because it will avoid surprises at trial and ensure that Catholic Charities is able to adequately prepare its defense. The Court appreciates that reopening discovery, even on a limited basis, will cause some delay to this case, which has been ongoing since 2016. However, the Court finds that the delay will be minor, and is necessitated by Fleming's summary judgment affidavit, which contains information not adduced during her deposition. Again, the Court has not set a date for trial as of yet. Catholic Charities' alternative request to reopen discovery is accordingly granted. The Court will reopen discovery for the limited purpose of Catholic Charities' deposing Fleming regarding Paragraph 6 of her summary judgment affidavit. The Court next considers Fleming's motion for reconsideration.

## II.    Fleming's Motion for Reconsideration

Fleming moves the Court to reconsider two aspects of its ruling on summary judgment. First, Fleming argues that the Court erred by dismissing Fleming's sexual harassment allegations pertaining to the harassment by a third-party vendor, Vaia. Pl.'s Mot. Reconsider at 3–7. Second, Fleming contends that the Court erred by dismissing Fleming's sexual harassment claim pertaining to conduct by Washington prior to January 2015. *Id.* at 7–9. The Court evaluates each in turn.

### A.  Count III Sexual Harassment (Fleming) with Respect to Vaia's Conduct

The Court held that "Fleming's retaliation claim with respect to her allegations against Vaia's owner are time-barred," and granted summary judgment against

Fleming "with respect to Fleming's sexual harassment claim against Catholic Charities premised on the conduct of Vaia's owner." Order Summ. J. at 51. Fleming argues that the Court erred in its ruling in three ways: (1) Fleming offered competent evidence to show that she was subjected to sexual harassment by Vaia's owner within the statute of limitations period; (2) a jury should assess the credibility of Fleming and Cathy Whinna; and (3) the cases the Court relied upon in its Order support Fleming. Pl.'s Mot. Reconsider. For the reasons discussed below, Fleming fails to meet her heavy burden to establish that the Court made a manifest error of law or fact.

### 1. Fleming's Competent Evidence of Harassment During the Limitations Period

Fleming argues, in a nutshell, that the Court improperly gave more weight to Catholic Charities' evidence that Fleming was not exposed to Vaia's owner during the statute of limitations period than the Court gave to her affidavit and deposition testimony that she was sent to Vaia approximately two to three times per week. Pl.'s Mot. Reconsider at 3–5. Fleming also emphasizes her testimony that she requested a position change (which eventually was granted in 2015) precisely because she was being harassed by Vaia's owner, to support her position that she was being harassed by Vaia's owner through 2015. *Id.* at 4. Fleming argues that the Court took conflicting evidence and improperly assessed the credibility of Fleming and Cathy Whinna (Whinna, Director of Facilities Services and Emergency Response). *Id.* Fleming additionally avers that the Court improperly made an inference in favor of the moving party, Catholic Charities. *Id.* at 4–5. Catholic Charities retorts that the Court did not make an improper credibility assessment between Whinna and Fleming because

41

controlling precedent holds that "mere assertions (by an employee who lacks first-hand knowledge) disputing the accuracy of a properly authenticated business record are insufficient to create a question for the jury." R. 152, Def.'s Resp. Reconsider at 3–4.

Again, "manifest error is not demonstrated by the disappointment of the losing party," but instead by the "the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto*, 224 F.3d at 606 (internal quotation and citation omitted). Fleming cannot show that the Court misapplied or failed to recognize controlling precedent because the Court's decision was underpinned by, and consistent with, Seventh Circuit case law. Specifically, the Court's decision that "no reasonable jury could believe that Vaia's owner sexually harassed her within 300 days of November 2015, in the face of clear records to the contrary," Order Summ. J. at 50, is supported by *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010). In *Turner*, the Seventh Circuit affirmed summary judgment for the employer on wage claims and found that "although Turner disputes the accuracy of The Saloon's records, his mere assertions are insufficient to create a jury issue." *Id* (citations omitted).

While Fleming cites to cases about boilerplate law governing summary judgment, such as the prohibition against assessing the credibility of witnesses, and the requirement that all inferences be drawn in favor of the nonmoving party, she fails to overcome her "heavy burden" in demonstrating that the Court failed to follow controlling precedent, in light of *Turner*'s applicability. Put simply, *Turner*, which is

still valid and controlling precedent, supported the Court's decision, so Fleming cannot show that the Court committed a manifest error of law. Fleming, too, had a chance to rebut the completeness of Vaia's records on summary judgment but failed to do so. It is improper for Fleming to take a second bite at the apple here. Fleming's motion for reconsideration on Fleming's competent evidence regarding Vaia is denied.

### 2. Credibility Assessment of Fleming and Whinna

Fleming's second argument fares no better than the first because she simply reargues the facts that were already before the Court on summary judgment. Specifically, Fleming responds to the argument Catholic Charities made in its reply brief in support of summary judgment regarding the implausibility of Fleming's testimony. Pl.'s Mot. Reconsider at 5–6. Catholic Charities argued that it was difficult to believe that Catholic Charities' ten vans would have required such frequent repairs and maintenance. Defs.' Fleming Reply at 4. Catholic Charities supported its argument with math: "To visit Vaia 2-3 times every week for 2.5 years adds up to about 325 visits." *Id.* But the Court already considered Fleming's testimony that she was sent to Vaia two to three times per week, as well as Catholic Charities' arguments regarding the testimony. Furthermore, Fleming argues for reconsideration based on her response to Catholic Charities' mathematic argument when that was not the basis for the Court's holding. Instead, the Court found that no reasonable juror could believe that Vaia's owner sexually harassed her within 300 days of November 2015, "in the face of clear records to the contrary." Order Summ. J. at 50. As a result, Fleming's rebuttal is to an argument that the Court did not rely in in reaching its

43

decision, so her contention does not persuade the Court that reconsideration is merited.

A Court will not reconsider its decision simply because one party disagrees with the outcome. *Oto*, 224 F.3d at 606. To prevail on a motion to reconsideration, Fleming must show much more, such as the Court's manifest error of fact or law. *Id.* Fleming has failed to make that showing, so her motion for reconsideration on the plausibility of Fleming's testimony is denied.

### 3. The Cases the Court Relied Upon

In a final attempt to get the Court to conduct a do-over, Fleming argues that two cases the Court relied upon in its decision, *Hicks v. Irvin*, 2010 WL 2723047, at *3 (N.D. Ill. July 8, 2010) and *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010), "actually support" Fleming. Pl.'s Mot. Reconsider at 6–7. Yet, the Court already considered these cases and found that they supported its decision that Fleming's allegations regarding Vaia's conduct were time-barred. Fleming's different reading of the cases is not a basis for reconsideration, so Fleming's motion for reconsideration on that basis is denied as well.

### B. Count III Sexual Harassment (Fleming) with Respect to Washington's Conduct Before 2015

Fleming next takes aim at the Court's finding that Fleming's allegations before 2015 about Washington's conduct are time-barred. Fleming's argument is dead in the water, however, because Fleming supports this contention with *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014), a case that Fleming already cited in her response brief in opposition to summary judgment. Fleming Resp. Summ. J. at 7.

Fleming objects that the Court did not give enough weight to the *Adams* decision, but that is not a proper basis for reconsideration, for a motion to reconsider is not an appropriate vehicle to "advance arguments already rejected by the Court . . . ." *Schilke*, 758 F. Supp. 2d at 554. Fleming now also attempts to distinguish authority cited by Defendants in their opening brief that she failed to address in her response brief. Defs.' Memo. Fleming Mot. Summ. J. at 5–7; Order Summ. J. at 54. A motion for reconsideration is not the appropriate vehicle for Fleming to fix oversights made in her summary judgment response brief either. Fleming's motion for reconsideration on Fleming's allegations of Washington's pre-2015 conduct is denied.

## Conclusion

For the reasons given above, Catholic Charities' motion for reconsideration (R. 146) is granted in part and denied in part, and Fleming's motion for partial reconsideration (R. 150) is denied. The Court reconsiders its holdings on Count I (sexual harassment – Brownlee), Count III (sexual harassment – Fleming), and Count V (retaliation – Brownlee), to the extent the Court did not address arguments by Catholic Charities that provided independent bases for summary judgment. to the extent the Court did not address arguments made by Catholic Charities that provided independent bases for summary judgment. To that end, the Court concurrently is entering an amended Memorandum Opinion and Order on summary judgment, which reflects the Court's reconsideration on those counts. Upon reconsideration, Defendants' motion for summary judgment on Count I (sexual harassment – Brownlee) and Count III (sexual harassment – Fleming) is still denied, whereas

Defendants' motion for summary judgment on Count V (retaliation – Brownlee) is now granted. Catholic Charities' motion to reopen discovery is granted. The Court reopens discovery for a limited purpose: Catholic Charities may depose Fleming about Paragraph 6 of her summary judgment affidavit. The Court refers supervision of the limited discovery to Magistrate Judge McShain. The Court reopens discovery for a limited purpose: Catholic Charities may depose Fleming about Paragraph 6 of her summary judgment affidavit. The Court refers supervision of the limited discovery to Magistrate Judge McShain.

Within seven (7) days after taking Fleming's deposition, the parties shall file a joint status report indicating the parties' readiness for trial. The status report shall state: (1) whether the parties would like a settlement conference with Magistrate Judge McShain, (2) whether the parties consent to proceeding to trial before Magistrate Judge McShain, and (3) whether the parties agree to a bench trial before the District Judge.

Dated: March 1, 2022

United States District Judge
Franklin U. Valderrama

46