**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ESTHER BROWNLEE and JOANIE FLEMING, | |
| Plaintiffs, | |
| v. | No. 16-cv-00665 |
| | Honorable Franklin U. Valderrama |
| CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO and DWAYNE WASHINGTON, | |
| Defendants. | |

**AMENDED MEMORANDUM OPINION AND ORDER[1]**

Plaintiffs Esther Brownlee (Brownlee) and Joanie Fleming (Fleming) (collectively, Plaintiffs) worked for the Catholic Charities of the Archdiocese of Chicago (Catholic Charities) as mobile outreach workers providing emergency services to homeless and at-risk people in Chicago. Plaintiffs allege that they worked in a discriminatory, sexually charged, and hostile work environment. They brought suit against Catholic Charities and one of their male co-workers, Duane Washington (Washington) (collectively, Defendants), asserting several counts arising under Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000(e), *et seq.* (each count concerns a distinct Title VII theory, including sexual harassment, sex

---

[1]This Amended Memorandum Opinion and Order is issued as a result of Defendant Catholic Charities of the Archdiocese of Chicago's Motion for Reconsideration, R. 146, which the Court granted in part concurrently with the issuance of the instant ruling.

discrimination, and retaliation). R. 37, SAC.[2] Brownlee also brought state claims for battery, intentional infliction of emotional distress (IIED), and violations of the Illinois Gender Violence Act (IGVA), 740 Ill. Comp. Stat. 82/1 *et seq. Id.* Defendants now move for summary judgment as to the following Brownlee counts: Count I (sexual harassment); Count IV (sex discrimination); Count V (retaliation); Count VIII (battery), Count IX (intentional infliction of emotional distress), and Count X (IGVA violation). R. 122, Defs.' Brownlee Mot. Summ. J. And, Defendants move for summary judgment as to the following Fleming counts: Count III (sexual harassment) and Count VI (retaliation). R. 124, Defs.' Fleming Mot. Summ. J. Defendants also move to strike certain portions of affidavits that were attached to Plaintiffs' responses in opposition to the motions for summary judgment. R. 135, Defs.' Mot. Strike. For the reasons stated below, Defendants' motion to strike (R. 135) is granted in part and denied in part. Defendants' request for reasonable attorneys' fees in connection with bringing the motion to strike is denied. Defendants' motion for summary judgment as to Brownlee's claims (R. 122) is granted in part and denied in part. Defendants' motion for summary judgment as to Fleming's claims (R. 124) is granted in part and denied in part.[3]

---

[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[3]It appears that Defendants' Amended Local Rule 56.1 Statement of Uncontested Facts in Support of Summary Judgment [R. 121] was designated as a "motion" on the case docket in error. The Court directs the Clerk of the Court to strike the "motion" designation from R. 121.

## Background

The following facts are set forth as favorably to Plaintiffs, the non-movants, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). This background section details all material undisputed facts and notes where facts are disputed. At summary judgment, the Court assumes the truth of the undisputed facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

## A. Overview of the Parties

Catholic Charities is an Illinois not-for-profit corporation that provides essential services to individuals in need throughout the Chicagoland area.[4] R. 130, Pls.' Resp. DSOF ¶ 1. Mobile Outreach, a Catholic Charities program, provides 24-hour emergency services to homeless and at-risk populations, including transporting individuals to shelters or hospitals, performing well-being checks, and delivering emergency food boxes. *Id.* ¶ 2. Mobile Outreach workers spend most of their nine-hour shifts in the field, driving from home to shelter to hospital and performing outreach services in pairs. *Id.* ¶¶ 8–9.

Brownlee and Fleming, as well as Washington, are all former Catholic Charities employees who worked in the Mobile Outreach program. Pls.' Resp. DSOF ¶ 3.

---

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for Defendants' Statement of Facts [R. 121]; "Pls.' Resp. DSOF" for Plaintiffs' Response to Defendants' Statement of Facts [R. 130]; "PSOF" for Plaintiffs' Statement of Additional Facts [R. 131]; and "Defs.' Resp. PSOF" for Defendants' Response to Plaintiffs' Statement of Additional Facts [R. 134].

Brownlee was hired as a Mobile Outreach worker in September 2012. Pls.' Resp. DSOF ¶ 85. From September 2012 through May 2015, Brownlee worked during the 3 p.m. to 12 a.m. shift. *Id.* ¶ 86. In May 2015, Brownlee was transferred to the 7 a.m. to 4 p.m. shift, on which Washington became her regular partner. *Id.* ¶ 94. Brownlee received a few disciplinary warnings during the course of her employment (August 7, 2013 – unexcused absences; August 20, 2014 – excessive "dock" time; December 15, 2014 – excessive unexcused absences (Final Written Warning); March 2, 2015 – ongoing attendance problems). *Id.* ¶¶ 89–93. On June 25, 2015, Catholic Charities terminated Brownlee following an incident involving Washington (discussed in more detail below). *Id.* ¶ 132.

Fleming was hired as a Mobile Outreach worker in October 2012. Pls.' Resp. DSOF ¶ 35. From September 2013 through October 2014, Fleming was partnered with Jackie Tate (Tate)[5]. *Id.* ¶ 36. Fleming was occasionally partnered with other Mobile Outreach workers, including Washington. *Id.* ¶ 37. Fleming estimates that she was paired with Washington two or three times over the course of her employment (but at no time during Washington's last two years of employment—2013 through 2015). *Id.* ¶¶ 37, 58. In May 2015, Fleming switched positions within the Mobile Outreach department from field worker to office administrative assistant. *Id.* ¶ 38. On May 15, 2016, Fleming resigned from Catholic Charities to take a new employment opportunity in another state. *Id.* ¶ 84.

---

[5]Tate's claims in this action were dismissed on summary judgment on February 28, 2020. R. 113.

Washington began working for Catholic Charities as a temporary hire in the fall of 2012 and was brought on as a regular employee on May 16, 2013. Pls.' Resp. DSOF ¶ 27. Washington received written and verbal discipline related to his driving three times while employed at Catholic Charities. *Id*. ¶¶ 30–32. On July 27, 2015, Washington received a written warning based on unprofessional behavior toward Brownlee (again, incident described in further detail below). *Id*. ¶ 33. Washington's last day of work at Catholic Charities was November 11, 2015. *Id*. ¶ 34. On November 20, 2015, Catholic Charities terminated his employment based on unprofessional behavior, including unsafe driving and disrespectful behavior toward colleagues and clients. *Id*.

### B. Facts Related to Brownlee's Claims

Brownlee asserts claims for sexual harassment, sex discrimination, retaliation, battery, intentional infliction of emotional distress, and a violation of the IGVA.

### i. Brownlee's Work Environment

Brownlee was transferred to the 7 a.m. to 4 p.m. shift on May 16, 2015, and with this transfer, Washington became her regular partner for the subsequent four weeks. Pls.' Resp. DSOF ¶¶ 94, 99. Brownlee testified that Washington made inappropriate comments to her even before they became partners, recalling three comments in particular—(1) Washington asked Brownlee if she was having sex with the Mobile Outreach security guard, a comment which Brownlee ignored; (2) Washington made comments about Fleming in Brownlee's presence, calling Fleming

a "dike–ass bitch"; and (3) Washington also said, in Brownlee's presence, that Fleming "need[ed] some dick." R. 121-1, Brownlee Dep. at 166:15–167:16; *see also* Pls.' Resp. DSOF ¶ 97.

Brownlee testified that during the four weeks she and Washington were partners, Washington made inappropriate comments about her and in her presence, engaged in inappropriate touching, and hit her with enough force to hurt her. These incidents are detailed as follows:

1. On several occasions, Washington commented that Brownlee "looked good" while looking at her backside when she was exiting their vehicle. Pls.' Resp. DSOF ¶ 100.

2. Approximately every other day, Washington suggested that Brownlee call Ray Lee (Lee), their supervisor, to ask for favors (such as being able to return to the office early). Pls.' Resp. DSOF ¶ 101. Washington implied that Brownlee would have better luck with Lee, telling Brownlee that "Ray likes you" or "Ray wants to fuck you." *Id*.

3. Approximately five times, Washington made comments to Brownlee such as, "if I was your man, I'd do this to you," "if I was your man, I'd fuck you like this," or if he was her man, she wouldn't be able to come to work, because she would be "walking crooked." Pls.' Resp. DSOF ¶ 103; *see also* Brownlee Dep. at 173:8–21. Brownlee responded to these comments by saying, "no, you aren't my man, and you aren't going to be." *Id.*

4. On several occasions, Washington told Brownlee that if he had sex with Fleming, Fleming wouldn't want to be with women anymore. Pls.' Resp. DSOF ¶ 104.

5. Approximately five times between May 16, 2015 and June 16, 2015, Washington touched Brownlee's shoulders, touched her face with his hand, or hugged her. Pls.' Resp. DSOF ¶ 105. When this touching occurred, Brownlee would hit his hand and say, "don't touch me." *Id.* The parties contest whether the touching was sexual, with Brownlee testifying that Washington touched her in a sexual nature, and it felt "creepy." *See* Brownlee Dep. 175:2–178:12.

6. On one occasion prior to June 16, 2015, Washington touched Brownlee's thigh while they were in their vehicle. Pls.' Resp. DSOF ¶ 106. Brownlee pushed his hand away and said, "don't do that." Washington did not touch her thigh again after this incident. *Id.*

7. Finally, on June 16, 2015, while delivering a food box to a senior citizen, Washington and Brownlee engaged in a verbal altercation. Pls.' Resp. DSOF ¶ 112. Washington did not believe that the client, who suffered from mental illness, was capable of signing for receipt of the food box. *Id.* Brownlee began yelling at Washington about how to handle the delivery. *Id.* When they returned to the car, Brownlee was still yelling and cursing at Washington. *Id.* ¶ 113. Washington then called Lee and placed the phone on speaker, so that Lee could hear Brownlee's cursing. *Id.* Lee instructed the pair to return to the office. *Id.* On the ride back to the office, Brownlee put in her earphones, so that she could ignore Washington. *Id.* ¶ 114. Wanting to get Brownlee's attention, Washington made physical contact with

Brownlee's shoulder. *Id.* ¶ 115. The severity of the contact is disputed. Washington testified that he reached over the passenger seat and touched her shoulder to get her attention (*see* R. 121-3, Washington Dep. at 183:4–184:24), and Brownlee testified that Washington hit her with enough force to "hurt" her (*see* Brownlee Dep. at 137:10–140:24). Brownlee testified that at some point during the argument, she may have called him a "stupid mother fucker," and after Washington hit her, she said something like, "[i]f you touch me again, I'm going to have my son touch your ass." *Id.* at 136:1–15, 131:14–16. The parties also dispute what transpired when they returned to the office. Brownlee testified that Washington, Lee, Renee Rouse (Rouse, the Director of the Mobile Outreach Program), and Stephens met in a separate meeting (without her) before she and Washington were questioned together. R. 131, PSOF ¶ 5. Washington testified that when they returned to the office, Lee and Ian Stephens (Stephens, Assistant Director of Mobile Outreach) met with Brownlee and Washington together initially; in that meeting, Lee and Stephens asked the pair to demonstrate what happened. Pls.' Resp. DSOF ¶ 121. Lee and Rouse (who joined shortly after the demonstration) concluded that Washington had tapped Brownlee on the arm to get her attention and had not hit her. *Id.* ¶ 121–22. Rouse prepared a detailed incident report based on her understanding of the events after speaking with Brownlee and Washington, and Human Resources initiated an investigation. *Id.* ¶ 123.

The extent and specificity of Brownlee's reporting of Washington's conduct are subject to considerable debate between the parties and are at the center of

Defendants' motion to strike. *See* Defs.' Mot. Strike at 1. The following is clear from the deposition transcripts:

1.    Agreeing with defense counsel's recitation of Brownlee's EEOC complaint, Brownlee testified that she told Lee that Washington "talks too much, plays too much, and is too touchy–feely." *See* Brownlee Dep. 183:12–184:1. Again, in agreeing with defense counsel's recitation of Brownlee's EEOC complaint, Brownlee testified that she did not inform Lee of Washington's comments *involving* Lee in more specific detail, because "she was too embarrassed to repeat them." *Id*. Brownlee further testified that she had this same type of "conversation" with Lee "on several occasions." *Id*.

2.    Brownlee testified that on one occasion, she asked Lee, "why do I have to work with this guy, man, he's a freak." *Id*. at 172:16–173:7.

3.    Brownlee testified that she "told [Lee] on several occasions that [Washington] would touch me and things like that, and I was like why do you guys have me working with him. He's very unprofessional. He talks on my phone, and [Lee] was like, well, that's why we put you with him because we know you can handle him […]." *Id*. at 163:16–164:5.

4.    As part of Human Resource's investigation into the June 16, 2015 incident, Brownlee sent a written statement to Human Resources via email on June 22, 2015. R. 121-1, Exh. A-20, Brownlee Written Statement. Brownlee explained the incident in detail and generally noted that "[t]his guy has been a constant problem with anyone he has worked with and nobody wants to work with him, he does the job

partially and only wants to drive he does not put work into the computer at all and talks about everyone at the job constantly." *Id.* at 2. Before sending this email, Brownlee had never complained about Washington's conduct in writing. Pls.' Resp. DSOF ¶ 107.

5.     Brownlee testified that on June 17, 2015 (one day after the incident), Catholic Charities "wanted to put me right back with him." *See* Brownlee Dep. at 146:15–147:11. She complained to Lee, explaining that she didn't feel safe working with him. *See* Pls.' Resp. DSOF ¶ 130; *see also* PSOF ¶ 6. Brownlee testified that at first, Lee resisted, insisting that Rouse said she had to ride with him. Brownlee Dep. at 146:22–147:11. Lee then called Rouse, and "at some point," Brownlee was partnered with someone else for a couple of days. *Id.* Brownlee was not partnered with Washington again. Pls.' Resp. DSOF ¶ 129.

6.     Defense counsel noted the "three different times" Brownlee complained about Washington's conduct (her non-specific conversation(s) with Lee; her June 22, 2015 email; and, her June 17, 2015 verbal complaint that she did not feel safe) and asked Brownlee if there were any other times that Brownlee "complained about [Washington's] treatment of her." Brownlee Dep. at 184:14–22. Brownlee answered that "she came to [Lee] on a regular basis because [Washington's] behavior, it's like he would want to drive on a daily basis." *Id.* Brownlee continued, noting that "[h]e did not like writing cases, he did not like carrying food boxes. He didn't want to do the work, he would only drive." *Id.* Brownlee would often come in early and tell Lee that she was going to drive that day. Washington would get "so angry" if Brownlee

tried to drive and do "all kind of crazy stuff." *Id*. at 184:24–185:17. Brownlee further testified that when Washington was driving, "he would be just driving real crazy if I—if I didn't talk to him because a lot of times I would just shut down and don't say anything, yeah, because he would be so belligerent and crazy, so I talked to Ray about those things." *Id*.

### ii.   Brownlee's Termination from Catholic Charities

On June 25, 2015, Catholic Charities terminated Brownlee. Pls.' Resp. DSOF ¶ 132. The reasoning behind Brownlee's termination is contested by the parties. Cynthia Gutierrez (Gutierrez, Human Resources) and Luiz Barbosa (Barbosa, Department Director) testified that Brownlee's termination was based on a combination of her prior disciplinary history (including that she had received a Final Written Warning several months earlier), coupled with the fact that she threatened and swore at Washington on June 16, 2015. *Id*. ¶ 130. Brownlee testified that her June 22, 2015 email was the reason for her termination, because she was fired shortly after she sent the email. *Id*. ¶ 133. Brownlee further disagrees with Catholic Charities' "pretextual" explanation for her termination, as she testified that Gutierrez was relying on information provided to her by Lee and Rouse, and Lee, Rouse, and Washington were close friends. *Id*. ¶ 132; *see also* PSOF ¶¶ 12–13.

Approximately two years after her termination from Catholic Charities, Brownlee began seeing a therapist. *Id*. ¶ 139.

11

### C. Facts Related to Fleming's Claims

Fleming asserts claims for sexual harassment and retaliation.

#### i.    Fleming's Work Environment

Fleming testified that the sexual harassment she faced as part of her employment with Catholic Charities stemmed from two sources: (1) Defendant Washington (her co–worker, and on a few occasions, driving partner) and (2) the owner of Vaia Auto Repair Company (Vaia), a vendor that contracted with Catholic Charities. The Court summarizes the interactions involving Washington and Vaia's owner in turn.

#### 1)   Interactions Involving Defendant Washington

During her deposition, Fleming testified about nine specific incidents involving Washington. The incidents are outlined as follows.

1.    On or about October 24, 2012, Washington was assigned to work with Fleming and Tate for the day. Pls.' Resp. DSOF ¶ 39. While the parties dispute the precise wording of the commentary, it is undisputed that Washington noticed Fleming and Tate were wearing tight pants that day and proceeded to comment on the tightness of their pants. *See* Washington Dep. at 119:15–120:11 ("it's going to be a hard day working with them with them jeans on"); R. 131-10, Tate Dep. at 156:11–21 ("I wish I was your jeans because I would be all up in that."); R. 121-2, Fleming Dep. at 92:5–9 ("I like the way your jeans fit" and "look at that ass."). Fleming and Tate also heard Washington make a comment to another employee about the way their jeans were fitting on their backsides. Pls.' Resp. DSOF ¶ 40. Fleming overheard

Washington's comment and asked Washington if he was aware of Catholic Charities' policy regarding sexual harassment. *Id.* Later that day, Washington apologized to Fleming for making the comment. *Id.* Fleming asked Rouse about the procedure for submitting a grievance to Human Resources. *Id.* ¶ 42. Fleming submitted the following grievance to her supervisory chain and Human Resources regarding Washington's commentary and Samira Robinson (Robinson, Outreach Coordinator)'s handling of the incident:

> On October 24, 2012, I was approached by a male co–worker who made an inappropriate comment about the way my jeans fit. Ms. Robinson was standing there at the time and overheard me asking him if he was aware of Catholic Charities policy on sexual harassment? I then informed Ms. Robinson about the conversation that had transpired between the co-worker and me since she had not intervened. I further told her that I didn't feel comfortable with this co-worker riding with us given his comments. Ms. Robinson then went to the gentlemen and stated she wasn't going to let him ride with us because he made me angry. My coworker then came to me and apologized for the comments he had made. We talked about it and things were cleared up. Clearly, I thought this was unprofessional on Ms. Robinson's behalf and not handled properly.

*Id.* Though Fleming did not specify Washington's name in her report, she told Rouse that Washington was the co-worker who made the comment about her pants. *Id.* ¶ 44. Following the incident, Rouse told Washington that he should not make comments of that nature regarding a co-worker's jeans; she considered it a verbal warning. *Id.* ¶ 45. Rouse also issued Robinson a write-up. *Id.* ¶ 45. At some point thereafter, Washington asked Fleming if she had filed a grievance against him. *Id.* ¶ 47.

2.      Sometime in the fall of 2012, Fleming overheard Washington refer to a transgender man as a "little gay girl." Pls.' Resp. DSOF ¶ 48.

3.      In September 2013, Washington was partnered with Fleming again. While they were riding in the van together, Washington said, "I like the way your jeans fit," and "look at that ass." Pls.' Resp. DSOF ¶ 49. Fleming testified that while she doesn't remember if Washington said anything further, she was certain that she would have informed Washington that his advances were unwelcome. *See* Fleming Dep. at 96:14–23.

4.      In February 2014, Washington was sitting near Fleming in the Mobile Outreach break area. Pls.' Resp. DSOF ¶ 50. While talking to her, Washington touched Fleming on the outside of her upper arm and leg for not more than a couple seconds. *Id.* She said, "don't touch me." *Id.* He put his hands up, and said, "oh, oh, oh," backing off. *Id.*

5.      Around the same time, possibly during that conversation, Washington, aware that Fleming was a lesbian, told Fleming that he did not care for gay men, but he liked lesbians. Pls.' Resp. DSOF ¶ 51.

6.      On an unknown date, Fleming witnessed Washington touch the back of co-worker, Kim Orr (Orr) and say, "all that ass." Pls.' Resp. DSOF ¶ 52. Orr turned around and said, "don't touch me," to Washington; Washington apologized. *Id.*

7.      On an unknown date prior to October 22, 2014, Washington told Fleming that he would "take her in the basement and bend her over some

boxes." Pls.' Resp. DSOF ¶ 53. Fleming did not say anything in response but looked at him and shook her head. *Id*.

8.     In April 2015, Fleming overheard a conversation between Washington and Lee. Pls.' Resp. DSOF ¶ 54. Washington asked Lee, "how did you get up in there?" referring to an overweight female co-worker. *Id*. Fleming believed this comment referred to having sex with the female co-worker and her weight. *Id*.

9.     On an unspecified date, Fleming also heard Tate say, "what the fuck?" in reaction to Washington showing her a pornographic cell phone video. Pls.' Resp. DSOF ¶ 55. Fleming did not see the video. *Id*.

After recounting these incidents, Fleming was asked whether she remembered anything else that Washington said or did that was offensive. *See* Fleming Dep. at 115:15–18. Fleming testified that she could not recall any additional offensive incidents "at that time." *See id*. at 115:19. Subsequently, and the subject of further debate in Defendants' motion to strike, Fleming stated in her post-deposition affidavit that Washington made sexually harassing comments to her "at least every other day" until his termination in November 2015. PSOF ¶ 29; *see also* R. 131-7, Fleming Aff. at ¶¶ 5, 7.

### 2)  Interactions Involving the Owner of Vaia

Catholic Charities typically used Vaia, an approved mechanic vendor, to repair the Mobile Outreach vehicles. Pls.' Resp. DSOF ¶ 60. Mobile Outreach employees were instructed to advise their supervisors when their vehicle needed repair, and the

supervisors would tell them to take the vehicle to Vaia. *Id*. ¶ 59. In November 2012 (her first interaction with Vaia's owner), Fleming brought a Mobile Outreach vehicle to Vaia for repairs. *Id*. ¶ 61. The owner of Vaia told her, "you must have a happy husband." *Id*. Fleming said she was a lesbian and had a wife. The owner responded, "I wonder how she fucks you." *Id*. Later that day, Fleming reported the comment to Lee and told him not to send her to Vaia again. *Id*. ¶ 62. Lee told Fleming that he had known the Vaia owner for years, and the owner was "his boy." *Id*. ¶ 63. Lee added that the owner owned half the block where the shop was located, and Fleming "might want to talk to him." *Id*. ¶ 63; *see also* Fleming Dep. 85:8–12.

Thereafter, Fleming returned to Vaia to drop off or pick up vehicles, and the owner continued to make offensive remarks and "hit on" her. Fleming Dep. 86:4–18. On one occasion, the owner asked Fleming if she wanted to take a trip with him; Fleming responded, "no." Pls.' Resp. DSOF ¶ 64. Another time, the owner asked to take her to dinner. *Id*. Fleming said she turned his advances down every time. *Id*. Fleming also testified that she continued to report the owner's advances to Lee, but he did not address the situation. *Id*. ¶ 65.

Fleming brought in vehicles for repair and interacted with the owner through May 2014, despite her complaints to her supervisors regarding his advances. Pls.' Resp. DSOF ¶ 65. Fleming's frequency of Vaia visits is disputed. Fleming testified that she does not know how many times she visited Vaia between November 2012 and May 2014, but she estimates it could have been several times a week; Catholic Charities records reflect that Vaia repaired their vehicles only 32 times over a period

16

of two-and-a-half years, from January 2013 through August 2015. *Id*. ¶¶ 66, 72. Also disputed, Fleming stated in her affidavit that she was subjected to unwelcome comments *every* time she visited Vaia. *See* PSOF ¶¶ 38, 41.

It is undisputed that Fleming made her first complaint to Human Resources about the owner of Vaia as part of her Human Resources "environmental scan" interview. Pls.' Resp. DSOF ¶ 67; *see also* Fleming Dep. at 126:23–129:23 (Defendants contend that the environmental scan took place in July 2015; Plaintiffs maintain that Fleming was not asked about timing nor does her testimony establish a July 2015 timeframe for the environmental scan). Fleming told Human Resources that Vaia's owner made an inappropriate comment to her. *Id*. As part of her interview, Fleming also told Human Resources that Lee was aware of her concerns regarding the owner and failed to report them. Pls.' Resp. DSOF ¶ 68. On July 15, 2015, Catholic Charities terminated Lee for a number of concerns related to unprofessionalism and poor management, including his failure to effectively handle Fleming's report about Vaia's owner. *Id*. ¶ 69. That same day, Catholic Charities dropped off a vehicle at Vaia to install a GPS unit, a back-up alarm, and a fire extinguisher; this was the final time Mobile Outreach used Vaia for any service. *Id*. ¶ 75. On August 4, 2015, Cathy Whinna (Whinna, Director of Facilities Services and Emergency Response) notified all Catholic Charities vice presidents that Catholic Charities was no longer using Vaia as an approved vendor. *See* R. 121-6, Whinna Dec. at 1.

### ii.    Alleged Retaliation Against Fleming

Fleming testified that Catholic Charities retaliated against her following her report regarding Vaia and Lee during her environmental scan interview. Pls.' Resp. DSOF ¶ 77. Fleming testified to three examples of retaliation, as follows:

1.    Sometime after her environmental scan interview, Rouse told Fleming that Fleming was the reason "[Lee] got fired." *Id*. Fleming responded that Lee "got himself fired," and Rouse agreed, saying, "Yeah he did. He really did." *Id*. ¶ 77.

2.    In September 2015, Rouse moved Fleming's workspace from a private office to a cubicle. *Id*. ¶ 78. Fleming testified that Rouse said she needed to move Fleming's workspace, because Barbosa needed a private space when he came into the office, and "she got her directions from Luiz Barbosa." Fleming Dep. at 134:1–135:15. Fleming further testified that she believed Rouse decided to move her workspace as retaliation for her sexual harassment complaints. *Id*. at 144:18–23.

3.    On September 16, 2015, the Mobile Outreach program directors met with the City of Chicago (the City) regarding shelters. Pls.' Resp. DSOF ¶ 79. Rouse did not invite Fleming to the meeting. *Id*. Fleming testified that Barbosa was surprised that Rouse did not invite her to the meeting, because Fleming had prepared the "shelter-bed" report, and her work on the subject was the main purpose for the meeting with the City. Fleming Dep. at 143:13–145:15. Fleming testified that she believes she was not invited as an act of retaliation following her complaints regarding Vaia and Lee. *Id*.

### iii.    Fleming's EEOC Charge and Catholic Charities Departure

On November 2, 2015, Fleming filed a charge with the U.S. Equal Opportunity Commission (EEOC). Pls.' Resp. DSOF ¶ 82. On May 15, 2016, Fleming resigned from Catholic Charities to take a new employment opportunity in another state. *Id*. ¶ 84.

### D. Procedural History

By way of a brief procedural history, Plaintiffs' First Amended Complaint (FAC) named Catholic Charities as the sole defendant. R. 8, FAC. Catholic Charities moved to dismiss the FAC for failure to state a claim, and the motion was granted in part. *See Brownlee v. Catholic Charities of the Archdiocese of Chicago* (*Brownlee I*), 2017 WL 770997 (N.D. Ill. Feb. 28, 2017).[6] With leave of court, Plaintiffs filed their Second Amended Complaint (SAC), the instant Complaint, adding Washington as a defendant. *See* SAC. Defendants again moved for partial dismissal of the SAC. R. 41. The Court dismissed Count X, the IGVA claim, against Catholic Charities (but not Washington). *See Brownlee v. Catholic Charities of the Archdiocese of Chicago* (*Brownlee II*), 2018 WL 1519155, at *9–11, 13 (N.D. Ill. Mar. 28, 2018).

Defendants subsequently filed four partial motions for summary judgment, which collectively sought dismissal of all then-pending claims and counterclaims. *See* R. 80, 82, 84, 88. In a February 28, 2020 Memorandum Opinion and Order, the Court struck the Local Rule 56.1 fact statements (R. 79) and denied the motions for summary judgment on Brownlee and Fleming's claims without prejudice. *See Brownlee v. Catholic Charities of the Archdiocese of Chicago* (*Brownlee III*), 2020 WL

---

[6]This case was pending before Judge Gottschall until it was reassigned to the Court on September 28, 2020. *See* R. 144, Min. Entry.

977968, at *4 (N.D. Ill. Feb. 28, 2020). The Court noted that Defendants had improperly raised "dozens of relevance, materiality, personal knowledge, and sham affidavit issues [that struck] at the heart of the complicated legal and factual issues raised by the claims of Fleming and Brownlee." *Brownlee III*, 2020 WL 977968, at *4. In striking the fact statements and denying the summary judgment motions, the Court instructed Defendants to make all evidence arguments in either legal memoranda or a motion to strike should Defendants opt to refile. *Id*. The Court then granted Catholic Charities' request for summary judgment as to Counts II and VII, which were the two claims brought by now-terminated plaintiff Tate. *Id*. at *9.

Defendants have now filed separate amended motions for summary judgment and supporting memoranda for each of the two remaining plaintiffs, Brownlee (R. 122) and Fleming (R. 124). In line with the Court's previous instruction, Defendants proffered objections to Plaintiffs' post-deposition affidavits in the pending motion to strike. *See* R. 135, Defs.' Mot. Strike.

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party

20

must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

## Analysis

The Court addresses Defendants' motion to strike first, followed by Defendants' motion for summary judgment as to Brownlee's claims and Defendants' motion for summary judgment as to Fleming's claims.

### A. Motion to Strike

As a preliminary matter, and in an effort to clean up the record, the Court addresses Defendants' Partial Motion to Strike Plaintiffs' "Sham" Affidavits. *See* Defs.' Mot. Strike.

### i. Striking Affidavit Statements as Contradictory

In moving to strike, Defendants contend that discovery established undisputed facts—that Brownlee never complained to Catholic Charities about Washington's alleged sexual harassment; that Fleming only reported one sexually suggestive

comment uttered by Washington back in 2012, a complaint that was investigated and resolved; and that Fleming had only a handful of interactions with Washington over the next several years, and she never reported any additional sexual harassment by Washington. R. 136, Defs.' Memo. Mot. Strike at 2. Defendants argue that "faced with these deficiencies," Brownlee and Fleming now improperly seek to avoid summary judgment by relying on "sham affidavits" (post-deposition affidavits that were attached to Plaintiffs' response to Defendants' Rule 56.1 statement of facts). *Id.* Defendants maintain that these "sham affidavits" improperly contradict Plaintiffs' deposition testimony on the central issues of the case, including the timing and frequency of sexual harassment and whether Plaintiffs reported it. *Id.* Defendants argue that several identified statements should be stricken as contradictory to deposition testimony per the sham affidavit doctrine. *Id.*

The law is well-established that "in general, parties may not 'patch–up potentially damaging deposition testimony' with a contradictory affidavit." *Richards v. U.S. Steel*, 2015 WL 1598081, at *4 (S.D. Ill. Apr. 9, 2015) (citing *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.,* 259 F.3d 792, 799 (7th Cir. 2001)); *see also DF Activities Corp. v. Brown,* 851 F.2d 920, 923 (7th Cir. 1988) (noting that almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants). To determine whether a contradictory statement constitutes an impermissible "sham," courts in this Circuit "examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury." *Arce v. Chi. Transit Auth.*, 311 F.R.D. 504, 510 (N.D.

22

Ill. 2015) (citing *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007)). The sham affidavit doctrine applies "upon a threshold determination of a 'contradiction,' which only exists when the statements are 'inherently inconsistent'" and the discrepancies are "incredible and unexplained." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (quoting *Commercial Underwriters*, 259 F.3d at 799). In contrast, when the change is "plausible and 'the party offers a suitable explanation such as 'confusion, mistake, or lapse in memory,' a change in testimony affects only its credibility, not its admissibility." *McCann*, 622 F.3d at 751 (citing *Commercial Underwriters*, 259 F.3d at 799).

Notably, the Seventh Circuit has made clear that courts should make a sham determination "with caution," as credibility and weight are generally issues of fact for the jury, and "we must be careful not to usurp the jury's role." *Gavin/Solmonese LLC v. Kunkel*, 2019 WL 1125792, at *1 (N.D. Ill. Mar. 12, 2019) (internal citations omitted). The Seventh Circuit's *Castro v. DeVry Univ., Inc.* elucidates this point. 786 F.3d 559 (7th Cir. 2015). Writing for the court, Judge Hamilton observed that few honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification. *Id.* at 571–72. Disregarding as a sham every correction of a memory failure or variation in a witness's testimony requires "far too much from lay witnesses." *Id.* (citations omitted). An affidavit can be excluded as a sham only where the witness has given "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Id.* The care that *Castro* mandates in applying the sham affidavit doctrine dictates that a decision

23

to invoke it should be left until the court is actually asked to decide whether "the only reasonable inference" is that the affidavit or errata sheet was a "sham," *id.* at 571, and therefore so inadequate as to fail to create a "genuine dispute," Fed. R. Civ. P. 56.

### 1) Brownlee Affidavit

Keeping these standards in mind, Defendants specifically take issue with the allegedly contradictory statements in paragraphs 12, 16, and 17 of Brownlee's affidavit. Defs.' Memo. Mot. Strike at 1. The Court reviews each identified paragraph in turn.

1.      Paragraph 12: "That Ray Lee and Jason Marsh had knowledge that Washington harassed me in the van because I complained to both on several occasions about the harassing things Washington said to me and how erratic and unsafe his driving was." R. 131-4, Brownlee Aff. ¶ 12. Defendants argue that this statement contradicts Brownlee's testimony, which established that Brownlee did not report Washington's comments to Lee, because she was "too embarrassed," and she only made general complaints to Lee that Washington was a "freak" or that he "talks too much, plays too much, and is too touchy feely." Defs.' Memo. Mot. Strike at 4. In their response, Plaintiffs contend that Brownlee's paragraph 12 is not contradictory, highlighting that Brownlee clearly testified that she did not report certain comments involving *Lee* to Lee on account of embarrassment, but she *did* report that Washington would touch her "on several occasions." *See* Brownlee Dep. at 163:17–19. Noting that district courts should take great caution in making a sham

24

determination, the Court finds that Plaintiffs have pointed to enough deposition statements that together suggest paragraph 12 is not contradictory. The Court does not strike paragraph 12.

2.     Paragraph 16: "That I complained to Lee about Washington's sexual harassment nearly every other day for the month period I was his partner." Brownlee Aff. ¶ 16. For the same reason given with regard to paragraph 12, the Court does not strike paragraph 16.

3.     Paragraph 17: "That when I complained to Lee about Washington's sexual harassment, he would acknowledge my concerns, downplay them and often state, 'You can handle him Esther, that's why we made you two partners.'" Brownlee Dep. ¶ 17. In the Court's view, this affidavit statement is consistent with Brownlee's deposition testimony. *See* Brownlee Dep. at 163:16–24 ("Because I brought it out in the open and I had told Ray on several occasions that he would touch me and things like that, you know, and I was like why do you guys have me working with him. He's very unprofessional. He talks on my phone and then Ray was like, well, that's why we put you with him because we know you can handle him, which -- and they knew -- they kind of knew he had some behavioral problems at the job."). The Court does not strike paragraph 16.

### 2) Fleming Affidavit

Defendants also take issue with the allegedly contradictory statements in paragraphs 6, 7, 9, 10, 12, 25, and 26 of Fleming's affidavit. Defs.' Memo. Mot. Strike at 1. Again, the Court will review each identified paragraph in turn.

1.      Paragraph 6: "That from October 2012 to November of 2015, Dwayne Washington made sexual comments to me that interfered with my ability to do my job." R. 131-7, Fleming Aff. ¶ 6. Defendants argue that paragraph 6 expands the time period of alleged harassment, in contradiction to Fleming's deposition testimony. Defs.' Memo. Mot. Strike at 5. Defendants maintain that Fleming did not identify any alleged sexual comments that Washington made to her after October 22, 2014. *Id.*; *see also supra* at 12–15. Again, noting that a sham determination should be made with great caution, the Court finds that paragraph 6 is not directly contradictory, because after walking through nine particular incidents, Fleming testified that she could not recall any additional offensive incidents "at that time." Fleming Dep. at 115:19. The Court cannot definitively say that the October 2012 to November of 2015 timeline is a "sham" when Fleming left the timeline open in her deposition. The Court does not strike paragraph 6.

2.      Paragraph 7: "That during the period from October 2012 to October 2014, Washington made comments of a sexual nature to me approximately every other day." Fleming Aff. ¶ 7. For the same reason given with regard to paragraph 6, the Court does not strike paragraph 7.

3.      Paragraph 9: "That each time Washington would make a sexually inappropriate comment to me, I reported it to our supervisor, Ray Lee." *Id.* ¶ 9. In the Court's view, this affidavit statement is not wholly inconsistent with Fleming's deposition testimony, which again leaves open the (disputed) question of how many

26

times Fleming reported Washington's misconduct. *See* Fleming Dep. at 121:4–122:15. The Court does not strike paragraph 9.

4.      Paragraph 10: "That in response to my complaints, Ray Lee would state 'you know how he is.'" Fleming Aff. ¶ 10. The Court finds Defendants' argument with regard to paragraph 10 undeveloped. Are Defendants objecting to the fact that the word complaint is plural? Or, are Defendants objecting to Lee's purported statement? Because the Court cannot tell, it does not strike paragraph 10.

5.      Paragraph 12: "That despite my complaints about Washington, I was assigned to be his partner a few times, including at least once in 2014." Fleming Affidavit ¶ 12. Similar to paragraph 10, the Court finds Defendants' argument with regard to paragraph 12 undeveloped. Again, are Defendants objecting to the fact that the word complaint is plural? Or, are Defendants objecting to the partner assignment? Because the Court cannot tell, it does not strike paragraph 12.

6.      Paragraph 25: "That following Ray Lee's termination, Rouse began to increasingly scrutinize my work." Fleming Aff. ¶ 25. Defendants argue that this statement about Rouse's retaliation against Fleming contradicts her deposition testimony, in which she stated that apart from moving Fleming out of her office and not inviting her to a meeting, she did not believe Catholic Charities did anything else to retaliate against her. Defs.' Memo. Mot. Strike at 10–11 (citing Fleming Dep. At 146:1–11). Plaintiffs counter that the statement in Fleming's affidavit does not contradict her deposition testimony, because Fleming testified that Rouse was "very calculating" and not a "very honest person." *See* Fleming Dep. at 145:4–6. The Court

does not find Plaintiffs' explanation persuasive. In testifying to an observation about Rouse's character, Fleming did not tie such observations to "retaliation." The Court strikes paragraph 25.

7. Paragraph 26: "That I received write-ups from Rouse after Lee's termination that were not warranted." Fleming Aff. ¶ 26. For the same reason given with regard to paragraph 25, the Court strikes paragraph 26.

### ii. Striking Affidavits Statements on Other Admissibility Grounds

Following their sham affidavit arguments, Defendants also contend that dozens of other affidavit statements should be stricken on admissibility grounds. Defs.' Memo. Mot. Strike at 11. Defendants cite a laundry list of affidavit paragraphs coupled with a list of purported bases for inadmissibility. *Id.* at 11–12. In parentheses only, Defendants label certain statements as "hearsay" and "legal conclusions" without any attempt to cite to the applicable federal rule or supporting case law. *Id.* In response, Plaintiffs contest that Defendants' arguments regarding these other bases for admissibility are underdeveloped. The Court agrees, and Defendants' last-ditch explanations in their reply do not save them. The Seventh Circuit has "repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (internal quotations omitted); *see also Dyson, Inc. v. Sharkninja Operating LLC*, 2016 WL 4720019, at *1 (N.D. Ill. Sept. 9, 2016) ("Arguments raised for the first time in a reply brief are waived.") (citing *U.S. v. Kennedy*, 726 F.3d 968, 974 n.4 (7th Cir. 2013)). Because Defendants' arguments

are undeveloped, the Court does not strike any of the paragraphs identified as inadmissible on pages 11 and 12 of Defendants' memorandum. *See* Defs.' Memo. Mot. Strike at 11–12.

In sum, the Court grants Defendants' motion to strike with respect to paragraphs 25 and 26 of Fleming's affidavit and denies Defendants' motion to strike with respect to all other identified affidavit paragraphs. The Court also denies Defendants' request for reasonable attorneys' fees in connection with bringing the motion to strike.

### B. Motions for Summary Judgment

Turning now to the merits of Defendants' motions for summary judgment, the Court considers the Brownlee counts and the Fleming counts in turn.

### i. Count I: Title VII Sexual Harassment (Brownlee)

The Court begins with Count I, Brownlee's claim for Title VII sexual harassment against Catholic Charities. In Count I, Brownlee claims she was subject to sexual harassment for approximately one month leading up to the incident on June 16, 2015. SAC ¶¶ 114–129. To survive summary judgment on a sexual harassment claim, a plaintiff must adduce evidence sufficient for a reasonable jury to find that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [sex]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Focusing on the third and fourth elements, Catholic Charities contends that the alleged harassment does not qualify as "severe

or pervasive," and there is no basis for employer liability. R. 123, Defs.' Memo.
Brownlee Mot. Summ. J. at 5.

### 1) Severe or Pervasive Conduct

Catholic Charities argues that given the brief period of time that Brownlee was
partnered with Washington and his "relatively mild behavior" exhibited during those
four weeks, Brownlee cannot prove that she was subjected to harassing conduct that
was "severe or pervasive." Defs.' Memo. Brownlee Mot. Summ. J. at 5. Catholic
Charities further explains that Brownlee's allegations (i) that Washington made "a
few crude comments every so often (telling her she looked good, telling her that Lee
liked her or wanted to have sex with her, and telling her that 'if I was your man, I
would do this to you…')," and (ii) that Washington "touched her leg once, and her back
or shoulder several times" do not show the type of "systemic discriminatory behavior"
that a harassment claim requires. *Id.* at 6 (citing *Scruggs*, 587 F.3d at 840) (affirming
summary judgment where the supervisor commented that the employee was "made
for back seat of car," told the employee that she looked like a "dyke," and struck her
with clipboard, as those incidents alone did not create a hostile work environment).
Catholic Charities cites cases in the Seventh Circuit that stand for the proposition
that "fleeting, boorish behavior, particularly from someone not in a position of
authority over the plaintiff (an important consideration), is not severe enough to rise
to the level of a hostile working environment." *Id.* at 6 (citing *Hostetler v. Quality
Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (noting that even intimate or more
crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the behind—

"may be considered insufficiently abusive to be described as 'severe' when they occur in isolation"); *EEOC v. Int'l Profit Assocs.*, 647 F. Supp. 2d 951, 982–85 (N.D. Ill. 2009) (granting summary judgment in favor of the employer after finding allegations of a male co-worker asking the plaintiff out, rubbing her shoulders and back, and telling her that he was a good kisser were insufficiently abusive to be described as severe)).

Brownlee, in response, argues that even one instance of contact with an intimate body part in isolation can satisfy the severity requirement (citing *Patton v. Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006)), and here, Washington's conduct did not occur in isolation. R. 128, Brownlee Resp. at 12–13. Brownlee contends that "his severe and pervasive acts occurred at least five times over the course of one month." *Id.* Brownlee points out that evidence establishes Washington would rub her shoulders, attempt to hug her, touch her face, and proposition her when they were alone together. *Id.* at 13. Considering these circumstances, Brownlee argues that it cannot be said as a matter of law that Washington's conduct was not so severe or pervasive as to interfere with her work environment. *Id.*

In determining whether conduct is severe or pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Soucie v. City of Braidwood, Ill.*, 2019 WL 1239781, at *6 (N.D. Ill. Mar. 18, 2019) (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993)). If the plaintiff "does not subjectively perceive the environment to be abusive,

31

the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation." *Soucie*, 2019 WL 1239781, at *6 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). Likewise, conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Id.* (internal citation omitted).

To satisfy the subjective test, Brownlee must demonstrate that she actually perceived her work environment as hostile. Based upon the record here (and not meaningfully contested by Catholic Charities), Brownlee meets this burden. *See* Brownlee Dep. at 163:17–19 (Brownlee testified that she "told [Lee] on several occasions that [Washington] would touch me and things like that, and I was like why do you guys have me working with him."; *see also* PSOF ¶ 6 (Brownlee complained that she did not feel safe being paired with Washington).

When analyzing the objective severity of harassment (at issue in the briefs), drawing "the line is not always easy. On one [actionable] side lie sexual assaults; *other physical contact . . . uninvited sexual solicitations; intimidating words or acts; obscene language* or gestures; pornographic pictures. On the other [unactionable] side lies the occasional vulgar banter, tinged with sexual innuendo." *Soucie*, 2019 WL 1239781, at *6 (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (internal citations omitted) (emphasis added)). Employers generally do not face liability for "off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Passananti v. Cook Cty.*,

689 F.3d 655, 667 (7th Cir. 2012). Nor are they liable for "occasional vulgar banter, tinged with sexual innuendo." *Soucie*, 2019 WL 1239781, at *7.

Reviewing the record, the Court disagrees with Catholic Charities' characterization that Washington made a "few crude comments every so often." Defs.' Memo. Brownlee Mot. Summ. J. at 6. By the Court's count, Brownlee testified that Washington made unwelcome comments about her "look[ing] good" and stared at her backside on "several occasions"; suggested that she ask Lee for favors "approximately every other day," because Lee liked her and wanted to "fuck her"; made uninvited comments about "fucking her" approximately five times; made comments about her having sex with Fleming "on several occasions"; touched her on the shoulders and face and hugged her "approximately five times," and touched her on her thigh, an intimate body part, one time. *See generally* Pls.' Resp. DSOF; Brownlee Dep. And this tally does not even include Brownlee's affidavit statement that she "complained to Lee about Washington's sexual harassment nearly every other day for the month period [she] was his partner." Brownlee Aff. ¶ 16. The Court finds that a reasonable fact finder could find these unsolicited comments and uninvited touching to be severe enough to fall on the side of "uninvited sexual solicitations," "intimidating words or acts," and "obscene language," rather than on the side of merely vulgar banter. *Soucie*, 2019 WL 1239781, at *6. And, with respect to pervasiveness, the Court finds it to be a question of fact as to whether (by the Court's count) dozens of comments over the course of a month constitutes pervasive harassment. The Court next addresses Catholic Charities' second argument, regarding employer liability.

### 2) **Employer Liability**

An employer may be liable for sexual harassment "if the harassment is done by a co-worker and the employer is shown to have been negligent in failing to prevent the harassment." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995)). An employer is deemed negligent if it fails to take reasonable steps to discover and remedy the harassment. *Id.* According to the Seventh Circuit, the first step in evaluating an employer's potential negligence is to assess "whether the employer was on notice of the harassment." *Id.* And "[n]otice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863, 866 (7th Cir. 2013) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1037 (7th Cir.1998)).

Catholic Charities asserts that it was not on notice of any sexual harassment of Brownlee. Defs.' Memo. Brownlee Mot. Summ. J. at 7. Specifically, Catholic Charities insists that, despite knowing the process for reporting sexual harassment at Catholic Charities, Brownlee only made vague and non-specific complaints to her supervisor, Ray Lee (Lee). *Id.* at 7–8. Brownlee responds that Catholic Charities ignored Brownlee's complaints about sexual harassment, and that Catholic Charities was also put on notice of Washington's conduct by the sexual harassment complaints of Fleming and Karla Davis. Brownlee Resp. at 13–14.

The Court finds that Brownlee has adduced sufficient evidence on the employer liability element, such that a reasonable jury could find in her favor. As an initial matter, Brownlee has presented adequate evidence indicating that Catholic Charities was "on notice of the harassment." *Cooper-Schut*, 361 F.3d at 426 (citation omitted). For example, Brownlee testified that she "told [Lee] on several occasions that [Washington] would touch me and things like that, and I was like why do you guys have me working with him. He's very unprofessional. He talks on my phone, and [Lee] was like, well, that's why we put you with him because we know you can handle him […]." Brownlee Dep. at 163:17–19. Additionally, in her affidavit, Brownlee states that "Ray Lee and Jason Marsh had knowledge that Washington harassed me in the van because I complained to both on several occasions about the harassing things Washington said to me and how erratic and unsafe his driving was." Brownlee Aff. ¶ 12. In terms of the frequency of her complaints, Brownlee stated that she "complained to Lee about Washington's sexual harassment nearly every other day for the month period [she] was his partner." *Id.* ¶ 16. Thus, the Court finds that Brownlee marshaled enough evidence to show that Catholic Charities was on notice of the sexual harassment.

Catholic Charities advances two primary arguments in opposition, neither of which persuades the Court.

### a) Vague and Non-Specific Complaints

First, Catholic Charities argues that it was not on notice because "Brownlee's complaints to Lee were vague and non-specific . . ." Defs.' Memo. Brownlee Mot.

Summ. J. at 7. Catholic Charities maintains that Brownlee only informed Lee that Washington was "a freak," and that she may have told Lee that Washington "talks too much, plays too much and is too touchy feely." *Id.* (internal quotation marks and citation omitted). Accordingly, Catholic Charities reasons that it could not have been put on notice of Washington's sexual harassment of Brownlee. *Id.* However, because the Court is denying Defendants' motion to strike with respect to the pertinent paragraphs of Brownlee's affidavit, *see supra* Section A(i)(1), the record contains evidence indicating that Brownlee not only informed Lee of Washington's generally bad behavior, but also that she specifically "complained to Lee about Washington's sexual harassment nearly every other day for the month period [she] was his partner," that "Ray Lee and Jason Marsh had knowledge that Washington harassed [Brownlee] in the van because [she] complained to both on several occasions about the harassing things Washington said to [her]," and that upon hearing Brownlee's concerns, Lee "would acknowledge [her] concerns, downplay them and often state, 'You can handle him Esther, that's why we made you two partners.'" Brownlee Aff. ¶¶ 12, 16, 17.[7] Catholic Charities' argument that it was not on notice of sexual harassment of Brownlee due to the vague nature of her complaints therefore falls flat.

### b) Failure to Escalate Complaint to Human Resources

Second, Catholic Charities contends that it was not on notice because Brownlee failed to properly "escalate" her report of Washington's sexual harassment to human resources: "If she thought Lee had failed to respond adequately to her vague

---

[7]The credibility of Brownlee's affidavit statements, of course, is not an issue to be resolved at summary judgement. *Omnicare*, 629 F.3d at 704.

complaints, Catholic Charities' policy instructed her to then escalate the issue to HR, but she did not." Defs.' Memo. Brownlee Mot. Summ. J. at 8. Catholic Charities directs the Court to three cases in support of this argument: *Westbrook v. Illinois Dep't of Hum. Servs.*, 2018 WL 1469035, at *9 (N.D. Ill. Mar. 26, 2018); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011); and *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019). The Court addresses each below, beginning with *Yancick*.

In *Yancick*, the Seventh Circuit affirmed the district court's grant of summary judgment against a plaintiff employee alleging a racially hostile work environment under 42 U.S.C. § 1981. 653 F.3d at 534–35. The Seventh Circuit found that, "taken as a whole, the facts do not lead to a reasonable inference that the harassment was pervasive or severe or motivated by race." *Id.* at 544. Accordingly, the Seventh Circuit stated that it could end its discussion there without addressing the defendant's employer liability arguments. *Id.* at 549. Yet, "for completeness," the court "note[d]" that the plaintiff's claim would fail on the employer liability element as well. *Id.* In assessing the employer liability element, the Seventh Circuit stated that the plaintiff could have either "followed the harassment policy reporting requirements or reported 'the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Id.* at 549 (quoting *Parkins*, 163 F.3d at 1037). The court in *Yancick* found that the plaintiff "did neither," because he reported to a "low-level supervisor who had no authority to hire, fire, transfer, or

discipline any Hanna Steel employees," and because the supervisor's "unwillingness and refusal to address the situation" made it "unreasonable for [the plaintiff] to believe that [the supervisor] would convey his complaints up the ladder." *Id.* (citation omitted).

Similarly in *Westbrook*, the court granted summary judgment in favor of the defendant on the plaintiff's hostile work environment claim, noting that the plaintiff only reported the alleged harassment to a "low-level supervisor with no authority to deal with the harassment." 2018 WL 1469035, at *9. Just as in *Yancick*, the court in *Westbrook* framed the issue with language from *Parkins*, 163 F.3d at 1037: "the plaintiff can either follow[] the harassment policy reporting requirements or report[] the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Id.* (internal quotation marks and citations omitted). Significantly, the court explained that the plaintiff "knew that the correct person to go to [was] . . . the Assistant Director of Nursing," and that "[s]urely after the first few months of Jacobson's demonstrated indifference, [the plaintiff] could not reasonably expect that [the supervisor] would report the racially offensive conduct to her supervisors." *Id.* at *9.

The facts in this case are distinct from those in *Yancick* and *Westbrook*. In both cases, the plaintiffs failed to follow the employers' harassment reporting policies. *Yancick*, 653 F.3d at 549; *Westbrook*, 2018 WL 1469035, at *9. In addition, the plaintiffs in *Yancick* and *Westbrook* reported the purported harassments only to low-

level supervisors who did not have the authority to deal with the harassment. *Yancick*, 653 F.3d at 549; *Westbrook*, 2018 WL 1469035, at *9.

Here, the facts, construed in favor of Brownlee, show that she complied with Catholic Charities' sexual harassment policy. Catholic Charities' Employee Handbook provides: "Any employee who feels that he or she has been subjected to or witnessed an incident of unlawful discrimination or harassment should report the matter to his or her immediate supervisor or another supervisor within the chain of command." R. 131-13, Employee Handbook at 31. The record shows that Brownlee followed that policy by reporting Washington's sexual harassment to her immediate supervisors, Lee and Marsh. Brownlee Aff. ¶ 12. The policy in turn required supervisors who are either informed of harassment or who reasonably suspect harassment to report such incidents to the Service Area Vice President, who was then required to contact HR, and if necessary, the legal department. Employee Handbook at 31. Catholic Charities ignores these portions of the policy and insists that if Brownlee "thought Lee had failed to respond adequately to her vague complaints, Catholic Charities' policy instructed her to then escalate the issue to HR . . . ." Defs.' Memo. Brownlee Mot. Summ. J. at 8 (citation omitted). Catholic Charities further argues that Brownlee knew the proper way to escalate a harassment claim based on an email she had sent to a vice president at Catholic Charities in May 2013. *Id.*

However, each of these arguments misses the mark. True, the reporting policy provides that "if previous conversations have been ineffective, the employee should report the concern to the Employee Relations Manager in the Human Resources

Department." Employee Handbook at 31. Yet, the record is equivocal as to the effectiveness of Brownlee's reports to Lee. Although Brownlee and Washington continued to be paired, Brownlee stated that Lee, at the very least, "would acknowledge [her] concerns" about Washington's behavior. Brownlee Aff. ¶ 17. Moreover, while Brownlee stated that she talked to Lee and Marsh frequently about Washington's conduct, she was only paired with him for a month, so unlike the plaintiff in *Westbrook*, Brownlee's complaints did not sit idle for months. *Westbrook*, 2018 WL 1469035, at *9. As a result, Brownlee may not have considered her reporting attempts to be ineffective, which means she did not violate the reporting policy by failing to escalate her complaint to human resources.

With respect to Brownlee's prior sexual harassment complaint, the record illustrates that Brownlee made her previous harassment complaint via email to a vice president at Catholic Charities on May 14, 2013. R. 121, DSOF ¶ 87. However, Brownlee did not sign an acknowledgment form stating she received the Employee Handbook until October 22, 2013. R. 121-1, Exh. A-27, Employee Handbook Acknowledgment. So, the Court does not find Brownlee's previous harassment complaint (made before the record shows she had received the Employee Handbook) probative to the question of whether she complied with the harassment reporting policy with respect to Washington's conduct (taking place after she had received the Employee Handbook). All of this is to say, Catholic Charities' arguments do not convince the Court that the evidence, evaluated in the light most favorable to

Brownlee, shows that Brownlee failed to follow Catholic Charities' sexual harassment reporting policy.

In any event, there is evidence in the record that Lee and Marsh had the authority to deal with the harassment, so even if Brownlee had failed to follow the policy, Brownlee's notice still would pass muster under the *Parkins* framework. *See Yancick*, 653 F.3d at 549. The Employee Handbook provided that supervisors informed of harassment needed to report to the Service Area Vice President, who was then required to contact HR, and if necessary, the legal department. Employee Handbook at 31. This reveals that Lee and Marsh had the authority to deal with Brownlee's complaints of sexual harassment.

However, even if Lee and Marsh did not actually have the authority to deal with the harassment, Brownlee can satisfy the *Parkins* framework if she establishes that it was reasonable for her to expect Lee to elevate her complaint up the ladder. *See Yancick*, 653 F.3d at 549. Here, the Court finds that it was reasonable for Brownlee to expect Lee to report the harassment, when the Employee Handbook required him to do so.

Hence, this case unlike *Yancick* or *Westbrook*. The facts, construed in Brownlee's favor, show that she followed Catholic Charities' reporting policy, and that the supervisors she reported to had the authority to deal with the purported harassment. Thus, Brownlee satisfies the *Parkins* framework, unlike the plaintiffs in *Yancick* and *Westbrook*. *See Yancick*, 653 F.3d at 549 (quoting *Parkins*, 163 F.3d at 1037) (emphasis added) (plaintiff could have either "followed the harassment policy

41

reporting requirements *or* reported 'the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'").

Catholic Charities' third case in support of its argument that it was not on notice of the sexual harassment of Brownlee, *Hunt v. Wal-Mart Stores*, 931 F.3d 624, likewise fails to convince the Court that Brownlee has failed to satisfy this element at the summary judgment stage. The *Hunt* decision's analysis revolved around the application of the *Faragher-Ellerth* defense. The *Faragher-Ellerth* defense is an affirmative defense that an employer may raise to escape liability for a hostile work environment and requires the employer "prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Hunt*, 931 F.3d at 628 (citation omitted). As far as the Court can discern, Catholic Charities' briefs are silent as to the *Faragher-Ellerth* defense, so the usefulness of *Hunt* in resolving the issues of this case is unclear.

No matter, even if Catholic Charities were invoking the *Faragher-Ellerth* defense here, *Hunt* is distinguishable. The Seventh Circuit found the employer in *Hunt* took sufficient steps to prevent the harassment, in large part, due to the employer's prompt and thorough investigation into the purported harassment once the employee had complained to the store manager, who had reported the complaint

to human resources. 931 F.3d at 630–31. By contrast here, Catholic Charities has not directed the Court to any evidence that Brownlee's supervisor escalated the complaint to human resources, nor has Catholic Charities shown that it investigated Brownlee's complaints of sexual harassment by Washington. *Hunt* thus does not fit the facts of this case.

In sum, Brownlee has adduced sufficient evidence to support the severe or pervasive and the employer liability elements of her sexual harassment claim; Defendants' challenges to those elements fall short. The Court accordingly denies Defendants' motion for summary judgment with respect to Count I.

### ii.     Count IV: Title VII Sex Discrimination (Brownlee)

Brownlee asserts Count IV against Catholic Charities on the theory that her 2015 termination was actionable discrimination based on her sex. SAC ¶¶ 162–175. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Unlawful discrimination may be proved though direct evidence of impermissible motive, or indirectly through the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–03 (1973); *see also Bellaver v. Quanex Corp.,* 200 F.3d 485, 492–93 (7th Cir. 2000) (applying this method to sex discrimination cases). Brownlee does not argue that any direct evidence of impermissible motive exists. Instead, Brownlee relies on the

indirect method, which requires her to establish four distinct elements of a prima facie case: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated person outside the protected class. *See McDonnell Douglas,* 411 U.S. at 802; *Bellaver,* 200 F.3d at 493. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If such a reason is proffered, the plaintiff then bears the ultimate burden of showing that it is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802.

Catholic Charities does not meaningfully challenge Brownlee's showing of a prima facie case for sex discrimination and proceeds ahead to the burden-shifting/pretext analysis. The Court will do the same. Catholic Charities articulates the following as a legitimate, nondiscriminatory reason for Brownlee's termination: Brownlee's (admittedly) unprofessional behavior displayed on June 16, 2015 (including swearing and a threat of violence), considered in light of her prior disciplinary history, was the sole reason for her termination. Defs.' Memo. Brownlee Mot. Summ. J. at 8. In explaining the disparate treatment, Catholic Charities maintains that it determined that Washington did not "hit" Brownlee when he touched her arm (as she claims), found that her swearing and threat of violence were more severe than his unprofessionalism, and Brownlee, unlike Washington, had received a Final Written Warning just a few months earlier. *Id.* at 9. Further, Catholic Charities argues that Brownlee may disagree with its termination decision,

but "it is not the court's concern that an employer may be wrong about its employee's performance or may be too hard on its employee. *Id.* (internal citation omitted). The Court finds that this explanation suffices as a *McDonnell Douglas* legitimate, nondiscriminatory reason for termination.

It follows that Brownlee now bears the ultimate burden of showing that Catholic Charities' proffered reason is really pretext for discrimination on the basis of sex. *Cooper v. Lew*, 2015 WL 7568382, at *4 (N.D. Ill. Nov. 24, 2015) ("Plaintiff can nevertheless proceed if she offered evidence that the reason offered by the government is insufficient or not worthy of belief."). Brownlee argues that Catholic Charities' pretext in terminating Brownlee but not Washington is rooted in the Cat's Paw theory. "[T]he 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Int'l Corp.,* 673 F.3d 625, 628 (7th Cir. 2012) (citing *Staub v. Proctor Hosp.,* 562 U.S. 411, 419–22 (2011)). Brownlee contends that, here, a discriminatory animus towards her was present, because Washington was "very close friends with Ray Lee and Renee Rouse – the two Catholic Charities employees responsible for disciplining Washington in 2014 and 2015 and who conducted the June 16, 2015 investigation which concluded with Brownlee's termination." Brownlee Resp. at 6 (citing PSOF ¶¶ 11–13).

Catholic Charities argues that Brownlee has misapplied the Cat's Paw theory for two reasons: (1) Brownlee has not presented any facts, or even a coherent argument, to suggest that Lee and Rouse harbored *sex*-based animus, and (2) even if Lee and Rouse did harbor such animus, Brownlee lacks facts that Lee and Rouse were the proverbial "cat's paw" to the ultimate decision-makers. R. 133, Defs.' Brownlee Reply at 9–10. The Court agrees. Brownlee's contention that Washington was *friends* with Lee and Rouse is not evidence of sex-based discriminatory animus. *See, e.g.*, *Jenkins v. Lifetime Hoan Corp.*, 259 Fed. App'x. 863, 866 (7th Cir. 2008) (affirming summary judgment in favor of the employer, because allegations that a female colleague was treated more leniently because of relationship with a vice president did not amount to sex discrimination); *Howard v. Donahoe*, 2012 WL 5845581, *4 (N.D. Ill. Nov. 19, 2012) (granting summary judgment in favor of the employer, because speculation that a co-worker involved in an altercation was spared from termination due to having friends in high places, even if true, offered no basis for undermining the employer's reason for terminating the employee). The Court finds that Brownlee has misapplied the Cat's Paw theory and has not met her ultimate burden of showing that Catholic Charities' explanation for Brownlee's termination was really pretext for discrimination on the basis of sex. Because Brownlee failed to carry this burden, her sex discrimination claim cannot survive summary judgment, and the Court accordingly grants Catholic Charities' motion for summary judgment with respect to Count IV.

### iii.    Count V: Title VII Retaliation (Brownlee)

In Count V, in an alternative theory regarding her termination, Brownlee claims that Catholic Charities terminated her in retaliation for complaining about Washington's harassment. Title VII's anti-retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Caskey v. Colgate-Palmolive Co.,* 535 F.3d 585, 592–93 (7th Cir. 2008) (citing 42 U.S.C. § 2000e-3(a)). "To establish a . . . retaliation [claim] under Title VII, [Brownlee] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Catholic Charities argues that Brownlee satisfies neither the first nor third elements of the retaliation cause of action—she did not engage in a protected activity, and she has not established a causal link between the protected activity and an adverse employment action. Defs.' Memo. Brownlee Mot. Summ. J. at 10–11.

### 1)  Protected Activity

Catholic Charities first maintains that Brownlee did not engage in a statutorily protected activity, because she did not complain about sexual harassment to her supervisors. Defs.' Memo. Brownlee Mot. Summ. J. at 10. Catholic Charities argues that "neither Brownlee's verbal complaint to Lee nor her June 22, 2015, e-mail could be reasonably construed as a complaint about sexual harassment." *Id.* Indeed, contends Catholic Charities, general complaints about Washington's work

habits, his arguing with Brownlee, and Washington's alleged contact with Brownlee's shoulder (without reference to any sexual comments or touching) do not constitute a protected activity. *Id*. In support of its position, Catholic Charities cites *Tomanovich v. City of Indianapolis*, 457 F.3d 656 (7th Cir. 2006), which holds that general complaints that do not suggest a connection to a protected status are not a protected activity.

Brownlee disagrees, insisting that while she may have not used the "sexual harassment" magic words, her complaints were not the general, conclusory statements made by the plaintiff in *Tomanovich*. Brownlee Resp. at 8 (citing *Gentry v. Export Packaging, Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (finding that plaintiffs are not required to use the term "sexual harassment" in their complaints where the evidence shows that a plaintiff perceived her environment as hostile)). Brownlee maintains that she did complain to Lee on multiple occasions that Washington would inappropriately touch her. *Id*. at 8 (citing PSOF ¶ 19). She further contends that her testimony of her complaints to Lee ("told [Lee] on several occasions that [Washington] would touch me and things like that," Brownlee Dep. at 163:17–19; Washington "talks too much, plays too much, and is too touchy–feely," *id*. at 183:12–184:4; "why do I have to work with this guy, man, he's a freak," *id*. at 172:16–173:7), in context, show that she perceived her environment as hostile. Brownlee Resp. at 8.

Catholic Charities counters that Brownlee misstates the facts. Catholic Charities maintains that "nowhere in [Plaintiffs' Statement of Facts] ¶ 19 or any of the undisputed facts does it state that Brownlee told Lee Washington touched her

inappropriately on any occasion, let alone multiple occasions." Defs.' Brownlee Reply at 12.

The Court agrees that Brownlee's complaints about Washington are distinguishable from general, conclusory statements. And, after reviewing the evidence, the Court finds that Catholic Charities, not Brownlee, misstates the facts. While Catholic Charities maintains that nowhere in any of the undisputed facts does it state that Brownlee told Lee that Washington touched her inappropriately on any occasion, the Court notes Brownlee's testimony that she "told [Lee] on several occasions that [Washington] would touch me and things like that." *See* Brownlee Dep. at 163:17–19. In viewing the facts in the light most favorable to Brownlee (as it must), the Court finds that there is a genuine issue of material fact as to whether Brownlee engaged in a protected activity here, the first element of a retaliation claim. A reasonable jury could find that Brownlee complained to Lee about the sexual harassment she was facing. The Court turns next to Catholic Charities' second argument, regarding causation.

### 2) Causation

Catholic Charities contends that Brownlee cannot establish that her termination was retaliatory because the sole reason for her belief that she was fired due to her complaints of sexual harassment is the "short timing between her June 22, 2015 e-mail and her June 25, 2015 termination." Defs.' Memo. Brownlee Mot. Summ. J. at 10. According to Catholic Charities, suspicious timing, alone, is insufficient to establish a causal link, and the timing here does not suggest a causal link because

Catholic Charities asked for the summary email that Brownlee claims led to her termination. *Id.* at 11. Overall, Catholic Charities maintains that Brownlee lacks evidence that she was terminated for any reason other than her behavior on June 16, 2015, in addition to her prior disciplinary history. *Id.* Brownlee responds that "[i]n addition to suspicious timing, Brownlee can show that she was retaliated against based on pretext." Brownlee Resp. at 9.

To establish a causal link in a Title VII retaliation claim, the plaintiff must show "but-for" causation. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 748–49 (7th Cir. 2021) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). That is, Brownlee "must show that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (internal quotation marks and citations omitted). To do so, Brownlee can offer circumstantial evidence, such as suspicious timing, ambiguous statements, "and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Brownlee may further offer "evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Board of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal quotation marks and citations omitted).

Brownlee proffers two types of evidence to satisfy the causal link of her retaliation claim: (1) suspicious timing; and (2) pretext. Yet, as discussed below, Brownlee fails to "present circumstantial evidence that, when considered together, would permit a jury to believe that the defendants retaliated against her for exercising her [] rights." *Cole v. Illinois*, 562 F.3d 812, 815 n.2 (7th Cir. 2009).

### a) Suspicious Timing

As part of Human Resource's investigation into the June 16, 2015 incident between Brownlee and Washington, Brownlee sent a written statement to Human Resources via email on June 22, 2015. Brownlee Written Statement. Brownlee explained the incident in detail and generally noted that "[t]his guy has been a constant problem with anyone he has worked with and nobody wants to work with him, he does the job partially and only wants to drive he does not put work into the computer at all and talks about everyone at the job constantly." *Id.* at 2. On June 25, 2015, Catholic Charities terminated Brownlee. DSOF ¶ 132. Brownlee testified that she believed her termination was retaliatory because of the short time between her June 22, 2015 email and her June 25, 2015 termination. DSOF ¶ 133. Defendants counter that the timing between Brownlee's email and termination is not suspicious, as Catholic Charities requested that Brownlee compose and send the June 22, 2015 statement. Defs.' Memo. Brownlee Mot. Summ. J. at 10–11.

"Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky v. Means-Knaus*

*Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (citations omitted). *See Coleman*, 667 F.3d at 861 (interval of few weeks or months "may provide probative evidence of the required causal nexus" when "there is corroborating evidence of retaliatory motive").

At first blush, the timing of Brownlee's termination appears suspicious. Brownlee's termination came only three days after her email complaining about Washington, and such a short time frame could be indicative of a causal link. *See, e.g., Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). However, Catholic Charities ordered Brownlee to compose and send the email as part of the company's investigation of the June 16, 2015 altercation, so it seems improbable that Catholic Charities would terminate Brownlee for doing exactly what she was told to do. DSOF ¶ 125. In addition, Catholic Charities' investigation involved not only Washington's bad conduct on June 16, 2015, but also Brownlee's bad conduct. Defs.' Memo. Brownlee Mot. Summ. J. at 11; DSOF ¶¶ 112–25. As such, Brownlee's termination "on the heels of the key parties submitting statements about the incident," Defs.' Memo. Brownlee Mot. Summ. J. at 11, is not necessarily suspicious. Even assuming suspicious timing here, that timing alone does not establish causation in this case because Brownlee has not offered "corroborating evidence that supports an inference of causation." *Sklyarsky*, 777 F.3d 892, 898 (citations omitted). Thus, the Court finds that Brownlee's suspicious timing evidence falls short of supporting the necessary causal link for her retaliation claim.

### b) Pretext

Brownlee avers that she can show that she was retaliated against based on pretext, under the cat's paw theory. Brownlee Resp. Summ. J. at 9–11. Defendants retort that Brownlee "lacks evidence to suggest that her termination was influenced by anything but her swearing and threatening behavior toward Washington [on June 16, 2015], combined with her prior disciplinary history." Defs.' Brownlee Reply at 12.

Once an employer in a Title VII retaliation case produces evidence "which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action . . . the plaintiff, to avoid summary judgment, then must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). When assessing pretext evidence, a court does not evaluate whether the employer's stated reason for the adverse action "was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). "A pretextual decision then, 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Scruggs*, 587 F.3d at 838–39 (quoting *Argyropoulos*, 539 F.3d at 736).

53

Applying these concepts here, Catholic Charities has produced evidence sufficient to show that it had a "legitimate non-discriminatory reason" for terminating Brownlee, namely her swearing and threatening behavior toward Washington on June 16, 2015, combined with her prior disciplinary history, which included warnings about unexcused absences, excessive "dock" time, and ongoing attendance problems. DSOF ¶¶ 89–93; *see also supra* Section B(ii). Thus, to avoid summary judgment on her retaliation claim on the basis of pretext, Brownlee "must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Robertson*, 949 F.3d at 378 (citation omitted). Brownlee has failed to meet that burden because she has not adduced enough evidence demonstrating that Catholic Charities did not "honestly believe[] the reason it has offered to explain the discharge." *Harper*, 687 F.3d at 311.

While Brownlee asserts that "[e]mployer honesty is exactly what is at issue in the present case," Brownlee Resp. Summ. J. at 9, she does not explain how, or direct the Court to evidence of Catholic Charities' dishonesty. Rather, she highlights the friendships between Lee and Washington and Lee and Rouse, as well as the fact that Washington was not terminated despite his disciplinary history. *Id.* at 10. In other words, Brownlee maintains that "Washington and Lee's friendship, coupled with Washington's extensive disciplinary history, creates an issue of material fact where a jury could find a causal connection between Brownlee's complaints and Lee's discriminatory animus towards Brownlee." *Id.*

The Court disagrees for three reasons. First, Brownlee has produced no evidence supporting her claim that Lee has discriminatory animus towards Brownlee. The fact that Washington, who purportedly sexually harassed Brownlee, was friends with Lee is not evidence that Lee had discriminatory animus. *See Jordan v. Summers*, 205 F.3d 337, 343–44 (7th Cir. 2000) (employee's mere perception that white female employees were being groomed for promotions failed to establish pretext); *Jenkins v. Lifetime Hoan Corp.*, 259 Fed. App'x. 863, 866 (7th Cir. 2008) (allegations that female colleague was treated more leniently because of relationship with a vice president did not amount to sex discrimination).

Second, Washington and Lee's friendship does not indicate that the decisionmakers who terminated Brownlee—Luiz Barbosa, Cynthia Gutierrez, and Bob Hannicke—provided a "phony reason" for doing so. *Scruggs*, 587 F.3d at 838–39 (citation omitted). For that to be the case, Brownlee would have to show, at minimum, that the cat's paw theory connects some discriminatory animus of Lee to Barbosa and Gutierrez's decision to terminate Brownlee. Brownlee has not made that showing. Again, Brownlee has not established that Lee has discriminatory animus, and as will be discussed further below, Brownlee has not shown that the cat's paw theory applies to this case.

Lastly, it is not the Court's place to second-guess the fairness of Catholic Charities' termination decision. While it indeed seems unfair that Washington, unlike Brownlee, was not fired following the June 16, 2015 altercation, despite his disciplinary history, the Court's "sole focus is on whether the employer's stated reason

can be characterized as a falsehood rather than an honestly held belief." *Robertson*, 949 F.3d at 378 (citations omitted). Brownlee has not offered enough evidence for a reasonable jury to find, by a preponderance of the evidence, that Catholic Charities' stated reason for terminating her was a falsehood, so her pretext argument fails.

Brownlee cites an unpublished decision, *Stringer v. Cambria Fabshop-- Indianapolis, LLC*, 2015 WL 1499085, at *12 (S.D. Ind. Mar. 31, 2015), in support of her pretext argument, but the case is inapposite. In *Stringer*, the employer's stated reason for terminating the plaintiff was the plaintiff's violation of the employer's offensive behavior/harassment policy. *Id.* at *16. The plaintiff argued that the employer's argument was pretextual, as a similarly situated employee engaged in comparably egregious conduct and yet was not terminated. *Id.* The court in *Stringer* stated that the Seventh Circuit "has recognized that 'a discrimination plaintiff may employ such comparator evidence to discharge [his] burden at the pretext stage . . .'[;] the inconsistency in [an employer's] application of its [harassment] policy [can] create[] a genuine issue of material fact as to whether its stated reason for terminating [the plaintiff] was a pretext for discrimination" *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012)). While Brownlee similarly supports her pretext argument with Catholic Charities' distinct treatment of Washington, Brownlee—unlike the plaintiff in *Stringer*—has not offered evidence sufficient to support a claim that Washington is a comparator.

To establish Washington as a comparator, Brownlee must show that she and Washington "engaged in similar conduct without such differentiating or mitigating

circumstances as would distinguish their conduct or the employer's treatment of them." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 808 (7th Cir. 2014) (internal quotation marks and citation omitted). Here, the record unequivocally demonstrates that there were differentiating circumstances that distinguish Brownlee's conduct from Washington's. For one, Catholic Charities determined, after its investigation of the June 16, 2015 incident, that Brownlee's unprofessionalism on that date was worse than Washington's because she made credible threats to have her son injure Washington, and because the company determined Brownlee's allegation that Washington hit her to be incredible. Pls.' Resp. DSOF ¶¶ 121–127, 130. Perhaps more importantly, Brownlee had recently received a final written warning before her termination, whereas Washington had not. *Id.* Thus, because the record directly contradicts Brownlee's claim that Washington is a comparator, her reliance on *Stringer* does not advance her pretext argument.

Brownlee's pretext argument also fails because she has misapplied the cat's paw theory of liability. Under a cat's paw theory of liability, an employer may be liable "when a biased supervisor 'who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). However, "the mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw

theory." *Id.* at 462. Significantly, where the "investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Staub*, 562 U.S. at 421.

The cat's paw theory does not fit here because Brownlee has not pointed to any evidence revealing bias or discriminatory animus on behalf of her supervisors, Lee and Rouse. Additionally, there is no evidence in the record that Lee or Rouse improperly influenced Barbosa, Hannicke, or Gutierrez to terminate Brownlee. As Catholic Charities points out, its human resources department investigated with information from multiple sources, not just Lee and/or Rouse. Defs.' Brownlee Reply at 10; Pls.' Resp. DSOF ¶ 125 (Plaintiffs do not contest that "Human Resources collected written statements from Washington, Brownlee and Lee in addition to the incident report prepared by Rouse."); *id.* ¶ 130.[8] Brownlee's claim to the contrary— that because Barbosa and Gutierrez only made infrequent visits to the 10 South Kedzie office, they must have relied solely on information provided by Lee and Rouse—is belied by the evidence in the record. Pls.' Resp. DSOF ¶¶ 125, 130. As a result, the cat's paw theory does not apply because the decisionmakers were not wholly dependent on a single source of biased information. *Id. See Martino v. MCI Communs. Servs.*, 574 F.3d 447, 453 (7th Cir. 2009) (internal quotation marks and

---

[8]Although Brownlee contests the statement of fact in ¶ 130 of Defendants' Statement of Material Facts, in reviewing the underlying evidence in support of Defendants' statement and Plaintiffs' response, the Court finds that the uncontroverted evidence shows that, although Gutierrez was not present to witness the incident on June 16, 2015 firsthand and relied in part on information provided to her by Lee and Rouse, she also relied on the statement submitted by Brownlee and statements made by Brownlee after the incident in a meeting with Lee, Rouse, and Ian Stephens (another supervisor), that she threatened Washington. R. 121-5, Gutierrez Dep. at 78:14-22.

citations omitted) (to avoid cat's paw liability a decisionmaker "is not required to be a paragon of independence. It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision"). All in all, Brownlee has failed to marshal enough evidence to illuminate a factual dispute on the question of pretext, so she cannot avoid summary judgment on that basis. *See Argyropolous v. City of Alton*, 539 F.3d at 736 n.6.

The Court, having considered Brownlee's suspicious timing and pretext arguments in support of causation, finds that Brownlee has failed to present enough evidence for a reasonable jury to find, by a preponderance of the evidence, that Brownlee was terminated in retaliation for any complaint of sexual harassment. The Court therefore grants Catholic Charities' motion for summary judgment on Count V (Retaliation – Brownlee).

### iv.    Count VIII: Battery (Brownlee)

Brownlee brings Count VIII against both Washington and Catholic Charities, alleging that Washington battered her on June 16, 2015, and Catholic Charities is liable for Washington's battery. SAC ¶¶ 225–243. Defendants accept that there are genuine issues of fact as to whether Washington battered Brownlee, but Defendants argue that summary judgment should nevertheless be granted as to Catholic Charities, because Brownlee has not established that Catholic Charities ratified Washington's alleged tort. Defs.' Memo. Brownlee Mot. Summ. J. at 11.

An employer can only be liable for an intentional tort committed by its employee if he was acting in the course and scope of his employment, that is, if he was furthering his employer's interest when committing the act. *Doe v. Sperlik*, 2005 WL 3299818, at *3 (N.D. Ill. Nov. 30, 2005) (citing *Bates v. Doria*, 502 N.E.2d 454, 457 (Ill. App. Ct. 1986)). Notably, the Court originally dismissed Brownlee's battery claim against Catholic Charities, because it failed to allege any basis for meeting this scope of employment test. *Brownlee II*, 2018 WL 1519155, at *6. Brownlee amended her battery claim in the SAC, and Catholic Charities again moved to dismiss it. The Court denied the motion to dismiss and allowed the claim to proceed, because Brownlee had alleged that, prior to the battery, she complained to Catholic Charities about Washington making "sexually offensive and aggressive comments" to her and "rubbing her shoulders and thighs on at least five occasions," but Catholic Charities did not reassign her to a new partner. *Id.* at *6. The Court reasoned that these allegations, if supported by evidence, would prove that Catholic Charities ratified Washington's tort (and thus could be liable for it) on the theory that management's knowledge of abusive behavior and failure to act on it is the equivalent of authorizing future torts. *Id.* (citing *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 938 (N.D. Ill. 2011)).

Using the Court's blueprint, Catholic Charities argues that Brownlee failed to produce evidence to support these allegations at the Summary Judgment stage. Catholic Charities maintains that Brownlee's only complaint to Lee about Washington prior to the alleged battery was to say, "why do I have to work with this

guy, man, he's a freak." Defs.' Memo. Brownlee Mot. Summ. J. at 12 (citing DSOF ¶ 108). Catholic Charities argues that "this vague comment could not possibly have put Catholic Charities on notice that Washington might later commit a battery against Brownlee." *Id*.

Brownlee disagrees with Catholic Charities' characterization of her complaints. Brownlee Resp. at 15–16. Brownlee contends that all of Washington's batteries occurred in the workplace and during work hours, and that Catholic Charities effectively ratified the battery when Brownlee notified Lee and Stephens of Washington's sexually harassing comments and touching during their shifts and nothing was done. *Id*. (citing PSOF ¶ 23).

The Court also disagrees with Catholic Charities' characterization of Brownlee's complaints. In addition to the testimony referring to Washington as a "freak," Brownlee also testified that she "told [Lee] on several occasions that [Washington] would touch me and things like that, and I was like why do you guys have me working with him. He's very unprofessional. He talks on my phone, and [Lee] was like, well, that's why we put you with him because we know you can handle him [...]." Brownlee Dep. at 163:17–19. And, in her affidavit, Brownlee states that "Ray Lee and Jason Marsh had knowledge that Washington harassed me in the van because I complained to both on several occasions about the harassing things Washington said to me and how erratic and unsafe his driving was." Brownlee Aff. ¶ 12. These statements are also coupled with other female employees' complaints about Washington. PSOF ¶ 24. In viewing the facts in the light most favorable to Brownlee

(as it must), the Court finds that there is a genuine issue of material fact as to whether Catholic Charities was put on notice and failed to act regarding Washington's sexual comments and uninvited physical touching. Reaching this determination precludes summary judgment as to Catholic Charities. Therefore, the Court denies Catholic Charities' motion for summary judgment with respect to Count VIII.

### v.    Count IX: Intentional Infliction of Emotional Distress (Brownlee)

Brownlee also brings Count IX against both Washington and Catholic Charities, claiming that Washington subjected her to intentional infliction of emotional distress, and Catholic Charities is vicariously liable. SAC ¶¶ 244–268. To succeed on an IIED claim, a plaintiff must establish: (1) conduct that is extreme and outrageous; (2) the defendant intended to inflict severe emotional distress; and (3) the defendant's conduct caused severe emotional distress. *Farrar v. Bracamondes*, 332 F. Supp. 2d 1126, 1131 (N.D. Ill. 2004).

Defendants argue that Brownlee fails to establish any of the requisite elements, namely that Brownlee provides no evidence that Washington engaged in the type of extreme or outrageous behavior required for an IIED claim. Defs.' Memo. Brownlee Mot. Summ. J. at 13. Defendants contend that to be truly extreme and outrageous, the conduct at issue must "go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Id.* (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). Defendants note that Brownlee alleges only a few weeks of crude remarks, a few instances of non-intimate touching on the

62

arm or leg, and a single slap of her shoulder by a co-worker. *Id*. Defendants contend that while "this might all be rude, […] it is nowhere near 'beyond all possible bounds of decency.'" *Id*. Defendants then cite two examples of cases where courts found even more outrageous behavior insufficient. In *Thomas v. Habitat Co.*, 213 F. Supp. 2d 887, 898 (N.D. Ill. 2002), the court found that conduct that included a supervisor grabbing an employee, wrapping his legs around her, and telling her that he loved her, which caused the employee to urinate, was not extreme or outrageous. And, in *Mosley v. City of East St. Louis*, 2015 WL 9268184, at *7 (S.D. Ill. Dec. 21, 2015), the court found that conduct that included the use of a voodoo doll, threats to have an employee fired, and driving past the employee's house was also not extreme or outrageous. Defendants argue that Brownlee's evidence fails to meet the high standard for IIED claims, especially considering that this tort "is even more constrained in the employment context," as some amount of conflict and distress is "unavoidable" in the workplace. Defs.' Memo. Brownlee Mot. Summ. J. at 13 (citing *Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017)).

Further, Defendants argue that evidence does not show that Brownlee suffered extreme emotional distress when Washington made sexual comments or touched her. *Id*. Defendants insist that Brownlee's reaction to the alleged battery showed that she was angry but does not suggest that she suffered severe emotional distress. *Id*. And, Defendants note that Brownlee never required medical treatment or counseling for any distress based on his behavior. *Id*. at 13–14. Finally, Defendants contend that even if Brownlee met the elements for an IIED claim, there is no basis for holding

Catholic Charities vicariously liable for an unforeseeable intentional tort of an employee. *Id.*

Brownlee counters that a jury could reasonably find from the evidence that Washington's pattern of offensive conduct towards her was intended to cause, or there was a high probability that his behavior would cause, her severe emotional distress. Brownlee Resp. at 14–15. Brownlee notes that Washington subjected her to weeks of degrading and outrageous sexual comments, which she reported to her supervisor. *Id.* (citing PSOF ¶ 19). Washington also rubbed her thigh, her shoulders, and even struck her on the shoulder. *Id.* (citing PSOF ¶¶ 10, 18). Brownlee also cites to one case, *Thomas v. Comcast of Chi., Inc.*, 2012 WL 3205008, at *9 (N.D. Ill. Aug. 12, 2012), which represents the other end of the spectrum. In *Thomas*, the court found that a reasonable jury could find that the defendant's comments ("you're sexy"; "I did not know you were that cute"; "You should not wear things like that to work because you look too good"; "You have pretty lips"; "You have nice legs"; "You're [sic] butt looks too juicy"; and "If I was your man, I would tear you up.") and physical interactions (touching her leg, rubbing her head, and an attempted kiss) were intentional, and evidence could reasonably support a claim that the defendant intended to cause or knew there was a high probability that his behavior would cause severe emotional distress. 2012 WL 3205008, at *2, 9.

The Court finds that there is a genuine issue of material fact regarding the nature of Washington's conduct and its effect on Brownlee. A reasonable jury could find that Washington's conduct falls closer to the type of conduct in *Thomas*, 2012

WL 3205008, at *2, 9 ("You're [sic] butt looks too juicy"; "If I was your man, I would tear you up."; and attempted kiss), than the conduct in *Habitat Co.*, 213 F. Supp. 2d at 898 (one instance of wrapping legs around plaintiff) and *Mosley*, 2015 WL 9268184, at *7 (voodoo doll and driving past the plaintiff's house). A reasonable jury could find that Washington, in making dozens of unsolicited sexual remarks and initiating unwelcome touching, intended to cause or knew there was a high probability that his behavior would cause severe emotional distress. A reasonable jury could even find that such extreme conduct *did* cause emotional distress, evidenced by Brownlee's outburst in response to the June 15, 2016 physical contact. And, as discussed with respect to the battery claim, a question of fact exists as to whether Catholic Charities ratified Washington's conduct. As such, Brownlee's IIED claim survives summary judgment, and Defendants' motion is denied with respect to Count IX.

### vi.    Count X: IGVA (Brownlee)

Finally, Brownlee claims that Washington violated the IGVA, which prohibits any act "of physical aggression . . . committed at least in part, on the basis of a person's sex." SAC ¶¶ 269–290; *see also* 740 ILCS 82/5(1). A cause of action under the IGVA arises when there is a "physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois." 740 ILCS 82/5. Battery can be defined as the willful touching of the person of another without that person's consent. *Flores v. Santiago*, 986 N.E.2d 1216, 1219 (Ill. App. Ct. 2013).

Washington contends that Brownlee's IGVA claim rests on the June 16, 2015 incident when he touched Brownlee on the shoulder to get her attention. Defs.' Memo. Brownlee Mot. Summ. J. at 14. He argues that Brownlee's IGVA claim must fail, because there is no evidence that this alleged "violence" was motivated by Brownlee's gender. *Id.* Citing to her testimony, Washington argues that even Brownlee herself does not believe this incident was motivated by gender. *Id.* When asked why she believes Washington hit her shoulder, Brownlee testified that he struck her, because "I wouldn't pay him no attention. I had my earphones in," and because he was angry that they were arguing. *Id.* (citing DSOF ¶ 119). Washington argues further that a male Mobile Outreach employee named Robert Ware testified that Washington would also touch him to get attention and that he was not offended because this was Washington's way of getting attention. *Id.* at 15 (citing DSOF ¶ 135). Accordingly, Washington suggests that this testimony negates any inference that his touching was motivated by Brownlee's sex. *Id.*

The Court notes that Washington incorrectly characterizes Count X as being predicated only on the July 15, 2016 "battery." Count X also alleges other instances of nonconsensual touching—Washington rubbed Brownlee's thigh and shoulders (SAC ¶ 270). And these allegations are supported by evidence in the record. Approximately five times between May 16, 2015 and June 16, 2015, Washington touched Brownlee's shoulders, touched her face with his hand, or hugged her. Pls.' Resp. DSOF ¶ 105. When this touching occurred, Brownlee would hit his hand and

say, "don't touch me." *Id.* Brownlee further testified that Washington touched her in a sexual nature, and it felt "creepy." *See* Brownlee Dep. 175:2–178:12.

Based on this evidence in the record and the elements of battery under Illinois law, the Court finds that a reasonable jury could find that Washington touched Brownlee without her consent, and that such contact was motivated at least in part by Brownlee's sex. The fact that Washington also touched male employees, and such touching may have not been motivated by sex does not persuade the Court otherwise. Brownlee's IGVA claim survives summary judgment, and Washington's motion is denied with respect to Count X.

### vii.    Count III: Title VII Sexual Harassment (Fleming)

The Court now turns to Defendants' motion for summary judgment regarding Fleming's claims. The Court begins with Count III, in which Fleming alleges that Washington and the owner of Vaia, a Catholic Charities vendor[9], sexually harassed her, resulting in a violation of Title VII by Catholic Charities. SAC ¶¶ 144–161. Defendants contend that they should be granted summary judgment with respect to Count III for three reasons. R. 125, Defs.' Memo. Fleming Mot. Summ. J. at 4–11.

---

[9]Though not discussed by either party, the Court notes that an employer can be liable for sexual harassment of an employee by a third-party non-employee (like the vendor owner here). *See, e.g.*, *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) ("That does not get Costco off the hook, however, because an employer can be liable for a hostile work environment that results from the acts of non-employees, including customers."); *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 437 (7th Cir. 2010) (finding that nursing home employer was liable to employee for sexual harassment perpetrated by "third-party non-employee" nursing home residents); *Lapka v. Chertoff,* 517 F.3d 974, 984 n.2 (7th Cir. 2008) ("Employer liability can be imposed when the harassment is committed by co-workers or by third parties.").

First, Fleming's claims are time-barred (*id.* at 4–7); second, the alleged conduct perpetuated by both Vaia's owner and Washington does not amount to unlawful sexual harassment as a matter of law (the third element of a sexual harassment claim) (*id.* at 7–9); and third, Fleming provides no basis for employer liability (the fourth element of a sexual harassment claim) (*id.* at 9–11). The Court addresses Defendants' arguments in turn.

### 1) Time-Barred

Fleming filed a charge of discrimination with the EEOC on November 2, 2015. Pls.' Resp. DSOF ¶ 82. Title VII requires that charges of discrimination must be filed within "300 days after the alleged unlawful employment practice occurred." 42 U.S.C. 2000e-5(e)(1). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921 (7th Cir. 2007). Filing a timely charge with the EEOC is not a jurisdictional prerequisite to suit in federal court; rather, it is an affirmative defense akin to administrative exhaustion. *Id.* (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982)). The EEOC charge requirement serves two main purposes: it "gives the EEOC and the employer a chance to settle the dispute, and it gives the employer notice of the employee's grievances." *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). Because Fleming alleges two theories of sexual harassment (harassment perpetrated by Vaia's owner and by Washington), the Court analyzes whether Fleming's November 2, 2015 filing was timely as to each theory.

### a) Vaia Owner's Conduct

Catholic Charities argue that its authentic business records are dispositive here. Defs.' Memo. Fleming Mot. Summ. J. at 5. Vaia's invoices establish that as of November 2015 (date of Fleming's EEOC filing), Catholic Charities had not sent Fleming to Vaia for over sixteen months. *See* DSOF ¶¶ 72–75. The invoices further show that Catholic Charities only sent a van for repair once in the year 2015 (on July 15, 2015), and Fleming had already been transferred to the Administrative Assistant office position by that time. *Id.* Based on these dates, Catholic Charities contends that any and all conduct involving Vaia falls outside the 300-day window. Defs.' Memo. Fleming Mot. Summ. J. at 4–5.

Fleming counters that she was still being subjected to harassment by the owner in May 2015 (within the statute of limitations period) when she changed positions. R. 129, Fleming Resp. at 6. Fleming adds that she requested the position change precisely because she was being harassed by Vaia's owner and thought the office job would shield her from his advances. *Id.* In its Reply, Catholic Charities again stands on the records, insisting that Fleming's statement that Vaia's owner sexually harassed her up until May 2015 is wholly inconsistent with clear business records to the contrary. R. 132, Defs.' Fleming Reply at 3–4. Catholic Charities contends that if Fleming believed these records were inaccurate or incomplete, she could have pursued discovery into that issue—for instance, by deposing Catholic Charities' recordkeepers, or subpoenaing Vaia for its records—but she chose not to. *Id.*

The Court agrees with Catholic Charities, finding that no reasonable jury could believe that Vaia's owner sexually harassed her within 300 days of November 2015, in the face of clear records to the contrary. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) (affirming summary judgment for the employer on wage claims and finding that "although Turner disputes the accuracy of The Saloon's records, his mere assertions are insufficient to create a jury issue"); *Kinsella v. Am. Airlines, Inc.*, 685 F. Supp. 2d 891, 901 (N.D. Ill. 2010) (granting summary judgment to the employer and refusing to accept the plaintiff's unsupported assertion that she called the FMLA hotline where there was no explanation as to why phone records showed no such call); *see also Hicks v. Irvin*, 2010 WL 2723047, at *3 (N.D. Ill. July 8, 2010) ("[T]he lack of a business record is evidence that something which ordinarily would have been recorded did not occur.") (citing Fed. R. Evid. 803(7)). The Court finds that Fleming's retaliation claim with respect to her allegations against Vaia's owner are time-barred and grants Defendants' motion for summary judgment with respect to Fleming's sexual harassment claim against Catholic Charities premised on the conduct of Vaia's owner.

### b) Washington's Conduct

Catholic Charities argues that Fleming's sexual harassment claim regarding Washington's conduct should also be time-barred. Defs.' Memo. Fleming Mot. Summ. J. at 5–7. Catholic Charities contends that Fleming alleges only a single incident involving Washington in the 300 days prior to filing her charge, and the sexually charged comment was not even directed at her (in April 2015, Fleming overheard

Washington say, "how did you get up in there?" to Lee in reference to an overweight female co-worker). *Id.* at 5. Catholic Charities argues that this sole incident is legally insufficient to create a hostile work environment, and so, Fleming must rely on the "continuing violation" doctrine in order to bring in all earlier incidents to support her claim. Catholic Charities insists that Fleming cannot do so. *Id.* "Under the 'continuing violation' doctrine, a Title VII plaintiff may recover for otherwise time-barred conduct that is part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period." *Id.* (citing *Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015)).

Catholic Charities explains that a plaintiff can reach beyond the 300-day period only when she "was reasonable not to perceive her working conditions as intolerable until the acts of harassment had, through repetition or culmination, reached the requisite level of severity." *Id.* at 5–6 (citing *DeClue v. Cent. Ill. Light Co.* 223 F.3d 434, 435 (7th Cir. 2000); *Flynn v. Mid-States Screw Corp.*, 2001 WL 789411, at *4 (N.D. Ill. July 11, 2001) (continuing-violation doctrine inapplicable where the employee knew that harassment was unacceptable more than 300 days earlier)). Catholic Charities insists that it was not reasonable for Fleming to wait one-to-three years (all previous Washington incidents occurred in 2012 and 2014) before filing an EEOC charge, because she had already determined that Washington's conduct rose to the level of sexual harassment in 2012 (Fleming first submitted a written grievance against Washington in the fall of 2012). *Id.* at 6–7; *see also Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006) ("This court has applied the continuing violation doctrine

when the plaintiff could not reasonably be expected to perceive the alleged violation before the limitations period has run, or when the violation only becomes apparent in light of later events."); *Gracia v. Sigmatron Int'l, Inc.*, 2013 WL 5782359, at *5 (N.D. Ill. Oct. 25, 2013) (noting that the continuing violation doctrine does not apply if the employee should have reasonably perceived her working conditions as intolerable). In submitting a written grievance against Washington in the fall of 2012, Catholic Charities contends that Fleming knew Washington's behavior was unacceptable far earlier than January 2015. *Id.* at 7.

In response, Fleming first notes that the comment she overhead in April 2015 was not the only event that occurred within the 300-day statute of limitations. Fleming Resp. at 6–7. In her affidavit, Fleming states "[t]hat from October 2012 to November of 2015, Dwayne Washington made sexual comments to me that interfered with my ability to do my job." Fleming Aff. ¶ 6. And Fleming argues that the continuing violation doctrine does apply, because Washington's sexually harassing remarks and conduct escalated in severity as Fleming's employment progressed, and Fleming filed her EEOC charge in November 2015 when she realized she had a substantial claim under Title VII. Pls.' Fleming Resp. at 6–7. Fleming explains that in 2012, Washington made sexual comments about Fleming's appearance ("I wish I was your jeans because I would be all up in that," "I like the way your jeans fit," and "look at that ass."); in 2014, Washington escalated his conduct to unwelcome touching and a remark that he would "take her in the basement and bend her over some boxes"; and in 2015, Washington continued to make sexually overt comments in Fleming's

presence. *Id*. at 7–8. Fleming insists that it was this escalation that made her realize that she had a cognizable Title VII claim. *Id*.

The Court disagrees and finds that Fleming cannot rely on the continuing violation doctrine here. Fleming's escalation argument is unpersuasive. She contends that there was a long-continued series of harassing acts that constituted an escalating pattern, but it was evident long before she sued that Washington's conduct was objectively sexually harassing, and Fleming subjectively perceived it as sexually harassing. One need not look further than Fleming's complaints to her supervisors starting in 2012. Fleming may not reach back and base her suit on conduct occurring so long before she filed the EEOC charge. *See Gracia*, 2013 WL 5782359, at *5 (on summary judgment, finding that the continuing violation doctrine does not apply if the employee should have reasonably perceived her working conditions as intolerably hostile). And notably, Fleming does not even attempt to challenge Defendants' cited cases.[10]

While the Court finds that Fleming cannot rely on the continuing violation doctrine to bring in 2012 and 2014 conduct, this finding does not end the analysis. There is a genuine issue of material fact as to whether Washington's conduct

---

[10]The Court notes that the United States Supreme Court, in *dicta*, has nodded disagreement with imparting a reasonableness analysis on the continuing violation exception. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct."). However, post-*Morgan* case law suggests that the reasonableness analysis is still good law in the Seventh Circuit. *See Savory*, 469 F.3d at 672; *see also Gracia*, 2013 WL 5782359, at *5 (citing *DeClue*, 223 F.3d at 435)).

persisted up until November 2015. Theoretically, Fleming's claim could be based on the sexual comments Washington made between January 2015 and November 2015, as those comments would be firmly within the 300-day window (no continuing violation doctrine needed). Fleming Aff. ¶ 6. As such, the Court finds that Defendants cannot prevail on summary judgment on a time-bar theory as to Washington's conduct in the January 2015 through November 2015 timeframe.

### 2)  Severe or Pervasive Conduct

The Court finds that Defendants also cannot prevail on summary judgment as to the merits of Fleming's sexual harassment claim based on Washington's conduct.

Like with Brownlee's sexual harassment claim, the Court notes that Catholic Charities does not meaningfully contest Fleming's demonstration of subjective sexual harassment. The Court finds that Fleming has met her burden in showing that she perceived her work environment as hostile. *See* Fleming Dep. at 121:4–122:15.

As for the objective test (debated in the briefs), the Court disagrees with Defendants' characterization that Fleming claims only a handful of relatively mild interactions with Washington over her years of employment. Defs.' Memo. Fleming Mot. Summ. J. at 8. Looking only at interactions alleged between January 2015 and November 2015 (as all previous allegations are time-barred), the relevant evidence is "[t]hat from October 2012 to November of 2015, Dwayne Washington made sexual comments to [Fleming] that interfered with [her] ability to do [her] job." Fleming Aff. ¶ 6. The Court finds it to be a question of fact as to whether this constitutes severe or

pervasive harassment (a requisite element of a sexual harassment claim). The Court turns next to Catholic Charities' argument regarding its liability as an employer.

### 3) Employer Liability

Catholic Charities contends that Fleming's sexual harassment claim with respect to Washington fails because Fleming cannot show that Catholic Charities "knew or should have known about the harassment and unreasonably failed to stop it." Defs.' Memo. Fleming Mot. Summ. J. at 9 (citing *Yancick*, 653 F.3d at 550). Catholic Charities maintains that Fleming did not complain about Washington's conduct other than reporting a 2012 comment Washington made about Fleming's pants. *Id*. at 10. Catholic Charities further suggests that it reacted reasonably to Fleming's 2012 report, as her report led to an apology from Washington, a supervisor's verbal warning to Washington, and a Mobile Outreach training about sexual harassment. *Id*. Fleming disputes this, stating that she "complained to Ray Lee each time that Washington made a sexually harassing comment to her, which was approximately every other day up until Washington's termination in November of 2015." R. 129, Fleming Resp. at 10 (citing PSOF ¶ 29).

As was the case with Brownlee's harassment claim, Catholic Charities may be liable for Fleming's purported sexual harassment by Washington if "the employer is shown to have been negligent in failing to prevent the harassment." *Cooper-Schut*, 361 F.3d at 426 (citation omitted). The first step in assessing Catholic Charities' potential negligence is to determine "whether the employer was on notice of the harassment." *Id*. That determination is satisfied when notice is "given to either

someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert*, 723 F.3d at 866 (citation omitted).

Here, the record contains evidence that Fleming informed Lee about Washington's purported sexual harassment, including harassment taking place in 2015. Fleming Aff. ¶ 6.[11] Due to Catholic Charities' own sexual harassment reporting policy, as discussed above, *supra* Section B(i)(2), which mandates that supervisors informed of harassment escalate such reports to human resources, Employee Handbook at 31, Lee was "someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Lambert*, 723 F.3d at 866 (internal quotation marks and citation omitted). The Court thus finds, for the same reasons it did for Brownlee above, that there is sufficient evidence in the record for a reasonable jury to find that the employer liability element of Fleming's sexual harassment claim with respect to Washington's conduct is met. *See supra* Section B(i)(2). Whether Catholic Charities was actually on notice is an issue for another day. *See Anderson v. City of Rockford*, 932 F.3d 494, 509 (7th Cir. 2019) ("Of course, the ultimate facts may come out differently at trial and fully absolve Detective Stevens. Our conclusion is limited to observing that the record, as it now stands, allows the plaintiffs to survive summary judgment on this alleged Brady violation.").

---

[11]Catholic Charities attacks this evidence, arguing that Fleming's evidence that she complained to supervisors every other day for three years about Washington "rests solely on Fleming's inadmissible affidavit and contradicts her deposition testimony." Defs.' Fleming Reply at 8. Yet, the Court, as discussed above, has rejected this argument by Defendants in connection with their motion to strike. *See supra* Section A(i)(2).

The Court thus finds, for the same reasons it did for Brownlee above, that there is sufficient evidence in the record for a reasonable jury to find that the employer liability element of Fleming's sexual harassment claim with respect to Washington's conduct is met. *See supra* Section B(i)(2). Because Fleming has marshaled enough evidence in support of her sexual harassment claim involving Washington, Defendants' motion for summary judgment on Count III (Sexual Harassment – Fleming) with respect to Washington's conduct is denied.

### viii.    Count VI: Title VII Retaliation (Fleming)

In Count VI, Fleming claims that Catholic Charities retaliated against her following her complaint of sexual harassment. SAC ¶¶ 193–209. As noted above, Title VII's anti-retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Caskey*, 535 F.3d at 592–93 (citing 42 U.S.C. § 2000e-3(a)). "To establish a . . . retaliation [claim] under Title VII, [Fleming] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet*, 926 F.3d at 896. Catholic Charities argues that Fleming satisfies neither the second nor third elements of the retaliation cause of action—Catholic Charities did not take a materially adverse action against her, and she has not established a causal link between a protected

activity and an adverse employment action.[12] Defs.' Memo. Fleming Mot. Summ. J. at 11–12.

### 1) Adverse Employment Action

The Supreme Court has found that an "adverse employment action" is an action that might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 382–383 (7th Cir. 2020) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 52 (2006)). Challenged actions involving the reassignment of job responsibilities are typically not materially adverse unless there is a "*significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009) (emphasis in original). Fleming argues that she faced increased scrutiny from supervisor Rouse following her complaints during the environmental scan. Rouse (i) told Fleming that she was the reason Washington was fired; (ii) did not invite her to a meeting with the City of Chicago; and (iii) moved her from a private office to a cubicle. Fleming Resp. at 12–13.

Defendants argue that these trivial actions do not constitute adverse employment actions as a matter of law and cannot form the basis of a retaliation claim. Defs.' Memo. Fleming Mot. Summ. J. at 12. The Court agrees. A review of Fleming's complete statement regarding Washington's firing reveals that Rouse

---

[12]The Court denied Catholic Charities' motion to dismiss Fleming's retaliation claim, finding that the retaliation claim was not time-barred. *See Brownlee II*, 2018 WL 1519155, at *3–5. Catholic Charities does not proffer a time-bar argument with respect to Fleming's *retaliation claim* in the instant motion for summary judgment.

agreed that Washington "got himself fired." Pls.' Resp. DSOF ¶ 77. And, not being invited to a meeting and being asked to move workspaces cannot be characterized as materially adverse—causing "a significant or substantial change"—to her job responsibilities. *Robertson*, 949 F.3d at 382–383 (quoting *Stephens*, 569 F.3d at 791).

Without having produced sufficient evidence that she suffered an adverse action, Fleming's retaliation claim cannot proceed to trial. The Court cannot conclude from the record that a reasonable person in Fleming's situation would have been dissuaded from reporting harassment. Defendants' motion for summary judgment with regard to Count VI is granted.

## Conclusion

For the reasons given above, Defendants' motion to strike (R. 135) is granted in part and denied in part. Defendants' motion for summary judgment as to Brownlee's claims (R. 122) is granted in part and denied in part as follows. The Court grants Defendants' motion for summary judgment on Brownlee's Count IV (Title VII Sex Discrimination) and Count V (Title VII Retaliation), and denies Defendants' motion for summary judgment on Brownlee's Count I (Title VII Sexual Harassment), Count VIII (Battery), Count IX (Intentional Infliction of Emotional Distress), and Count X (IGVA).

Defendants' motion for summary judgment as to Fleming's claims (R. 124) is granted in part and denied in part as follows. The Court grants Defendants' motion for summary judgment on Fleming's Count III (Title VII Sexual Harassment) with respect to Vaia Owner's Conduct, Count VI (Title VII Retaliation), and denies

Defendants' motion for summary judgment on Fleming's Count III (Title VII Sexual Harassment) with respect to Washington's conduct

Dated: March 1, 2022

United States District Judge
Franklin U. Valderrama